# EXHIBIT 5

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TOMMY HATTEN, Plaintiff, | ) |
| -vs- | ) No. 1:22-CV-7020 |
| RYDER INTEGRATED LOGISTICS, INC., Defendant. | ) |

The videotaped discovery deposition of. TOMMY HATTEN, taken pursuant to the provisions of the Code of Civil Procedure and the Supreme Court Rules of the State of Illinois pertaining to the taking of depositions for the purpose of discovery, taken before DEANNA L. TUFANO, Certified Shorthand Reporter of the State of Illinois, at 300 South Wacker Drive, Suite 1050, Chicago, Illinois, County of Cook on Tuesday, August 29, 2023 at 9:06 a.m.

Reported for:
MAGNA LEGAL SERVICES
(866) 624-6221
www.magnals.com, by:
Deanna L. Tufano, C.S.R.

A P P E A R A N C E S:

LAW OFFICES OF TODD M. FRIEDMAN.
MR. DAVID B. LEVIN
707 Skokie Boulevard, Suite 600
Northbrook, IL 60062
(224) 218-0882
dlevin@toddflaw.com
on behalf of the Plaintiff;

CONSTANGY BROOKS SMITH & PROPHETE LLP.
MS. ERICA YOUNG
MS ASHLEY L. ORLER
300 South Wacker Drive, Suite 1050
Chicago, IL 60606
(773) 661-4710
eyoung@constangy.com

on behalf of the Defendant;

Reported BY: DEANNA L. TUFANO, CSR
LICENSE NO. 084-003819

Videographer: Slawomir Kojro



I N D E X


WITNESS PAGE
TOMMY HATTEN
Examination by Ms. Young .................. 5
Examination by Mr. Levin .................. 255
Further Examination by Ms. Young .......... 259


E X H I B I T S


Exhibit A ................................ 56
Exhibit B ................................ 58
Exhibit C ................................ 59
Exhibit D ................................ 72
Exhibit E ................................ 91
Exhibit F ................................ 93
Exhibit G ................................ 103
Exhibit H ................................ 107
Exhibit I ................................ 109
Exhibit J ................................ 110
Exhibit K ................................ 126
Exhibit L ................................ 129
Exhibit M ................................ 147
Exhibit N ................................ 150




THE VIDEOGRAPHER: We are now on the record. This begins video one in the deposition of Tommy Hatten in the matter of Tommy Hatten verses Ryder Integrated Logistics, Incorporated, in the United States District Court, Northern District of Illinois, Eastern Division, Case Number 1:22-cv-7020. Today is August 29, 2023. The time is 9:06 a.m.

This deposition is being taken at 300 South Wacker Drive, Chicago, Illinois at the request of Constangy Brooks Smith & Prophete, LLP. The videographer is Slawomir Kojro of Magna Legal Services, and the court reporter is Deanna Tufano of Magna Legal Services.

Counsel identify yourselves for the record.

MR. LEVIN: David Levin, Law Offices of Todd M. Friedman on behalf of Plaintiff, Tommy Hatten.

MS. YOUNG: Erica Young, Constangy Brooks Smith & Prophete on behalf of Ryder Integrated Logistics, Incorporated.

THE VIDEOGRAPHER: Will the court reporter identify herself and swear in the witness.

THE COURT REPORTER: My name is Deanna Tufano. Can you raise your right hand.



(Witness sworn.)

TOMMY HATTEN,

called as a witness herein on behalf of the Defendant having been duly sworn, was examined and testified as follows:

EXAMINATION

MS. YOUNG:
Q Thank you for coming today, Mr. Hatten.
A Okay.
Q Can you please state and spell your name for the record.
A My name is Tommy Hatten. That's T-O-M-M-Y, H-A-T-T-E-N. In.
Q Thank you. Have you ever had your deposition taken before?
A No.
Q Okay. So I just want to go over a couple backgrounds and rules just to make today go a little bit more smooth.
A Okay.
Q So a court reporter will be taking down everything that is said today. As a result, all of your answers must be verbal. For example, like nods of the head, uh-huh, no, she can't get that down.

Page 6

A Gotcha.
Q So just try to use all words today; do you understand?
A Yes.
Q Okay. Also for the benefit of the court reporter, we must talk one at a time and cannot talk over each other. There may be some questions where you can anticipate what I'm going to ask. There may be some answers where I can anticipate what you're going to say. I just ask that you let me finish my question first, and the same, I'll let you finish your first; do you understand?
A Yes.
Q At the conclusion of the deposition, the court reporter will prepare a written transcript that contains all of the questions that I asked today and all of your answers. You will have the opportunity to review the transcript for errors and make appropriate changes. However, if you change any of your answers, I can comment on those changes in the trial of this action; do you understand that?
A Yes.
Q Okay. So I want your best -- oh, one more thing. Your attorney may object to certain questions that I may

Page 7

ask. He can object at any point, but you still like should continue to answer the question?
A Okay.
Q I want your best testimony regarding this lawsuit and obtain a complete understanding of your claims. So if I ask a questions and you don't understand, please let me know and I will repeat it or I will rephrase it in a way that helps you understand a little bit better.
If you answer the question, I will assume that you understood the question; do you understand?
A Yes.
Q Do you agree that if you do not let me know that you do not understand the question, I will assume that you understood the question?
A Yes.
Q So also, if you need a break, that's completely fine, just let me know, we can take a break. I only ask that if there is a question pending, you answer the question pending and then we can take a break after that.
A Okay.
Q Do you understand that?
A Yes.
Q Do you have any questions about your deposition or anything I just went over so far?

Page 8

A No.
Q Okay. So now we're just going to go into your readiness to testify. Do you believe that you have the ability to understand my questions and can give your most accurate and truthful testimony today?
A Yes.
Q Are you taking any drugs, medications, or other substances that could impair your ability to testify truthfully today?
A No.
Q Have you consumed any alcohol within the last eight hours?
A No.
Q Do you suffer from any physical or mental condition that you believe would affect your ability to testify truthfully?
A No.
Q Is there any reason why you're unable to proceed with today's deposition?
A No.
Q Okay. And then you said you never had your deposition before, correct?
A Never.
Q Did you review any documents in preparation for

Page 9

your deposition today?
A No, no.
Q No documents at all?
A No documents.
Q Have you made any notes or writings related to this lawsuit?
A No.
Q So I'm going to ask you some questions about your contact with your attorneys. I don't want you to tell me the substance of what you all talked about or any details of what you all talked about; do you understand that?
A Yes.
Q Okay. Can you tell me whether you spoke with your attorney in preparation for this deposition?
A Yes.
Q How many times?
A Maybe twice.
Q And when did you meet with your attorney?
A I want to say yesterday, I spoke with him yesterday, and I think maybe could have been possibly last Thursday.
Q Okay. How long did the meeting on last Thursday last?
A Maybe a couple seconds, it was just -- it was



MAGNA LEGAL SERVICES

Page 10

just --
Q And don't tell me the substance.
A Yeah, I mean, it was just to go over, I guess to prepare for the deposition, but I guess he must have had some other things going on that we had to reschedule --
Q Okay. So what did you say -- sorry --
A That's what that was just about for Thursday. But yesterday, we actually spoke with the -- concerning the deposition.
Q Okay. So Thursday would you say you spoke for one minutes or less?
A Yes.
Q Okay. And then how long would you say you all met for yesterday?
A Nearly -- nearly an hour or so.
Q Okay. Did anyone else participate in the meeting that was held to prepare for your deposition?
A No.
Q And just to confirm, when you say your attorney, this is David Levin?
A Yes.
Q Okay. Did you speak with anyone other than your attorney about your deposition today?
A No.

Page 11

Q And this is any detail like anything?
A I let me wife know that I had a deposition today, so let me correct that. I did let me wife know that I had to come to Chicago for a deposition concerning my case for Ryder.
Q And what's your wife's name?
A Quanisha, Q-U-A-N-I-S-H-A, Stepney, S-T-E-P-N-E-Y.
Q And when did you speak with her?
A Like yesterday.
Q And what exactly did you all discuss?
A Just the time I had to be here.
Q Anything else?
A No.
Q And you didn't speak with anyone else, correct?
A Correct.
Q Okay. Other than your attorneys -- and you kind of answered this but just want to confirm -- have you spoken with any other family or friends regarding a lawsuit?
A No.
Q What about the allegations against Ryder?
A Nothing.
Q Have you posted anything related to your

Page 12

allegations in this lawsuit on social media, so LinkedIn, Twitter, TikTok, so many, but any of them?
A No, nothing.
Q Okay. Have you discussed this case with any current or former Ryder at any point?
A Yes.
Q Who?
A Angela Simms.
Q Can you spell that for the record?
A A-N-G-E-L-A, S-I-M-M-S.
Q And when did you speak with Ms. Simms?
A Concerning just the whole case itself?
Q Yes.
A I can't really pinpoint. It could have been a couple years ago. Yeah, I mean matter of fact, yes, it could have been a couple years ago just letting her know that I was seeking legal help on my case with Ryder.
MR. LEVIN: I'm sorry to interrupt, but to clarify, when you say case, are you asking him about this specific lawsuit that was filed in federal court, the EEOC proceeding, the allegations before anything was filed.
MS. YOUNG: Yeah, we can break it down.
BY THE WITNESS:
A Okay. Yeah, because I kinda really didn't a

Page 13

clear -- I didn't know what you was talking about. I don't know if you was talking about the whole thing in total or just this. So what are you referring to?
BY MS. YOUNG:
Q Yeah. And just let me know if you're not clear on --
A Okay --
Q -- exactly what --
A Okay --
Q I'm asking so I can clarify --
A Okay. I'm sorry, that was my mistake.
Q No, no problem. So let's -- We can break that down. Let's start with the lawsuit. Did you speak with Angela Simms about this lawsuit filed in federal court?
A No.
Q Okay. And did you speak with Ms. Simms about the EEOC charge that you filed?
A Yes.
Q Okay. When did you speak with her about the EEOC charge?
A I guess around the first time that I actually went to the EEOC, I don't know the exact date that was. But when I first, I guess, filed the claim in with the EEOC.



MAGNA LEGAL SERVICES

Q Okay. Did you speak to her prior to filing the charge of discrimination?
A Yes.
Q When was the first -- and I know it's like years ago, so you may not remember exact dates, but just if you can give me like a time range of when you spoke first with her?
A I would have to say around -- okay. You want to know when I spoke with her concerning the --
Q Your allegations against Ryder.
A Before the -- you said before the actual -- was it before the EEOC complaint you're asking me, that's what you're asking me?
Q Yes.
A Yeah, I had -- okay. Yeah, it had to been around maybe August sometime after my termination.
Q And that was 2021, correct?
A Yes.
Q Okay. And what did talk to Ms. Simms about in August, 2021?
A Just briefly about I'm going to try to seek legal representation to see if I can pursue a case with -- against Ryder.
Q Was anyone else present?



A No.
Q Okay. How did Ms. Simms respond?
A She pretty much responded with pretty much the same thing. That's when I first actually realized that she was pretty much going through the same thing that I was going to with the Ryder situation, so I just let her know that I was seeking representation to try to pursue my claim against them.
Q Okay. And we'll go into detail later about what the Ryder situation is.
A Okay.
Q But when you said she pretty much said the same thing, what is the same thing?
A That she was going to try to seek representation for the same thing also.
Q Okay. Against Ryder?
A Yes.
Q Did you speak with her after you filed your charge of discrimination against Ryder?
A Yes, I'm pretty sure I did. I don't remember exactly what the conversation could have been about, but I spoke with Ms. Simms, okay, I know it was back in -- it had to have been back in August. So I would say, I don't know the time frame, but I do know I spoke with her after



I filed the charge and I could have let her know that I actually did it. I mean, it wasn't -- I can't really remember exactly, but I do --
MR. LEVIN: Don't guess if you're not sure.
THE WITNESS: Okay.
BY MS. YOUNG:
Q And so you said you spoke with her after filing the charge of discrimination?
A Yes.
Q And you said August, just to confirm this, August of 2021?
A Yes.
Q And what was Ms. Simms response?
A Pretty much just she was saying pretty much what I was -- what I was pretty much talking about. We just -- we try to find some legal representation, that's about it.
Q Okay.
A Yeah.
Q Was anyone else present during your conversations with Ms. Simms?
A No.
Q Did you speak with anyone else any other -- I'm sorry, let me clarify.



Did you speak with any other current or former Ryder employees about, let's say, your lawsuit filed in the federal court --
A No --
Q -- court.
Did you speak with any other former or Ryder -- current or former Ryder employee about your charge of discrimination against Ryder?
A No.
Q Do you know the address and contact information of Ms. Simms?
A No.
Q Okay. Anybody else that you discussed this case with other than your attorney that you have not identified already?
A No.
Q Okay. Apart from this lawsuit, have you ever sued anyone before?
A No.
Q Has anyone ever sued you before?
A No.
Q Have you ever been in a courtroom for any purpose other than a traffic ticket?
A No.



MAGNA LEGAL SERVICES

Q Have you ever declared bankruptcy?
A No.
Q Have you ever been arrested?
A Yes.
MR. LEVIN: Objection. You can answer.
BY MS. YOUNG:
Q Have you ever been convicted of a crime?
MR. LEVIN: Objection again to relevance, which I don't necessarily need to make under federal rules, but you can answer?
BY MS. YOUNG:
Q Okay. When were you arrested?
A I don't remember the exact date, it was years ago.
Q Yeah, if you can just give me the year.
A I don't even know the year. That's just -- I don't run into laws and stuff like that, but --
Q Was it more than five years ago?
A Yes.
Q More than five?
A Yes.
Q More than 10?
A It could have been around that 10 mark, somewhere around there.



Q Okay. So it was around 10 years ago?
A Yeah.
Q Okay. Have you ever filed a claim against another employer?
A No.
Q Have you ever claimed that you were retaliated against at any other job?
A No.
Q Have you ever threatened to file a lawsuit?
A No.
Q Have you ever filed any other charges of discrimination with the Equal Employment Opportunity Commission?
A No.
Q Have you ever filed any charges of discrimination with the Illinois Department of Human Rights?
A No.
Q Or any state equivalent Department of Human Rights?
A No.
Q Do you know anyone who has sued or threatened to sue their employer?
A No.
Q Do you know anyone who has ever filed an



administrative charge against their employer?
A Nope.
Q So now I'm going to ask you just general background questions just about you.
A Okay.
Q What is your current home address?
A 906 Lilac Lane, that's L-I-L-A-C, Lane, Joliet, Illinois 60435.
Q And how long have you lived there?
A Nine years.
Q Have you ever gone by any name other than Tommy Hatten?
A No.
Q I know you said you're married to --
A Yes --
Q Ms. Stepney, right
A Yes.
Q Okay. Do you have any children?
A Yes.
Q What are their names?
A Alishea, that's A-L-I-S-H-E-A. Hatten, H-A-T-T-E-N.
Q How old is she?
A 25.



Q Any other children?
A And Tommy, Junior. He's 17.
Q And then what's your date of birth?
A 10/13/1976.
Q Where were you born?
A Benton Harbor, Michigan.
Q I went to U of M.
A Huh?
Q I went to University of Michigan.
A Oh, okay.
Q Have you ever served in the military?
A No.
Q Where did you attend high school?
A Joliet Central.
Q Did you graduate?
A No.
Q Okay. So did you receive any other formal education or training?
A No.
Q Do you presently hold any licenses, and this can include like CDL --
A No --
Q -- or anything such as that?
A No.



MAGNA LEGAL SERVICES

Page 22

Q And then have you attended -- even if you didn't complete it -- you attended any school or any training programs?
A No.
Q And then did you hold any employment before Ryder?
A Yes.
Q What was your -- what company did you work at prior to Ryder?
A Aryzta.
Q Spell that for me.
A A-R-Y-Z-T-A.
Q When did you work there?
A I worked there in 2017 a few months before I started Ryder around that time. So I think I started Ryder -- the same year that I started Ryder is the same year that I was working at that job.
Q Okay. And how long were you working there?
A Nearly about a year-and-a-half possibly.
Q Did you take FMLA at that job?
A No.
Q Were you provided any accommodations at that job?
A No.
Q Did that job require overtime?

Page 23

A Yes.
Q What was the required overtime?
A Working an extra eight-hour day. My shift was eight hours, so they were mandatory an extra was -- I was working Monday thru Friday, so they'll mandatory a Saturday, eight hour Saturday or something.
Q Was that each week you had to work an extra eight hour?
A Not every week.
Q Okay.
A It varies whenever the work need.
Q Okay. So like how often would you say you were required to work that extra eight hours, let's say a month?
A Maybe, maybe oh, let's say twice a month.
Q Okay. How did that employment end?
A Just looked for another job. I ended up working at Ryder. It was a cold storage that I was working at Aryzta so I ended up just getting out of the cold storage to pursue that job there.
Q Okay. So you quit -- you resigned?
A Yes.
Q What about before -- I'm sorry. And what was your position at Aryzta?

Page 24

A Forklift operator.
THE COURT REPORTER: I'm sorry?
THE WITNESS: Forklift operator.
BY MS. YOUNG:
Q Okay. What about before Aryzta, where did you work?
A I can't really remember right off. I'm trying to think. I don't really remember right off, I really don't. I don't want to say a job and that wasn't actually the job because I actually done had a few jobs working warehouses so I can't really just tell you it was -- it was a few years ago, so -- let me see.
Q And if you can't remember the order, that's fine, we can do --
A Okay --
Q -- them out of order if that assists a little bit --
A Okay. Okay. Okay. Well, it would have to be -- what is the name of that place? It's at the tip of my tongue. I'm getting like a brain freeze here, but --
Q And again, it doesn't have -- just any of the warehouses that you worked at let's say within the past 10 years?
A It was -- I'm trying to -- I got it, but I can't

Page 25

think of the name of the company. I really got it but I can't even think of the name of the company right off.
Q Okay. Without the name, do you remember when you could have worked at the company that you can't think of the name of?
A Yeah. It could have been around 2015, somewhere around there-ish. Yeah, 2015, 2016. Always kept employment, so you know, it was -- it's got to be around about 2015, 2016.
Q Okay. And this was a warehouse though?
A Yes.
Q Okay.
A When it come to me, I'll get it to you.
Q Okay. Thank you. Yeah --
A When it come to me, I'll get it to you.
Q Okay, yeah. If you remember later like, oh, I just thought of it, just let me know.
A Yeah.
Q So 2015, 2016. How long did you work at this warehouse?
A Probably over a year.
Q But less than two?
A Yes.
Q Okay. And then what was your position at the



MAGNA LEGAL SERVICES

Page 26

warehouse?
A Forklift operator.
Q Did you take FMLA at that job?
A No.
Q Were you provided an accommodation at that job?
A No.
Q Did that job require overtime?
A Yes.
Q How often?
A Every other week.
Q How much overtime did you have to do?
A I would say just an extra 8-hour shift or whatever. Yeah, just the minimum eight, but if it was 10, it could have been 10. Whatever the shift was, but we going to keep it at 8, so...
Q Okay. And did you work like approximately 40 hours a week there?
A Yes.
Q Before overtime?
A Yes.
Q Okay. And just to be clear, when you said eight-hour shift, did that have to be all in the same day or could you break up the eight hours throughout the week or --

Page 27

A No, eight hours a day.
Q Okay.
A Yeah, Monday thru Friday if that's what their shift was, it always -- nothing split up. Eight hours if it was eight, it was eight through the day.
Q Okay.
A Yeah.
Q And how does that employment end?
A Probably ended up looking for another job. I mean, finding something better.
Q Okay. So did you resign?
A Yes.
Q Okay. Oh, and just for clarification, when I asked did that job require overtime, was this like mandatory if you didn't do overtime, there was a consequence --
A Oh, yeah. Oh, yeah. Oh, yeah. It definitely was some was mandatory, some was volunteer, but it was overtime.
Q Okay.
A So that's the best way I can put that. I can't fin (sic) out what day we had. If it was mandatory, it was mandatory, but they had overtime. So if it was mandatory, it was there. If it was volunteer, it was

Page 28

there also, so...
Q Okay. And did you ever voluntarily work overtime?
A Yes.
Q How often?
A Maybe once a month, yeah.
Q So it would be like once a month you would voluntarily work--
A Yes.
Q -- and once a month it would be mandatory --
A Yes. Exactly, yeah.
No. Hold on. Not once a month I'm volunteering and once a month mandatory, but once a month that I'm doing my volunteer but in that same month, they still may be mandatory.
Q Okay.
A So I can say one week is mandatory, the other next week I may volunteer. The next week -- so four weeks in a month, I'll say twice I volunteer. I mean once I volunteer and I'll say maybe twice or once they may mandatory for that month.
Q Okay. Okay. That makes sense.
A Okay.
Q So it would be two to three times a month --

Page 29

A Yes.
Q -- you would have to do overtime?
A Yes, yes.
Q Got it.
A Even with the volunteer, okay, and the mandatory okay --
Q Okay. That makes sense. Thank you for clarifying.
A All right.
Q Any other positions let's say within the past 10 years that you can think of?
A A position?
Q Or employment you had outside of Ryder.
A It's really going to be hard to go back that far. Yeah, it really is. I done held quite a few warehouse jobs.
Q Okay.
A So, it's -- and it's crazy that I can't even think of no more like what happened. It's like I can't even think of the name of these companies now. I mean, yeah, because I just can't -- when something come through, I get it to you.
Q Okay. But were they mostly warehouse positions?
A Yes. That's all I ever worked was warehouses.



MAGNA LEGAL SERVICES

Q Okay.
A For the last 20 years if that helps.
Q Okay. Do you recall taking FMLA leave at any of the positions?
A No, no need for it.
Q And did most require overtime?
A Yes.
Q Okay. Mr. Hatten, what do you hope to get out of this lawsuit?
MR. LEVIN: Objection. If you want to discuss what he wants out of the lawsuit, we can have a settlement communication that's not off the record, so I'm going to instruct him not to answer that.
MS. ORLER: You're instructing your client not to answer that question, did I hear you right?
MR. LEVIN: What does he hope to get out of the lawsuit? I think that's an inappropriate question --
MS. ORLER: Why --
MR. LEVIN: You want have to a settlement conversation, we'll have a settlement conversation off the record off the camera.
MS. ORLER: That's not a proper objection. Do we need to get the judge on the phone for that?
MR. LEVIN: If you want to answer the question, you



can answer the question. And I'm not trying to be difficult, but as long as you're speaking, do you want to identify yourself, too.
MS. ORLER: I'm happy to, but I also want to say please stop with the speaking objections because then we'll absolutely have to get the judge on the phone.
My name is Ashley Orler. I'm also counsel for Ryder.
BY THE WITNESS:
A Okay. Just some justice. Just justice. Whatever that come by. Justice, whatever form that comes in.
BY MS. YOUNG:
Q Okay. Do you have a form that you're looking for in particular --
A No, just justice.
Q Just justice, okay. Let's jut get deeper into what justice looks like towards the end of the deposition, okay?
A Okay.
Q Okay. What is the basis of your lawsuit?
A What you mean?
Q Why did you bring the lawsuit against Ryder?
A Oh because I felt like my rights were being



violated.
Q What rights do you feel like were violated?
A I guess my civil rights.
Q Okay. What civil right?
A I mean, just, you know, treated equally. You know, not -- you know if -- just to be treated as anybody else would be treated for, you know, this situation here that I'm feeling like that I'm being discriminated against so I mean like -- I mean, repeat that again --
Q Yeah --
A I'm kind of losing my track on where I'm trying to go with it.
Q No problem. I just asked why did you bring a lawsuit --
A Okay.
Q And so you said civil rights were violated, so I was asking you what civil rights do you feel like were violated?
A My rights as, you know, for more as if, you know, I felt like they was taking hours, a lot of my hours that I actually needed to use. I could have actually used those hours for medical reasons and stuff. And I felt like at the rate that they were taking my hours, that wasn't -- even though they may have been able to do it, I



just don't feel like at that rate that they were taking the hours that where I was entitled to have them for medical, I just felt like that was being taken and not taking into consideration what they were actually -- what I actually had the hours to be used for instead of just the mandatory we take the hours, that's it. After this, you're terminated. So I just felt like -- I don't feel like that was -- that was right. That's why I felt like my rights was being violated right there because something that I felt like I needed for hours and my use, I was using it -- they were taking my hours for their use, but wasn't putting in consideration what I may need down the line if you're taking my hours at this type of rate.
Q Okay. And when you say hours, what hours are you referring to?
A My FMLA hours that I worked -- that I had.
Q Okay. So I want to go back to something you said. You say you don't believe you were treated equally. How do you believe you were -- like what did Ryder do where they didn't treat you equally?
A Well, I don't know nobody that actually went through the situation actually like I did besides Ms. Simms who I spoke with, but she was going through the



MAGNA LEGAL SERVICES

same thing. So I can't say that it's, you know, I don't want to -- let me see here. I mean, I don't -- I just -- I mean I may be wrong that was just what I was just feeling at the time and looking up that, you know, if, you know, I don't think that that was right that they were just taking the hours at that type of rate, you know. I don't -- I mean, I don't know how to just keep answering it or, you know, could you rephrase that one more again --

Q Yeah --

A -- maybe I can add a little more to it.

Q Yeah, no problem. So I'm just getting to this point where you said you felt like you weren't treated equally. Was there -- maybe if I ask another question it will help or rephrase it a different way.

Is there anybody you felt like was treated differently than you or more favorably than you?

A I mean, I can't say that for the simple fact I never had been on this type of medical so I can't like for this situation that I'm pursing a lawsuit for, I don't do these all the time, so I don't, you know, can't say that somebody else might have been getting -- so what I'm trying to say is I just felt like -- I mean, I mean, it's complicated. I can't say that they treat nobody



because I don't know about how this go. I just felt like that a lot of my hours was just being taken, and I just, you know, felt like it just wasn't -- I just felt like it wasn't right. Things that I was reading, I was just saying, you know. It just didn't feel right for me, you know. So that's why I was seeking legal representation to see is it right. It just didn't feel right to me that they was taking these hours. And I mean, I don't really know if that answers the question, but I can't really -- I don't know how to really just answer that because I can't say somebody else's more favorable and I don't really know who else is on FMLA. So, you know, I can't just be like hey, you treating me, you taking my hours, but --

BY MS. YOUNG:

Q Is it fair to say you don't have an example of someone who was treated more favorably than you?

A Yes.

MR. LEVIN: Object to form. He answered.

MS. YOUNG: Thank you.

BY MS. YOUNG:

Q So you said that you were reading things?

A Yeah.

Q And you just felt like it wasn't right. What



things did you read?

A The stuff that's on the laws that's governed around the FMLA and stuff like that.

THE COURT REPORTER: I'm sorry, can you repeat that.

THE WITNESS: Laws that's governed around the FMLA.

BY MS. YOUNG:

Q Okay. What laws did you read, do you recall?

A Just the laws --

MR. LEVIN: Objection. Asked and answered. Go ahead.

BY THE WITNESS:

A Just the laws about, you know, the overtime rate. You know, how they would use to be calculate what I supposed to have, and I was just under the impression that the way -- so I was reading things like the way that they -- at the rate that they taking the hours that I may not have been compensated for the right or I felt like they may have owed me more hours if they using these for my work, for a scheduled work week. That's why I'm looking at like if they using a certain amount of hours for my FMLA for the work week, was it actually calculated -- was my actual amount of FMLA hours actually calculated right.

BY MS. YOUNG:



Q Okay. And where did you look these laws up at?

A It's on the internet, I mean, Google.

Q Just random internet searches?

A Yeah.

Q Okay. When did you do these searches?

A I've been doing searches on this since, I'll say, about May of 2021.

Q What prompted you to start searching this?

A The hours that they were taking, you know. When they start taking the hours, human resource gave me a call and said that we gonna be mandatory and then the hours that you don't work we gonna be able to take them from you, so that's when I started looking more toward -- you know, because I'm like okay we working these type of hours. And then they was steady mandatorying (sic) extra hours and days so I'm like let me just see if the amount of hours that they taking and the rate that they take them, do I get compensated after it's used up because they was going so fast. So now it's got me worried like, okay, now my job is on the line because I supposedly had these many hours but they going so fast. So I'm just trying to get a clear understanding because nobody is communicating with me to how everything actually works, so I got to do my own research, my



MAGNA LEGAL SERVICES

homework on my own and you know, so that's why I was looking up stuff of that manner.
Q Okay. You said your job was on the line. What made you think your job was on the line?
A Because if I don't have anymore hours if they -- at the rate that they were taking my hours and even I was speaking with Devin Smith and maybe Adam. I mean, if that's his name, I think, Adam. I think maybe. Yeah, I think his name is Adam --
Q And sorry, just for the record, who are Devin Smith and Adam?
A My human resource. Devin Smith was my human resource.
Q Okay.
A And I think his name is Adam, he's one of the -- he's a Ryder personnel as well.
Q Okay.
A So when I was speaking with them concerning my hours on what happens after they're maxed out or whatever, what happens. So nobody -- everybody just was pretty much saying that that's it. Once when your hours is used up, that's it. So I'm like, okay, with my injury that I have, if my hours is used up and I may need these doctor visits the remaining of this year, my job could be



on the line because I don't have enough attendance points to fill this. So that's pretty much that's it.
Q Okay. And then you said you spoke with Devin Smith and Adam?
A Yeah.
Q When did you speak with Devin?
A I spoke with Devin a few times throughout May, June, all the way up until pretty much my termination. I don't remember exactly the times, but I have spoken with her numerous times concerning --
Q Give me a -- I'm sorry.
A You said give you a what?
Q Yeah, I'm sorry to cut you off. Can you give me a range of how often?
A Pretty much everyday. If not, once a twice a week, yeah, something like that.
Q Okay.
A Concern type, you know, real concern.
Q What was your all's conversations about?
A Just if she understood how the FMLA work and do they feel that -- you know, that they -- do they feel -- because I didn't know -- I'm not going to do that. But do she fell like I would be entitled to more hours if they using them at this type of rate. Like I was just



asking her what happens after my hours is up. So, you know, I never got a clear answer, never just got a clear answer. It was just pretty much like, well, you know, Tommy, we gonna -- I don't even remember what it was, but whatever, it wasn't nothing to make me feel like okay, don't worry about it, let them take these hours and that's it.
Q Okay. So for one to two times a week you spoke with Devin, but you don't feel like she ever gave you a clear answer, correct?
A Correct.
Q Okay. So then what was the like continuous conversations about?
A It didn't continue. I went to the labor board now. I went to the, you know -- I went to the wage and hour division about it. I was still speaking with her along this time. Not actually speaking with her like with a conversation, but just letting her know like, hey Devin, they still gonna try to, you know pretty much -- I didn't know the word accommodation at the time because I didn't know how FMLA works so I couldn't just actually be like, hey, you know but -- like I know what I'm talking about with this matter because when they started taking the hours, it made me do the research now. Like okay, so



now I got to get familiar with certain terms to use so maybe she can understand what I'm coming from why I'm so concerned about my hours.
Q Mr. Hatten, let me just also clarify. When you said it was taking your hours, what are you referring to?
A Using my FMLA hours, yeah --
Q For --
A -- the hours that I had for FMLA, they were using it for the mandatory overtimes.
Q Okay.
A I didn't have no problem with them using it for the regular work week. You know, I wouldn't have probably never looked into it or nothing look that if it wasn't for the mandatory. I was just seeing my hours diminish faster with that, so that's why I just started doing the homework and start communicating a little more to them to try to see if what I'm saying is right or is it something that can be done about the hours. I didn't know how to word it or hey, if this is over, can I get an accommodation because I didn't know about the accommodation thing until I just start doing more and more homework on it.
So it was really, you know, the conversations that I had with them back then was kind of



MAGNA LEGAL SERVICES

broken up, you know. It wasn't really able to get -- it was just mainly like can you all take these hours, that's pretty much what me and Devin conversation and everybody else was were you all able to take my FMLA hours at this type of rate without accommodating me if they were to just get, you know, exhausted.

Q Okay. And you said you started getting concerned about this in May of 2021, correct --

A Yes.

Q -- about exhaustion of FMLA?

A Yes.

Q When -- so you said you didn't know about accommodation until later. When did you learn about what an accommodation is or any of that?

A Until after August --

Q Okay.

A -- after I was terminated.

Q And how did you learn about that?

A I spoke with Ms. Simms around that time.

Q Okay.

A Ms. Simms was telling me that Ryder had let her know about an accommodation because I guess she was concerned about the same thing. She was on FMLA around that time. I didn't really know about her FMLA situation



until I was like later on for her -- I knew about her -- let me just reread (sic).

I knew about what they were doing to her, but I didn't know the extent of, you know, I didn't know the details on what they were actually telling her far more as the -- it was accommodation and all of that. So after I got terminated, that's when she let me know like did they offer you an accommodation or did you try to get accommodation. That's, you know, so it was after I was terminated that I actually understood about the word actually accommodation because I didn't know how FMLA works. I'm just FMLA, FMLA, my hours, my hours. So I don't know -- I didn't know at the time about there was an ADA or some type of other thing going on because my mind was focused on FMLA. So the ADA and all of that, that wasn't -- so I didn't know how to actually ask for something else besides my FMLA hours. I could, you know, I couldn't go to them. I didn't know. They didn't let me know that this was another option that I had if the FMLA had ran out possibly. You know, now that I understand it, they don't have to accommodate me, but I never knew about nothing. So I couldn't just go in and be like hey, I need an accommodation. So every, pretty much, all of the conversations that I had was just



concern and my FMLA hours. If they get exhausted, what happens. I never got a clear answer, so I was just scared.

Q Okay. And then I just want to go back a little bit.

So I know I asked you like what does it mean when you say they take your FMLA hours.

A Yeah.

Q How does FMLA get applied -- like how do they take the FMLA? How does that get applied? Do you submit it? Do they just -- how does it work at Ryder?

MR. LEVIN: Object to form. But if you understand what she's asking, you can answer.

BY MS. YOUNG:

Q If you don't understand, let me know. If you understand, you can answer.

A Okay. Could you repeat that one more time?

Q Yes. How does the process of like FMLA -- you said Ryder took your FMLA.

A Okay.

Q How does that work? Walk me through the process of how that is applied --

A Okay. Okay --

MR. LEVIN: Object to form again, but you can answer.



BY THE WITNESS:

A All right. I don't mean it by taking them, like taking them inappropriately or nothing. It's using the hours for the overtime, you know. so I would -- what I mean by they was taking my hours, we were required to put them in, but, you know -- I mean, I didn't know at the time that we were required. I just, you know, let my supervisor know at the time when I was on FMLA, you know, that I was using FMLA because that's what I was told on the paper. They're like whenever you using the FMLA, let your supervisor know.

Q Okay.

A And I guess it was -- I guess it was a system that they wanted us to put them in that I wasn't aware of. At the time, Devin made me aware of it later on, and me and her both sat down -- I wasn't putting any hours in, I was just using FMLA, just letting my supervisor know I was using FMLA. When Devin came to me and was like -- when the concern started coming up about the hours being used, then she actually looked and was like, wow, you don't have nothing in the system as you using your hours, you know. So me and her sat down and we actually went over the dates that I was using and she put those hours in, you know. It was a paper that we went



MAGNA LEGAL SERVICES

over and she put those hours in -- a lot of -- she put 400-something odd hours up in there like that. So I hadn't put nothing in there from the time I was using it, I was just letting them know that -- letting my supervisor know that I was using FMLA hours and, you know, it was going like that because it was just a lack of communication with this whole situation. Like it was just, just a whole lack of communication. I wasn't clear on a lot of stuff with FMLA. I just knew I was on FMLA works -- or reduced work schedule. If I'm using it, let me supervisor know and that's it.

And then later on, they had told me about an app that they were using that I wasn't signed into at the time to put my own hours in. That's when -- so when me and Devin sat down and she explained to me that I got to download this app and input them from the app, then I start putting them in after me and her sat down and put the hours in ourself, what, you know, what they should be taking, and that's how I was coming up with the overtime hours is being taken. Not taken, taken, but being used for the mandatory overtime.

Q Okay. When did this sit down with Devin occur?
A June, somewhere could possibly.
Q June of 2021?



A Yes.
Q Okay. So in June of 2021, you sat down with Devin and that's when you learned about your FMLA hours being taken?
A Yes.
Q Okay. So then what made you begin researching it in May of 2021 --

You testified earlier that you felt like your job was on the line beginning May 2021.
A Uh-huh.
Q So if you didn't know that your hours were being used at that point, what made you feel like your job was on the line?
A Okay. I knew about the hours that they were taking. I didn't -- you know, I wasn't able to see exactly how much I had left or what I was using because I didn't know about the system to input it in. So, but I was aware that they were taking the hours when Devin called me back in like -- in like January, February, March. It was like March or April or somewhere around there I think when she called me for the overtime, that they going to be taking overtime. So I was just aware that my hours were being used for the mandatory overtime. I didn't know exactly how many or none of this because I



wasn't putting nothing in. So Devin came to me that's, you know, a month or two later and she was like okay -- oh, okay. First, hold on. Before that --
Q Before what?
A Okay. Before -- before Devin -- before I actually spoke with Devin about the hours being used -- I'm trying to think because it was another -- it was another instance that I had to called in and spoke with I think it may have been -- it could have been Adam. I mean because at one point in time somewhere and I don't remember the exact date because I'm getting kind of cluttered up. Everything happened in like a three, four, five month span, so I'm just trying to narrow it down what happened because I know I spoke with --
Q Mr. Hatten, I don't want to cut you off, but just because you said you spoke with Devin one or two times weekly --
A Yeah --
Q -- if you can just clarify when you're telling me like which conversation with Devin you're referring to, that would be helpful.
A Okay.
Q So like if you're referring to the March or April conversation or the June conversation, that would help?



A Okay.
MR. LEVIN: Can we clarify what's the pending question --
THE WITNESS: Yeah, because I'm kind of --
MR. LEVIN: -- just to get back on track.
BY MS. YOUNG:
Q Yeah. So right now I'm asking about March or April --
A Oh, yeah, about the hours --
Q -- you spoke with Devin. And I was asking what did you all speak about in the March or April conversation where you said Devin let you know about your FMLA hours were taken --
A Okay. Yeah, yeah, yeah, yeah, yeah. Okay. so before the sit down, before the sit down and everything with Devin --
Q The sit down in June?
A The sit down in June for the hours to be put in, okay. Before that, I was aware of the hours being taken because she called me and let me know before that before we actually sat down and did the hours and she let me know -- she let me know that the hours were going to be taken. I was concerned at that point. I didn't know exactly how many hours I was being used, but that's, you



MAGNA LEGAL SERVICES

know, I was concerned at that point on okay if, if, if these hours were being used for my overtime, how much -- how much -- I was concerned about how many hours I had left first before I even -- so I didn't know because I couldn't enter them into the system. So before the -- listen, hold on because I'm just all over the place right now. Let me just take a second. I don't need a break. Let me just - -
Q Okay. Drink some water, that's fine.
A Because like I said, I'm trying to get it together because I definitely spoke with her before we actually put the hours in because no hours was in and I started using them. That's how when the hours got put in, I had end up having 400 and something because all of that time went by. But yeah, I was concerned about the hours and I knew about the hours that they were taking. I just didn't know how many. So I called -- may have Adam in all of this, and I was -- at that time, no, it might have been Carol Bates because she was the one that answered the phone, okay --
Q And can you tell me who Carol Bates is?
A Carol Bates is another one of the Ryder personnels for the absentee.
Q Okay.



A Okay.
Q When did you speak with Carol?
A It had to have been may possibly.
Q Okay.
A Hold on. January, February, March, had to have been about March or April, somewhere around there.
Q Okay. And Mr. Hatten, just because I don't want us to get sidetracked or confused --
A Yeah --
Q -- so now we're going from your conversation with Devin to your conversation with Carol, correct --
A Correct --
Q -- that's what you're telling me about?
A Correct. To get up to the point of how I knew my hours -- where my hours exactly were.
Q Got it. Got it. Okay --
A That's why I'm going back in time -- I'm trying to stay on the same page, but I'm just trying to go back I knew that the hours were being used before paperwork even got entered.
Q Okay.
A So I'm just trying to go back there on what all took place that lead up to me and Devin sitting down putting hours in.



Q Okay.
A For me to know my hours were being taken.
Q Okay. Thank you --
A Okay.
Q Thank you for clarifying.
A Okay.
Q Okay.
A So I can let you know -- I'm on the same page, I'm just all over, but I definitely understand what you were asking. So, yeah - so I spoke with maybe Carol -- everything happened before me and Devin sat down in June.
Q Okay.
A Okay. So all of this I can't put a date on. Like I say everything was just like a three, four month thing right there, so I can't like -- but before me and Devin sat down, I called Carol Bates and was asking about the hours that was being used and how many had I had left and this. So she said that I still had like maybe 3 or 400-hundred-some hours left to be used. I knew that wasn't right because I explained. I told her then, I said, well hold on, something is not right because I had been using FMLA since March. That's when they first let me use it. Even though I was on FMLA in February and was actually trying to use days, but that's something else.



I'll tell you about that. But I got on FMLA in February, so in -- I called Carol Bates and was letting her know that the number that she had, I don't think that that was accurate because I had been using FMLA hours. She said, okay, you haven't been -- you not in the system, your hours is not in the system, it's looking like this. So that's when Devin got involved. That's when I don't know if they called Devin around this time or I spoke with Devin. But whatever happened, it was -- that led up to me knowing exactly what was going on with the hours. I knew they were being used. I didn't know how much. I called Carol Bates, she was like, okay, you got 400. I'm like, no, that's not right. I've been using FMLA since this time. So it was -- so she was like, well, yeah, you got to have them put in the system. Me and Devin sat down, went over the days that I were here, days that I was using FMLA hours, and that's when I come up with the conclusion on, okay, you all taking my hours for this. That's how I realized the hours were being used and how many and what type of rate they were being used at.
Q Okay. And this was in June 2021?
A Yes.
Q Okay. So then I want to go back to when Carol -- you spoke to Carol in March or April and you asked about



MAGNA LEGAL SERVICES

your hours?
A Yeah.
Q And then at some point, you said you spoke to Devin in March or April?
A I spoke with Adam as well, somewhere in between there.
Q Okay.
A And when I spoke with Adam, my conversation with Adam was can I be accommodated after these hours were -- because I was still concerned about the hours. I mean, hold on. Let me say --
Q Okay.
A It wasn't an accommodation I was asking. So let me clear that out because I didn't know about the accommodation until afterwards. But what I was asking him was -- the reason why I'm using accommodation because I know now. But I wasn't wording it as accommodation, but I'm basically was crying out for help, accommodation. Let me know another word I can use for help. So when I was talking to Devin -- I mean, Adam, he was like man, I understand it. I know the job is working a lot of overtime. I hate that you have to be in it, but, you know, unfortunately we're able to take these hours. They send me -- he looked into it. He was like I'll look into



it and all of this, and he sent me a, paper a letter or something like that saying that they were just able to use those hours. I don't know if they gave you all that paper or not. It wasn't nothing to be hidden or nothing like that, but I don't think I have it right now. I may have it, but, yeah.
And I'm sorry, David, if I didn't add that in for you there.
MR. LEVIN: It's okay. Let's just be clear --
THE WITNESS: Okay --
MR. LEVIN: -- that the question she's asking and that you're answering so that --
THE WITNESS: Okay --
MR. LEVIN: -- we have a clear record.
A Okay.
BY MS. YOUNG:
Q Okay.
A So it was a paper from -- I think it came from -- I'm not for sure, but it could have been from Abby, which I never ever spoke with, but I seen it might have had her name on it that said that we were able to unfortunately, we were able to use the hours --
MR. LEVIN: Just wait for a question --
THE WITNESS: Okay. Okay --



MR. LEVIN: -- to answer. It will make this go much more smoothly that way for everybody --
THE WITNESS: Okay.
BY MS. YOUNG:
Q I will now show you a document which the reporter will mark as Defendant's Exhibit A.
(Exhibit A was marked for identification.)
BY MS. YOUNG:
Q Please review this exhibit and when you have completed it, let me know.
A Okay, yes.
Q Is this the letter that you're referring to?
A Yes, yes, yes.
Q Okay. So on June 18th, Adam James sent you a letter?
A Yes.
Q Letting you on June 14th, they commenced to examine your FMLA entitlement. They investigated and determined you're entitled to 480 rolling hours per rolling 12-month period?
A Yes.
Q Okay. Just wanted to confirm that this was the letter you read.



A Yeah.
Q Okay. So you spoke to Devin, I'm trying to get this in chronological order as best as we can --
A Okay. Yeah, I know I'm kind of -- yeah, okay.
Q Just because you referred to a lot of conversations, and that's fine. This is helpful --
A Yeah --
Q I just want to make sure I have it accurate --
A Yeah. I am just trying to make sure I get the time frame. Like you said this in May and this -- five months --
MR. LEVIN: Just wait for the question, please.
BY MS. YOUNG:
Q Okay. So in March and April, you called Devin to -- because you were concerned about your hours, correct?
A (Indicating.)
Q And then you began being concerned in May. Up until Devin told you how to enter hours, how were you entering FMLA hours?
A I wasn't.
Q How were you taking FMLA leave?
A I just -- I let my supervisor know that I'm using the overtime hours. So if I'm leaving at -- if I'm leaving at a certain length of time in the remaining of

the shift, that's what's hours is being used.
Q Okay. And who was supervisor at the time?
A Jorge Nicholsen (sic) I think it was, yeah. Derrick was also my supervisor at one point in time in there, too. They was switching within months down the line. So Derrick was my supervisor and then George, both of them was there. I let both of them know, so...
Q Okay. So we're going to back up now a little bit, okay?
A Okay.
Q Okay. So I will show you a document which the reporter will mark as Defendant's Exhibit B.
(Exhibit B was marked for identification.)
BY MS. YOUNG:
Q Please review the document and when you're done with it let me know. Sorry. My pen is not writing on this portion of the paper.
A Okay. Yeah, I'm familiar with this.
Q Do you recognize this document?
A Yes.
Q Okay. Did you read this complaint? This is your amended complaint. Did you read it before it was filed?
A Yes.



Q How many times?
A Couple times, two.
Q Two?
A Yeah.
Q When, do you remember?
A No.
Q Was it like a week before it was filed, maybe a month, just the time frame?
A That I seen this?
Q Yes.
A I mean, before -- definitely before it was actually filed I seen it, yeah.
Q Okay. Is there anything inaccurate in your complaint to your knowledge?
A No.
Q Are there any claims that you believe you have against Ryder that you believe are not listed in this complaint?
A No.
Q I will now show you a document which the reporter will mark as Defendant's Exhibit C.
(Exhibit C was marked for identification.)
MR. LEVIN: Are all the copies only two pages? This



is not the full document.
MS. YOUNG: Oh, yeah. It's only two pages, I'm sorry about that. I really am only going to discuss Number 4 though -- I'm sorry Number A, Letter A.
MR. LEVIN: Well, it's not even --
MS. ORLER: Do you want to take a break, we'll print off the whole document?
MS. YOUNG: Yeah, we can print it out.
MR. LEVIN: I'm not trying to be difficult. She's going to ask him about Letter A and it's cutoff so the list of witnesses is cutoff.
MS. ORLER: Okay. We'll take a break.
MS. YOUNG: Yeah, let's take a break.
THE WITNESS: No problem.
THE VIDEOGRAPHER: Off the record, 10:15.
(recess.)
THE VIDEOGRAPHER: On the record 10:31.
BY MS. YOUNG:
Q Okay. So this is Exhibit C. Everyone has an accurate copy.
So again, Mr. Hatten, if you can just review and let me know when you're done reviewing it.
A Okay. I'm ready.
Q Do you recognize this document?



A Yes.
Q Okay. Is there anything inaccurate about this document?
A No.
Q So let's review the individuals, and this is going to be the response to A, individuals likely to have discoverable information. Can you please take a look at all of the individuals listed under A, please?
A Listed under A what?
Q The --
A Oh, yeah, okay.
Q Yeah. I believe --
A So Quanisha and Schubert, that's what you're referring to?
Q Yeah. Numbers 1 thru 7 all of the individuals listed for 1 thru 7.
A Yes.
Q Okay. As you sit here today, are there any persons you believe have knowledge or information concerning any facts relevant to this case who are not listed here?
A Yes.
Q Who?
A The Labor Board, the Wage and Hour Division.



MAGNA LEGAL SERVICES

Q Okay. And who is that?
A The investigator that was doing that, her name was Edith.
Q Okay. Edith what?
A I don't know her last name.
Q But Edith?
A Yeah.
Q And who is Edith again?
A She was an investigator.
Q For?
A For the Wage and Hour Division. I mean, she was investigating to make sure that my hours and stuff were being done the right way, I guess.
Q Okay. Anybody else that has knowledge of the claims in your case that are not listed --
A No --
Q -- in 1 thru 7 --
A That's the only one.
Q Okay. So now let's go take it all the way back to when you first began working for Ryder.
A Okay.
Q When did you first start working for Ryder?
A February of 20 -- I think it was 2018. February of 2018, that's the correct date. It may have been



something else because at the time I might have didn't, but the accurate date is February of 2018.
Q Okay. And what role were you first hired for?
A Forklift operator.
Q And when you say that it might be listed as something else, can you explain why it might be listed as something else?
A Oh, because I couldn't -- at the time when I think I was trying to pursue legal representation, I might have said another date and then just not exact the right date, but might have been the right year. So I mean, I might have just gave June or -- I'm thinking that I seen something that might have had -- I'm not really for sure if I gave the exact date, but I just want to make it clear now, that's the exact date of my hire.
Q February 2018?
A February of 2018.
Q Okay. And then forklift operator?
A Yes.
Q Great. Did you have to interview for the position?
A Yes.
Q Who did you interview with?
A Irisha.



Q Can you spell that?
A I-R-I-S-H-A.
Q Do you know her last name?
A No.
Q Okay. And then was that your only interview or were there multiple interviews?
A That was just it.
Q Okay. Do you know who made the decision to hire you?
A Most likely her.
Q Okay. Who did you report to?
A I'm trying to think who was my supervisor back then. Who was my supervisor back then. I can't remember who my supervisor was back then.
Q Okay.
A I just know -- yeah, I don't know who was my supervisor at the beginning of my start date.
Q So did you have multiple supervisors throughout your employment with Ryder?
A Yeah, yeah.
Q Okay. So you don't remember who it was in the beginning?
A Zach, Zach Spears (phonetic) he ended up being the supervisor for me for pretty much the remaining --



except he left in 2021.
Q Okay --
A Matter of fact, he left in 2020, the end of 2020, and then that's when Jorge Nicholsen came in.
Q Okay. Do you know when you started reporting to Zach?
A Had to have been later on that year.
Q Later --
A Later at probably the end of that year, middle, end of that year.
Q So late 2018 thru late 2020?
A Yeah.
Q Okay. And then beginning late 2020, you started reporting to Jorge?
A Yes.
Q Okay.
A Hold on, I reported to Derrick first and then Jorge came. So after Zach Derrick Boteng ended up around the beginning of 2021, yeah, somewhere around there, the end of 2020. Yeah, the end of 2020 beginning of 2021 Derrick was my supervisor for maybe a couple months and then it switched over to Jorge for the remaining until my termination.
Q So let's say mid 2021 --



MAGNA Legal Services

Page 66

A Yes, was Derrick.
Q Okay.
A And then the end of 2020 to 2021 all the way up to my termination was Jorge.
Q And you might have said this, I apologize, what is Jorge's last name?
A Nicholsen.
Q Did you have any direct reports?
A No.
Q What were your roles and responsibilities in the forklift -- did you -- just to clarify, did you hold the forklift operator position the entire time?
A Yes.
Q Okay. What were some of your responsibilities?
A I used to load and unload trucks.
Q Anything else?
A No.
Q Just load and unload trucks?
A Yeah.
Q Okay. And then you said you haven't held any other position at Ryder?
A (inaudible)
THE COURT REPORTER: I'm sorry?
THE WITNESS: No.

Page 67

BY MS. YOUNG:
Q Okay. So in your lawsuit -- you mentioned earlier that you had an injury, but in your lawsuit, you allege a disability. What disability do you have or did you have, do, did?
A I do have --
MR. LEVIN: Objection. Calls for legal conclusion, but you can answer.
BY THE WITNESS:
A My disability, what do you want to know what my disability is?
BY MS. YOUNG:
Q What was the -- like Why did you receive FMLA leave?
A For -- I had a retinal occlusion, whatever, in my right eye. I couldn't see, lost vision in my right eye.
Q Okay. And you said your right eye?
A Yes.
Q When did this happen?
A February of 2021.
Q Can we turn to paragraph -- so Defendant's Exhibit B is your Amended Complaint Paragraph 20.
MR. LEVIN: I'm sorry, what number did you say?
MS. YOUNG. Paragraph 20.

Page 68

BY MS. YOUNG:
Q Do you see that?
A Yes.
Q Okay. It says Plaintiff's condition substantially limits multiple life activities, including but not limited to Plaintiff's vision.
Can you explain how the retinal eye stroke limited your life activities?
A Yes. I mean, I have trouble reading, you know, seeing -- can't see nothing on, you know, I got to be real close up to see things. I got to have nothing on my -- no peripheral vision at all.
Q On your right eye?
A Yes.
Q Okay.
A So it's just mainly reading. Yeah, it's just...
Q Any other way it limited your life activities?
A Driving, you know. I can drive, but I mean just seeing certain signs sometime, I would be affected by that.
Q And is this all the time when you're driving?
A Yes, yeah.
Q Okay. Do you still drive now?
A Yes.

Page 69

Q Do you drive less now than before the eye stroke?
A The same.
Q The same amount?
A Yeah.
Q Okay. Any other way it changed or limited your life activities?
A No, just that.
Q To your knowledge, who at Ryder was aware of the eye stroke?
A Just Devin.
Q Okay. Anybody else.
A Not from me. If they did, it wasn't from me. So if they know about it, it wasn't from me so I'm not really for sure.
Q But you know for a fact Devin --
A Devin, yes.
Q Did anybody else know about your eye stroke to your knowledge at Ryder?
A No.
Q Okay. When did Devin first learn about your eye stroke?
A In February when it first happened.
Q How did she learn about it?
A I called her on the phone.



MAGNA LEGAL SERVICES

Page 70

Q When did you call Devin?
A Because I was off work so I had to let her know that I was in the hospital.
Q So was Devin like your point of contact --
A Yes --
Q -- kind of at Ryder?
A Yes.
Q Okay. And then what exactly did you tell her?
A That I was in the hospital. I lost vision in my right eye, and she -- that's when she constructed (sic) me to see if I can get on FMLA.
Q So Devin told you --
A Yes.
Q -- to apply for FMLA?
Did anybody else that you haven't told me about?
A No.
Q Okay. So you were in the hospital, you called Devin, let her know, hey, I'm in the hospital, this is going on. She told you to apply for FMLA. Did you apply for FMLA after that?
A Yes.
Q And when did you apply?
A A week later when I was able to about a week

Page 71

later.
Q Do you know the exact date that you had the eye stroke?
A February 2nd.
Q 2021?
A Yes, sorry.
Q No, you're fine. Okay so you applied for FMLA for the eye stroke one week later. Were you approved?
A Yes.
Q And if you don't know these words, just let me know. But do you know what intermittent verse continuous is?
A Yes.
Q Okay. Were your approved for intermittent or continuous FMLA?
A Intermittent.
Q And when was your leave scheduled to begin?
A I was under the -- I was under the impression that -- you say what again?
Q When was your leave scheduled to begin? So when could you first start taking FMLA hours?
A To my knowledge, it was -- I started taking it March 1st.
Q 2021?

Page 72

A Yes.
Q And when was your leave scheduled to end?
A 2022. I guess, February or March of 2022.
Q How much time were you approved to take -- like how many FMLA hours were you approved for?
A 480.
Q Was there any stipulations or like did they give you any guidelines about how you can use the leave?
A No.
Q Okay. So I am going to show you a document which I will mark as Defendant's Exhibit D.
(Exhibit D was marked for identification.)
BY MS. YOUNG:
Q Just take a minute to review the document and when you're done reviewing, let me know.
A Okay.
Q Was this the letter that you received from Ryder regarding your FMLA?
A Yes.
Q Okay. So here it says in that second paragraph, the longer one, for intermittent designation, you have been approved treatment two times a month, flares two to three times a week lasting 12 to 24 hours; does that seem

Page 73

accurate --
A Yes.
Q -- for what you were approved for?
A Yes.
Q Okay. So in your complaint, you state that you needed time off for flare-ups. Can you explain to me like what happens during a flare-up? What is a flare-up for you?
A My eye get like real pusky (sic) and blurry like just out of nowhere. You know, it just it start -- it will just start flaring up and like little pus stuff start coming up out of it like, you know. It happens every once in awhile and that's what I was considered a flare-up.
Q All right. So like you can't predict or like is it usually something that happens before?
A No --.
MR. LEVIN: Object to form. If you understand that, you can answer.
BY THE WITNESS:
A No, I don't -- you know, I just kind of feel it coming on. It's like my eye just starts getting like runny, like a runny feeling.
BY MS. YOUNG:



MAGNA LEGAL SERVICES

Page 74

Q Okay. So your eye gets runny and you just can feel it coming on and it starts running?
A Yeah, and it starts blurring up on me.
Q Okay. And when it blurs, can you see out of it at all?
A Not as good.
Q Okay.
A It's pretty much I feel like if you ever had your eye dilated, it like kind of do something to you. You have to have glasses or something to...
Q Okay. And on average, how often does this happen, this flare-up?
A In the beginning, it was happening like I may have it maybe every other day or something, yeah, something like that, like yeah.
Q What's the beginning for you?
A What you mean?
Q What is the beginning, you say in the beginning every other day?
A The beginning is what I mean by at the time of my injury from February to my termination, it was, it was, it was -- I didn't know what was going on. So that's what -- I couldn't understand the injury at all, so that's what I guess was considered the flare-up there.

Page 75

Q Okay. So from February thru August, your eye would --
A Yeah, it was badder (sic) in the beginning, but now that I guess that it's sinking in, it's not as worse as it used to be. I can kind of cope with it a little bit better now.
Q Okay. When did it start getting better?
A Around maybe the end of last year, yeah, 2022. Yeah, it was somewhere around there. It wasn't as -- the runniness and blurriness ain't as severe as it was in the beginning.
Q Okay. Did it usually happen at a specific time of day or could it happen at any point?
A Anytime.
Q When that happen -- when you have a flare-up, what do you do?
A Sit down.
Q Okay. Is there any medication you have to take for it?
A No.
Q Okay. You just have to sit down?
A Yeah.
Q And does that usually help?
A Yes.

Page 76

Q Okay. How long do you -- like how long does it last for?
A It varies. It can be -- I mean, I may fall asleep. It does that sometime. I may just sit down and just by doing what it's doing it just like drain me out, just make my tire, you know what I'm saying. So it can be -- it can last for awhile.
Q What's the longest it's lasted between February and August?
A I'd say maybe three, four hours.
Q And is that three, four hours of it consistently being that runny pus that --
A That the pus may stop, but it's still blurry.
Q For like three to four -- or max three to four hours?
A Yeah.
Q What's the shortest amount --
A That's --
Q I'm sorry.
A That's the minimal is three to four hours.
Q Oh, that's the least --
A Yeah, that's the least. Because when it started -- in the beginning when it started, I don't know if I was maybe, I don't know, but three to four hours

Page 77

minimum.
Q What's the max?
A Ooh, the max could be up to eight hours actually.
Q Of blurry vision?
A Yeah.
Q Okay. And I know you were seeing a medical provider for it. Like was there anything they advised you to do when you have it, when you have a flare-up?
A No, at that -- no, not at -- no, they didn't.
Q So it was just sit down?
A The one -- yeah, no. Just sit down, relax.
Q Okay. If you had a flare-up at work, could you still perform your job duties?
A No.
Q And why not?
A Because of my vision was blurry. I drive a forklift so...
Q You can crash or something?
A Yeah.
Q Okay.
A Tear something up.
Q So usually -- well have you ever had a flare-up while at work?
A Yes.



MAGNA
LEGAL SERVICES

Q And when that did happen, what was your next step?
A I would have asked to use an intermittent leave and go home.
Q So between March and August, like how often did you have flare-ups?
A Maybe twice a week. Maybe twice a week minimum.
Q And what about August to December, how much flare-ups would you have --
A Still flare-ups still the same, nothing ever changed.
MR. LEVIN: Just for clarity, all of these months we're taking about 2021?
MS. YOUNG: Yeah, sorry --
THE WITNESS: Yes.
BY MS. YOUNG:
Q And then what about March to August, 2022?
A Still I start noticing getting a little bit better towards like the middle end of last year, 2022.
Q So between March and August around, and you don't have to give me an exact number, but approximately how many flare-ups would you have a week?
MS. ORLER: Erica, can you use the year?
MS. YOUNG: Sorry. March and August 2022.



BY THE WITNESS:
A Okay. March and August, how many flare-ups between then?
BY MS. YOUNG:
Q Yes.
A Pretty much probably I'm going to say once a week now, yeah, that I notice, yeah.
Q And between August and December 2022?
A Still once a week.
Q And let's just go from January 2023 until now, how often do you have flare-ups?
A Still once a week.
Q And are the flare-ups the same symptoms?
A It's the same symptoms, yes.
Q Okay. And do the flare-ups still happen at any time --
A Any, yeah, they can happen.
Q Do you find is there a pattern of when they happen more often than not?
A When I wake up in the morning or getting ready to go to bed, I notice that it's -- the vision is something going on with it. Early in the morning I wake up and pretty much late at night is when I notice kind of a pattern like it could happen around this time, but it can



be in the middle of the day and it can still flare-up. But I just notice in the mornings is difficult.
Q Okay.
A I kind of was having one today when I got here.
Q Are you okay now?
A Yeah, I'm good.
Q Okay.
A Yeah.
Q Okay. And then you weren't able to complete any task when you have a flare-up, correct?
A Correct.
MR. LEVIN: Object to form.
BY MS. YOUNG:
Q Okay. What was your work schedule between February 2021 and August 2021?
A Sunday thru Wednesday 6:00 to 6:00, that was the schedule work. But I work 6:00 to 5:00, that's what my -- the schedule was 6:00 to 6:00, but it's -- yeah, I work 6:00 to 5:00. That was for another related issue.
Q Okay. Why did you work 6:00 to 5:00?
A Okay. I was working 6:00 to 5:00 because, I don't know if you seen that, but 6:00 to 5:00 was because at the time of when I got hired, I wasn't -- I was under the impression that we were working 6:00 to 4:30. So I



brought this up to human resource at the time who was Irisha and she just -- she stated that since I was on my 90-day trial, I had just began that I can continue to work the 6:00 to 4:30. Then -- yeah.
Then later on they -- yeah, that was it. Yeah, that's it. But that's the reason why I was actually because if you actually seen my work schedule, I don't know if you was looking at it or not so I just wanted to clarify that because it never was going to show 6:00 time punches out.
Q Okay.
A So you will see a 5:00 before you're going to see a 6. But the work schedule is 6:00 to 6:00, that's what we work.
Q Okay. And then you said so when you was first hired, you thought that you were going to work 6:00 to 4:30 a.m. --
A 6:00 to 4:30 because that was -- that's what I supposedly have been hired for those hours. But when I got there, they were like mandatorying 6:00 to 6:00. Nobody here really works until, 4:30, it's too busy.
Q Who told you that you were going to work 6:00 to 4:30?
A Irisha. I mean, yeah -- 6:00 -- yeah. Irisha



MAGNA LEGAL SERVICES

Page 82

let me know at the beginning. She let me know that the schedule was 6:00 to 4:30, but it may be some days that you may stay to 6:00. So when I got hired and started working, the supervisor or somebody whoever was at that particular time ended up letting me know that we work 6:00 to 6:00 around here.
Q And who was the sup -- was that --
A I'm trying to think of who could have told me that. Who was my supervisor.
Q Earlier you testified, you gave me three names --
A Yeah, Zach --
Q Zach Spears, Derrick Boteng --
A -- Derrick and Jorge.
Q So who was --
A Zach -- It would have had to have been maybe -- it wasn't him, I don't know, so I don't want to just -- but Zach was my supervisor majority of the time. I don't remember exactly who my soup supervisor was when I started, I can't remember.
Q Okay. But when were you notified that you had to work mandatory overtime.
A The first day.
Q Did you raise any concerns about that?
A Yes.

Page 83

Q With who?
A Irisha.
Q And what did you tell Irisha?
A That I couldn't work the 6:00 to 6:00 schedule.
Q Why not?
A Because I care for my mother early in the morning when I got off, so around about 5:00-ish, you know, I had -- my mother had got sick and was in the hospital and stuff like that.
Q And what did Irisha say?
A She said I was on a 90-day trial, that it was okay if I left at 4:30.
Q And so that's when you started leaving at 5?
A Okay. So I can elaborate on it just a little bit real quick.
Q Yes, please.
A So after the 90 days -- so during this time when I was working the 6:00 to 4:30, a month later the manager came in, and I forgot his name at the time. He explained that we were going to change the schedules, and they changed the schedule again to -- he was like we gonna change the schedule so that you getting off at 5 would help. It wasn't because of me, but he was like, we going to be doing the work schedule change and it might help

Page 84

you out with the hours that you need to work. So we went instead of the 6 to -- instead of being 6:00 to 4:30, which like I said 6:00 to 6:00 just the was mandatory, the actual 6:00 to 4:30. But like I said, when I got in, nobody said we ever worked to 4:30 so that's why I ended up being 6:00 to 6:00 -- scheduled 6:00 to 4:30. Actually when they changed it again, the hours ended up being 5:00 to 3:30.
Q When did they change the schedule?
A A month after I started so it had to have been February, March, around April-ish.
Q So April 2018 --
A In April 2018, I was working Monday, Tuesday, off Wednesday, Thursday and Friday 6:00 to 5:00. Because instead of the overtime like how they mandatoried the overtime from let's say 6:00 to 4:30, but it was 6:00 to 6:00. So since they changed -- went from 5:00 to 4:30 -- was it 5:00 to 4:30 or 5:00 to 5:30, one of them, however it went. But they ended up mandatorying the hour and a half. So made us work for 5:00 to 5:00, maybe 4:30. Yeah, 5:00 to 4:30. It's confusing, and I know but I'm just trying to give you everything that happened in that form. I didn't, you know, that's -- I mean, I maybe doing to much.

Page 85

Q No. I just want to make sure I'm following.
A Yeah.
Q So you started working in February of 2018, correct?
A Yes.
Q And you thought your schedule was going to be --
A 6:00 to 4:30.
Q Okay. And you were notified on the first day that there was going to be mandatory overtime?
A Yes. Brought it back to Irisha, she said it was okay for my first 90 days --
Q To do 6:00 to 4:30 --
A To do 6:00 to 4:30. Then the general manager at the time, I forgot his name, he came and was like we're going to switch the schedule anyway in about a month that might work for you. But since you're on the 90 days, just do your 4:30, and you know, if we do a shift change, it's gonna be, you know, it may work out for you. So that worked out. So I ended up that's -- I ended up working Monday, Tuesday, off Wednesday, Thursday, Friday, and off Saturday and Sunday.
Q 6:00 to 5:00?
A 6:00 -- 5:00 -- no, it was 5:00 to 4:30.
Q 5:00 to 4:30.



MAGNA LEGAL SERVICES

A Yeah.
Q Okay. And did that change at any point?
A At that changed seven months later really, somewhere around there and then it's -- yeah --
Q October 2018?
A Yeah.
Q Okay.
A So then we went back to Sunday thru Wednesday 6:00 to 6:00.
Q Okay. And did it stay that way?
A Yes, it stayed that way all the way up until 2021 sometime they changed it again around in there somewhere.
Q And in 2021, what did it change to?
A It changed to still was the same work days, Sunday thru Wednesday. The hours changed from 6:00 to 4:30 Sunday thru Wednesday. And then on -- Sunday thru Wednesday -- yeah, Sunday thru Tuesday, and on Wednesday we work 6-hour day or a 12-hour day. It would depend. We had to switch weeks. One week if you worked the 6-hour day, the next week you worked the 12-hour day.
Q Okay. So every other week?
A Yeah. Every other week, yeah. It's a lot of stuff was going on in there. I am just trying to make sure you all get everything how it actually was.



Q Okay. No that's helpful. And then did it stay that way thru the rest of 2021 -- well, until August of 2021?
A Yes.
Q Okay. Between February 2021 and August 2021, were you able to work the requirement of overtime hours?
A Yes.
Q So around how many hours per week did you work between February 2021 and August 2021?
A How many hours did I work?
Q Per week.
A 30 -- I'm going to say about 36 hours.
Q Okay. And was that consistent during -- between February and August of 2021?
A Yes.
Q Are you aware of any employees at your location that were not required to work overtime?
A No, everybody had to.
Q Okay. It didn't matter?
A It didn't matter, yeah.
Q Okay. So I know you took FMLA leave after February 2021 when you had your eye stroke. Did you take any FMLA leave prior to that?
A Prior to what, February?



Q February of 2021.
A Oh, no, no, no. I wasn't on FMLA then.
Q Okay.
A Yeah.
Q Okay. So the only FMLA leave you took during your employment with Ryder was in this February 2021 time?
A Yes.
Q Okay. Did you apply for FMLA leave any other time?
A No.
Q Okay. So you have your eye stroke in February, 2021, you request FMLA leave. I think you said you were approved for a year, approximately a year. Is that when you returned -- is that was when you were expected to be able to just return to normal duties everything?
A Yeah, I guess so.
Q So March 2022?
A Yes.
Q Okay.
A No, it was actually February of 2022, yeah.
Q No. You expected to return -- oh, February 2022 is when you expected to return to normal duties?
A I mean, that was the date that they was that the



FMLA suppose to end.
Q Okay.
A Yeah.
Q Okay. And you kind of alluded to this earlier, but I just want to confirm. Did you request any accommodations for your eye stroke?
MR. LEVIN: Objection. Calls for legal conclusion, but you can answer.
BY THE WITNESS:
A Okay.
BY MS. YOUNG:
Q Did you request any like alterations in your job duties or schedule or anything outside of FMLA leave?
A No.
Q So after you had the eye stroke, the only thing you requested was FMLA leave?
A Yes.
Q Okay. Did you speak with anybody about anything other than -- well, I think you alluded to earlier that you spoke to Devin?
A Yes.
Q Correct.
A Yes.
Q Okay. And this was in February 2021?



MAGNA LEGAL SERVICES

Page 90

A Yes.
Q Okay. Prior to February 2021 when you went out on FMLA leave, had you had any issues with attendance?
A No.
Q Okay. So had you ever received any discipline or attendance points or anything?
A Yes.
Q Okay. When?
A I don't remember the exact date.
Q Okay.
A But I definitely know I had some write-ups for attendance.
Q Okay.
A Yeah.
Q And was that just -- can you tell me about that, was that for arriving late, leaving early, do you know?
A It was actually -- yeah, it was actually for being absent, stuff like that. Yeah, absent.
Q Okay. So we're going to walkthrough some documents Mr. Hatten?
A Okay. So I'm going to show you an exhibit which we will mark as Defendant's Exhibit E.
MS. ORLER: Erica, let's take a quick break.
MS. YOUNG: Okay. Let's take a quick break.

Page 91

THE VIDEOGRAPHER: This is the end of video one. Off the record 11:12.
(Shore recess.)
THE VIDEOGRAPHER: This is video number two, deposition of Tommy Hatten. The time is 11:19 on the record.
BY MS. YOUNG:
Q Okay. So I am now marking Defendant's Exhibit E which I will show you.
(Exhibit E was marked for identification.)
BY MS. YOUNG:
Q Please take a minute to review it and let me know when you're done.
A Okay. I'm ready.
Q Do you recall receiving this document?
A Yes.
Q Okay. And I just wanted to know the details of the incident and this is a first offense written verbal warning, correct?
A Correct.
Q And in the details it says you were absent April 1, 2018, April 26, 2018, April 29, 2018, May 14, 2018, May 20, 2018, correct?

Page 92

A Correct.
Q Okay. And then tardy March 4, 2018 and April 9, 2018, correct?
A Yes.
Q And then left early May 6, 2018, correct?
A Yes.
Q Okay. So that's a total of 6.5 points. How do you points work at Ryder, attendance points?
A You get one -- if you're absent that counts as a whole point. If you're -- if you leave early at a specific time, the majority if you leave like at least, I guess, three hours left of your shift, it would be considered a half a point. If you come in late, it's a half a point at a certain -- for a certain length of time. So if you get there like three hours, at least three hours into the shift, it will be considered a half if you get there within the three hours. Anything after three, may be considered a whole point.
Q Okay. Okay. And then if it's like one hour, do you get a point for that --
A It's a half a point if it's an hour. A minute late is a half. I mean, yeah. An hour late would be considered a half a point.
Q Okay.

Page 93

A Yeah.
Q Okay. So this was like four months into your employment, correct?
A Yes.
Q You had gotten 6.5 points?
A Yes.
Q Do you dispute any of these points?
A I've probably could have. I'm pretty sure I did. It's a lot of -- it's a lot of stuff went on with the points.
Q Okay. But you signed and acknowledged it, correct?
A Yes.
Q Okay. So then I'm going to show you Defendant's Exhibit F.
(Exhibit F was marked for identification.)
BY MS. YOUNG:
Q Please take a minute to review and let me know when you're done.
A Okay.
Q Okay. So in this you now got 7.5 points, correct?
A Correct.



MAGNA LEGAL SERVICES

Q And then what's got added is that you were late on July 24, 2018 and then left early on October 11, 2018, correct?
A Correct.
Q Okay. And then here it says at the bottom that you refused to sign. Why did you refuse to sign?
A Probably was a discrepancy in there somewhere.
Q Okay. So when you like dispute any of the points on these counseling sheets, who do you do that with?
A A supervisor.
Q Okay. And what supervisor would you go to?
A I would go to Zach.
Q Okay. And what would you do?
A Just let him know could he look into my points and make sure these were -- the dates were accurate that I'm getting attendance points for.
Q Okay. So did you do that here?
A I could have. It was so long ago, I don't know. It's always pretty much disputed a lot of attendance points.
Q Why did you dispute a lot of attendance points?
A Because you -- it was some occasions there I was getting points when I was actually there at the job. So I don't know -- I really didn't understand a lot of the



points that I was getting sometime. Some days I wasn't -- they considered me marked late or something and I've been punched in at 6:00. So, you know, I mean, I don't -- you know, those were -- it could have been an issue where I came in for a mandatory overtime -- I mean, not a mandatory overtime, but just an overtime day and might have got consent from a supervisor that I can leave early. And they didn't really look at it, they just marking me as left early without really actually knowing that that supervisor on the next shift because if I'm working mandatory -- I mean, if I'm working overtime or even if it was mandatory, whatever the case may be, it's pretty much a lot of overtime and it's a different supervisor so -- because I'm on another shift if I'm working overtime. You know, it maybe -- you know, Ryder is 24 hours 7 days a week, so it's always somebody there. So when our shift ends, it may, you know, it cuts into the next shift. But like I said, we didn't work the Wednesday, so it's -- I mean, the Thursday, if I work a Thursday maybe another supervisor there, and he may give me a -- he may give me the okay to leave early or something, but not let my supervisor know or input it in the system. Then they got to -- they just input it in the system. Then they got to go back and talk to the



supervisor who I said who may have let me leave early. And then he got to okay it like oh, okay, I forgot to put that, but Tommy did okay it. I mean, I did okay it for Tommy. So that's how a lot of incidents, you know. So I mean, I don't know what days these points were at to actually tell you if that might have been it, but that was just a scenario why I would dispute points.
Q Okay. And then you said that you would sometimes get consent from a supervisor?
A Yes.
Q What type of consent would you get?
A So like if I come in and it's a mandatory day and we working from 6:00 to 4:30 and I may ask them, hey, if I finish my truck or do this or certain, you know, do you think I can leave early. He may say okay.
Q And then would he put that in writing or would it be verbal?
A It would be verbal.
Q Okay.
A And that's how the points end up getting there because things weren't done how they supposed to been done.
Q So if a supervisor verbally gives up consent to leave, and then who would then write -- like who would



assess the attendance points for you?
A I really don't know. I really don't know.
Q Okay. Who would have these meetings with you about the counseling --
A My supervisor.
Q Which was Zach Spears?
A Yes.
Q Okay. And then who would give you -- do you know what supervisor gave you verbal consent?
A Yeah. That's when we go to -- he get the word and the okay from the supervisor, whoever it was. You know, it's been times that the manager okayed me to leave, documented it and everything, and you know. I -- you know Ryder even have documents of me getting points and counselings for some stuff that the actual manager approved me to do verbally.
Q Okay --
A So they got to go back and get the okay that, you know, just like me and the supervisor -- I mean, the manager Larry Tisch (phonetic) he gave me the okay that if I'm coming into work mandatory, I let him know that if I'm coming in working -- I mean, not mandatory, but if I'm coming in and volunteering to work, I would ask him could I just work for a certain amount of time, six hours



MAGNA LEGAL SERVICES

Page 98

or something. So it's been times that I did that and the job actually gave me points for that not knowing that you know -- I mean -- and it was volunteer days that, you know, Lupe Torres would know one of those situations too because she was -- she had came to me with a counseling one time that we had to actually straighten out with her, too, that Larry Tisch gave me the okay to leave. So basically what I'm saying here is a lot of the points get disputed because a lot of stuff was being done verbally. So everybody got to go back to the drawing board when we get assessments for these, you know, attendance points. It's like well, okay, maybe this happened, and you know, it always been issues.

Q How are you notified when you receive an attendance point?

A Supervisor calls me to the desk and let me know, you know. If it's call for a write-up that's how I find out because I don't reach that level to get a write-up.

Q Okay. And then what if it's not a write-up, how are you notified of an attendance point?

A I really don't. I always checked on a regular though to get a printout of my points.

Q Okay. hat do you check?

A I just tell a supervisor could I have a printout

Page 99

of my points because I know how a lot of confusion get mixed up with the attendance points there.

Q How often would you ask for a printout of your points?

A I mean, every -- maybe every other week or so just to make sure even if I haven't missed a day just to make sure that we still there and ain't nothing extra been put on there.

Q And who would give you this printout --

A Zach.

Q So let's say for this example, you get this counseling or this second offense written warning, you don't agree with the points, what is the next step?

A The next step is to check the dates.

Q Okay. And the dates from the printout?

A Yeah, the dates from the time that I got a point. So if I look on here and be like, hey, the 29th was on a Thursday, he let me go that day early, let's speak with the supervisor though and get that validated, that's how that happens.

Q Okay. So then you speak with the supervisor, the supervisor says?

A Speak with human resource and get it straightened out, I guess.

Page 100

Q Okay.

A I guess he got to a -- because he wasn't able to -- you know what, he did change some stuff in the system before for me, so it was main -- my first point of contact is my supervisor for anything with attendance.

Q Okay. And what in the system -- what system are you referring to?

A It's a system for attendance, I guess. They got the chart they show you on there, okay, you was -- you know what I'm saying, so you can see your dates and times that you would actually -- so I don't know what kind of spreadsheet, spreadsheet basically. And you go and look at the dates and times so everybody can be accurate on okay what happened on this specific day.

Q How do you track your time?

A What do you mean how do I track it?

Q Like how do you track --

A Keep --

Q -- when you come in or when you first get to work, when you go on lunch, when you leave for work?

A I mean, we punch in, punch -- I mean, the time clock.

Q So a time clock?

A Yeah.

Page 101

Q Okay. Okay. Sorry one more thing. In this case, let's say you refused to sign, you go to your supervisor, they confirm, hey, you got verbal --

A They knock the point back down. They knock it off.

MR. LEVIN: Let her finish the question, please.

BY MS. YOUNG:

Q Okay. How do they document that?

A I don't know how they document it, I don't know.

Q Okay. Do you keep track of it in any way?

A I mean, they gave me the write out and let me know what was fixed, that's it. You know, I don't know how what they do or keep, you know, but they -- if it's something that I'm disputing they'll give me -- they'll just let me know or he'll call me to his desk and show me that that point was taken off. And then when I get a printout, I see my actual point being taken off or whatever happened.

Q What does he show you on that the point was fixed?

A He'll show me like on a spreadsheet on the computer.

Q Okay. And then would they give you anything in writing?



MAGNA LEGAL SERVICES

A No.
Q Okay. And then you said that you would get a printout --
A Of my request, yes.
Q Okay. So every other week, you would get a printout of your points?
A Yes.
Q Okay. Did you provide that to your attorney at any point, those printouts?
A I don't think so, I don't recall. I don't think so. I gave them -- no, I don't recall.
Q Okay. But you received them?
A Yes.
Q Do you still have them?
A Yes.
MS. YOUNG: Okay. David, can you make sure you supplement responses, so request to admit.
MR. LEVIN: Request to admit?
MS. YOUNG: I'm sorry, request for production of documents.
THE WITNESS: You said so what is that you say you wanted to see again so I know --
MR. LEVIN: Why don't you email me or call me after the deposition --



MS. ORLER: She's making the request now.
MR. LEVIN: I understand.
MS. ORLER: Yeah.
MR. LEVIN: Just so we're clear on what exactly you want and I will get it for you.
MS. YOUNG: I will follow-up, but, yes.
THE WITNESS: What do you want now?
BY MS. YOUNG:
Q I just was requesting the documents that you received from Ryder biweekly with your points -- or your attendance.
A Just showing my attendance points?
Q Yes.
A Okay. I may have -- yeah, I may have some.
Q Okay.
A They may be all over the place because like I say, I've been there for them years, but I may have some.
Q Okay. Thank you.
Okay. I will now show you what we will mark as Defendant's Exhibit F (sic).
MR. LEVIN: G.
THE COURT REPORTER: I'm sorry, G. My bad.
MS. YOUNG: Yeah, you're right, G.
(Exhibit G was marked for



identification.)
BY MS. YOUNG:
Q Please take a look at this and when you're done, let me know.
A Okay.
Q Okay. So in this one it says now your third offense or final warning from December 3, 2018, correct?
A Yes.
Q Okay. So then you were assessed additional points for being late on December 3, 2018, absent on October 14, 2018, correct?
A Yes.
Q Okay. And then you refused to sign this one as well. Why did you refuse to sign this?
A Probably another dispute.
Q Okay. And what did you dispute?
A I don't remember what we disputed, but I wasn't -- evidently it was something with attendance points that I didn't feel was accurate.
Q Okay. And then you wrote that you would like to speak to Irisha about the points?
A Yes.
Q Why did you want to speak to Irisha specifically?
A I don't recall why I actually wanted to speak to



her specifically, but I'm pretty sure it was a good reason.
Q Okay. Did you speak to Irisha?
A I'm pretty sure I did, yeah.
Q Okay. When did you speak to Irisha about --
A I don't know, but I'm pretty sure soon after this so I can't give you a date. But if I put that on there, I spoke with her.
Q Okay. Do you recall any follow-up from Irisha or Ryder about this?
A No. I'm pretty sure I got it straightened out.
Q Okay. When you say you got it straightened out, what does that mean?
A I don't think the points -- I'm pretty sure some points got tooken (sic) off from there.
Q Okay. So between the October 14th, December 3rd dates because those were the two extra ones, correct?
A Yeah.
Q Okay. So one of those dates were removed?
A Yeah, something was removed in there. I mean, I might have seen something a little more in depth that I might have needed to speak with her about something in the beginning. It could have been these beginning points. That's hard to say.



MAGNA LEGAL SERVICES

Page 106

Q Okay. And then I"m just curious because I know you said that you would dispute it with your supervisor and then they would correct it?
A Yeah.
Q So in this counseling record, this third offense and final warning and this second offense and final warning, it has the same absent and tardy and early out days.
A Yeah.
Q So was it corrected any like corrections that needed to be made between October 11th and December 3, 2018?
MR. LEVIN: Object to form. You can -- you can answer if you understand what she's asking.
THE WITNESS: Yeah, I don't -- you said -- could you repeat that again?
BY MS. YOUNG:
Q Yeah, no problem. I asked you about this October 11th counseling, correct?
A Yes.
Q Earlier. And you said that if the point was incorrect, then Ryder would correct it, correct?
A Yes.
Q Okay. So then on this December 3rd form, it has

Page 107

the same dates. So does that mean that Ryder did not correct it or what does that mean?
A Yes. It could have been that they didn't correct it.
Q Okay. So how do you get confirmation then that it's corrected when you request it?
A Just they just let you know. They just -- either you going to get a printout of it off your own request or they just tell you that it's taken off. So it was on you to, you know, either you're going to get your request to make sure that your stuff is off or you just take their word. A lot of times I took their word.
Q Did you ever request something in writing that they corrected something that you believed was a mistake?
A I didn't request it in writing, but I may have gotten a printout of it, and you know, that was good enough for me to show, okay, they got knocked off, but you know, that's it.
Q Okay. I will now show you what I will mark as Defendant's Exhibit H.
(Exhibit H was marked for identification.)
BY MS. YOUNG:
Q And I am going to a apologize right now that this

Page 108

is a little blurry. Take a look at it and let me know when you're done?
A Okay.
Q So now this is another final warning provided on March 6, 2019, correct?
A Yes.
Q Okay. And this is saying that you received eight points, correct?
A Correct.
Q And that you signed this one?
A Correct.
Q Did you sign it -- does that mean that you agreed with the points assessed?
A If I signed, I'm pretty sure, yes.
Q Okay. And just to confirm, Mr. Hatten, and again I know it is a little bit blurry, but the dates included on here are the same dates included --
A Yeah, that's what I was looking at.
Q So did you drop the dispute that the dates were inaccurate --
A Could have, could have, yes. Yes, could have --
Q Okay. So you are okay with the dates that were assessed on this --
A Yes, yes.

Page 109

Q -- on March 6, 2019 --
A Yes.
Q Okay. I will now show you what we will mark as Defendant's Exhibit I.
(Exhibit I was marked for identification.)
MS. YOUNG: And David, in case you want a more clearer copy, I can try to find one but this is also what we produced of the dates.
MR. LEVIN: I understand. He'll answer it to the extent he can read it.
MS. YOUNG: Yeah.
BY MS. YOUNG:
Q Let me know when you have looked at this.
A I'll look.
Q And I am not going to ask you to confirm any dates because I see that it's blurry, but you received this first written verbal warning on June 12, 2019, correct?
A Correct.
Q And you signed it on June 20, 2019, correct?
A Correct.
Q So does that mean you didn't dispute these points --



MAGNA LEGAL SERVICES

A Correct --
Q -- the 6.5 points.
Okay. I will now show you we will mark as Defendant's Exhibit J.
(Exhibit J was marked for identification.)
BY MS. YOUNG:
Q After you've read it, let me know your review is complete.
A Okay. I'm ready.
Q Okay. So this was a second written warning for attendance issued to you on August 13, 2019, correct?
A Yes.
Q Okay. And then here you signed it, correct?
A Yes.
Q Okay. And then you wrote I would like to dispute this point. I worked my full hour during my normal work week and was not able to work 12 mandatory hours, but worked all other mandatory hours after I had already worked.
Can you explain to me further what -- just like help me understand more of what the dispute is. Specifically it was like I was not able to work the 12 mandatory hours?



MR. LEVIN: Object to form. You can answer.
BY MS. YOUNG:
Q And the wording is just a little confusing to me so I'm trying to understand --
A It's confusing to me, too. It's confusing to me, too. Like I say, it was something that -- it was just something that I had disputed. I must have had an issue with something that was going on that maybe they, you know, they could have been aware of than what I can actually explain. So I mean, you know, whatever was going on at that particular time, it had to been something that only they would actually know what I was actually talking about and only me would know why I wrote that at that particular time, but I don't know why I might have wrote that.
Q Okay.
A But I wrote it, signed it, that's it.
Q Okay. Do you understand what you were trying to dispute in this?
A I'm trying to see (reading to himself). I don't know what was going on that I wrote that, you know. I don't know.
Q Okay. But can you confirm or can you tell me if this was related to mandatory hours?



A Yeah, it was something with it, yes.
Q Okay.
A It was definitely something with the mandatory hours.
Q You just can't go into detail what --
A Yeah, I don't remember exactly what it was.
Q Okay. That's fine. If you don't know that's fine. So I'll give you a second.
A Yeah, I don't know. Like I say, it was something with the mandatory. I must have either worked something and wasn't able to work something else or maybe -- I mean, like I say, it could have been. I worked one day because they was sometime their mandatory two days. Maybe I was just letting them know that I might have -- wasn't able to work that day. I might have spoke with someone, but I don't know, I really don't. I'm not really for sure why I actually wrote that.
Q Okay. No, that's fine.
So between May 20 of 2018 and August 13, 2019, you received 6 counseling records, correct?
A Okay. Yes.
Q That we just went over?
A Yes.
Q Do you allege anything was improper about these 6



counseling records?
MR. LEVIN: Objection. Answered and answered throughout the course of the testimony, but go ahead.
BY THE WITNESS:
A Yeah, something -- I mean, yeah, something was wrong with them. I just couldn't -- I can't point it out, though. But I mean, I disputed a lot of attendance points.
BY MS. YOUNG:
Q Okay. And to confirm, you did not have any -- you weren't on any FMLA leave between May 20 of 2018 and August 13, 2019, correct?
A No, no, correct.
Q Okay. Can we go back to your complaint, which is Defendant's Exhibit B, Paragraph 26. And let me know when you're there.
A Would this be considered B? I got A, C --
Q It will be this (indicating).
A Okay. This one there, okay. You said where I'm looking at.
Q You're going to go to Paragraph 26.
MR. LEVIN: Page 4.
THE WITNESS: Okay.
BY MS. YOUNG:



MAGNA LEGAL SERVICES

Page 114

Q Okay. So here it says on or about August 8, 2021, Plaintiff's Manager Jorge Nicolas told Plaintiff that his intermittent FMLA leave was exhausted. And I'm jumping to Paragraph 27.
It said, Defendant's Human Resources staff had not alerted Plaintiff at any point that he was close to exhausting or had exhausted his FMLA leave. Do you still allege that you were not alerted that your FMLA leave was close to be exhausted on August 8, 2021?
A Okay. You said -- what do you want me to answer to --
Q Yeah. Do you allege or do you believe that you were not alerted that your FMLA leave was close to being exhausted --
A Yes.
Q -- on August 8, 2021?
A Yes.
MR. LEVIN: Let her finish the question, please. Don't answer in the middle of the sentence. Can we do that --
THE WITNESS: Hold on. Let's redo that again to make sure, okay --
MR. LEVIN: Do that again to make sure.
BY MS. YOUNG:

Page 115

Q No, that's fine.
Do you allege that you were not alerted by Ryder that your FMLA leave was close to being exhausted prior to August 8, 2021?
A Correct.
Q Okay. So now I'm going to back to a little bit earlier in your testimony where I was asking you about when you spoke with different people regarding your claims and when you first started researching your claims?
A Yes.
Q So earlier you testified that you sat down and met with Devin in June 2021, correct?
A Correct.
Q And in June 2021, what did you and Devin talk about? Because earlier you testified you all talked about your FMLA leave hours, correct?
A Yes.
Q Okay. So are you aware in that conversation how many FMLA hours you used?
A In June?
Q Yes.
A Well, just -- I don't know exactly what day it was. I mean, yeah, it had to have been close to in June

Page 116

sometime I sat down and spoke with Devin and we inputted my FMLA hours into the system around that time because they hadn't had them in the system, so yes.
Q Okay. So were you aware in June how many FMLA hours you had used?
A Yes.
Q Okay. And were you aware in June how many FMLA leave hours you were allotted?
A No.
Q Okay. So I want to go back then to Defendant's Exhibit A. It's this one (indicating).
A Okay.
Q Okay. So then you received this letter on June 18, 2021 and it said that you were entitled to 480 hours per rolling 12 month period, correct?
A Correct.
Q So you new on June 18 that you had 480 hours, correct?
A This right here (indicating)?
Q Yes.
A Yeah. I was aware, yeah.
Q And then you knew in June 18 how many hours you had already taken, correct?
A Correct.

Page 117

Q Okay. So then are you saying that you did not know it was exhausted although you knew how many hours you had taken and how many hours you were allotted?
A Okay. So the reason why is because when I was speaking to Adam now, the FMLA, the way they had it, is based off 480 hours, but I was supposed to been -- and Devin even said that, too, at the time when we was inputting the hours that I supposed to have more than 480. So I wasn't clear on and she wasn't clear on -- at the time when we sat down, we knew it was 480. But like I said, the Labor Board got involved in it. They let Ryder know that I supposed to based off the hours that they gave me 480 was wrong. I was supposed to have 540. So I still wasn't clear on what I suppose to have and what I wasn't. Because at this time when me and Devin sat down and put the hours in, she was confused herself. She still was confused on how many hours I supposed to exactly have. But I definitely know it was more than -- it wasn't the 480.
Q Okay. When did the Labor Board get involved?
A This was all around in that time frame.
Q Can you give me like a month?
A If this was June, let me see, yeah, it had to been around all in that time frame June, July, that the



MAGNA LEGAL SERVICES

Labor Board was in on the investigation. It took them about a month at least. So if I'm just thinking like, yeah, it had to been a month because I was terminated right after the investigators made their claim.
Q So what made you get the Labor Board involved?
A Because I was concerned about if it was anything to do to make sure that the hour -- that I wasn't able to receive more hours for the hours that they were using because like I say, I never got clarity on what happens after the hours is gone, you know. I just know that they were leaving fast, so that's why I went to the Labor Board because I couldn't get no clarity. So they ended up telling me about how the hours and the process works with the FMLA.
Q Okay. So I'm going to go back to your earlier testimony just to be -- because I know that was a lot of back and forth of clarity of dates. So you began researching FMLA in May, correct.
A Correct.
Q And then you met with Devin in March or April, correct --
A Yes.
Q -- about your FMLA leave hours?
A Yeah. Yeah about she had before I even was



concerned about FMLA, it was right after she told me that they were going to be mandatory in hours and so it had to been around in that time, yeah, May somewhere. April, May, that she told me the mandatory overtime was going to start and your hours is going to be used for that if you're not able to work the overtime.
Q Okay. So you met with Devin after you researched FMLA in 2021 about your FMLA hour usage?
A No --
Q What I'm asking --
A -- I spoke. Let me see.
Q And I can clarify if that helps a little. I am asking -- so you began research -- I'm sorry. You began researching in May 2021. When did you meet with Devin about your FMLA hours running out?
A Okay. So if I met in May, you said when did I bring it to Devin about the concern about my FMLA hours?
Q Yeah.
A I mean, shortly after -- I mean, I wasn't concerned about the hours or did research until I spoke -- until Devin told me that the mandatory overtime was going to be going on. So that's when I started my research. So if she told me in March somewhere around there that the mandatory was gonna start, I didn't bring



it to her 'til April sometime, I guess. I mean, she told me about the mandatory hours first.
Q In March 2021, correct?
A Yeah. Whenever the date that she told -- yeah. So when she told -- she told me first about the mandatory FMLA hours. Maybe a month after that, that's when it happened because that's when I started noticing my hours going. So like I say, I don't know what dates they may be, but I talked to her first about she was going -- she called me and let me know they going to be mandatorying the hours, you got to use your hours and this. And then after that conversation, the weeks was going on, they started using these hours. So that's when I started doing my research on, okay. And then that's when I had spoke -- I might have spoke with Devin again before I went to Adam. So yeah, it was -- I spoke with Devin first whenever March or whatever, that's when she explained that the overtime. And then a month or so went by, time went by, hours started being used. I wasn't aware of what was being used, so that's when I went to -- called the Carol Bates lady, and that's how I ended up talking from her to Adam back to Devin.
Q Okay. And you weren't tracking your hours prior to --



A Yeah.
Q -- to June 2021, correct?
A Correct.
Q Okay. So what made you afraid that your hours were running out if you weren't sure of it?
A What made me afraid was just the knowledge of knowing what's going on. Like okay, I know just not knowing what my hours were, so like I say, just not knowing what my hours were, but I know that they using hours. That's why I was being truthful with Carol Bates when she called and was like hey, you got -- when I called her to ask her like, hey, how many hours do I have. So, you know, that's where I was concerned anyway because the months had went by with the mandatory. I still don't know how many hours I got because I wasn't aware of system that we was putting the FMLA hours in when we leave.
Q Okay.
A It was an app that we had to download. I didn't have it that particular time, didn't know, called Carol Bates. That's when I found out that she still -- like I said, out of the 480, she still thought I had 400 and some hours. So I'm like, that's not right. I've been using. I need to know exactly what's going on, how many



MAGNA LEGAL SERVICES

I got, what I used because I'm scared. I need to know, you know, what's gonna happen with my hours being going out so I better find out now before later on, you know, it was just a courtesy of my own and just check and see what the hours being used. Make sure if I can't see it, I got to just take, you know, follow my own conscious and find out exactly how many I have and is this something that can be done if I use them at this type of rate.

Q Okay. So then in June 2021 is when you met with Devin and you all entered your hours, correct?

A Correct.

Q Okay. So in June 2021, you knew how many hours you had used?

A Yes.

Q Okay.

A Just didn't know how many I actually had left. I know what I used.

Q Okay. What made you believe -- earlier you testified that you thought you should get more than 480 hours, correct?

A Yes.

Q What made you believe you should get more than 480 hours?

A Just off of doing research and going and reading



stuff off of the FMLA and overtime that they taking, and you know, I was reading something in there that was saying something like, okay, if they using these hours to take from you from FMLA, those hours got to be considered your work schedule so you got to be compensated off of what they're taking, you know, versus what you actually gave. Because, you know, it was based off 40 hours. I mean, you know, yeah, the FMLA was based off just a flat off 40 hours, 12 weeks --

Q 40 hours?

A I mean, 40 hours a week --

Q Okay --

A -- for 12 weeks --

Q Okay.

A Which comes to the 480 --

Q Okay.

A But since we was working overtime and when I went and did the research, it was just telling me that since employee work schedule may vary due to the overtime, so since you can't really -- since it wasn't no way that no one can really give an accurate amount of how many allotted hours I suppose to have, you got to go back to the 12 month prior to me getting on FMLA.

Q Okay.



A And that's, you know, that's how the calculations came because, you know, so that's why I was so confused and all of that because I went to -- what I was reading, I was just trying to make sure what I was reading was correct or wasn't incorrect just to get some clarity on these hours that they're using, do I get compensated for something. Because like I say, at the time, I didn't know how to use the word accommodation. I wasn't equipped and know about FMLA.

Q Okay. So when you say you researched, is this the same like earlier you said you just looked it up on Google, is that what this research was?

A Yes.

Q Okay. And do you recall any specific sites or anything or just Google and whatever pops up?

A Not right offhand, no.

Q Okay. Did you speak with anybody regarding how many FMLA hours you should be entitled to outside of Ryder?

A No.

Q Okay. So you do your research and then you raise it to Devin, correct?

A Yes.

Q And then Devin does -- how did we get to Adam?



Like how did we get here?

A We got there from --

MR. LEVIN: Object to form --

BY THE WITNESS:

A -- Carol Bates to Adam. When I contacted Carol Bates, Carol Bates transferred me to Adam. Adam said that he was the regional something for that district and I was speaking to the right person and he'll give me an answer to what it is that I need, and you know. And what I was telling him, he said it was making sense, but he had to, you know, he was like he got to do his research. That's what his words were.

Q Okay. So you --

A So he wasn't really knowledgeable about it.

Q Okay. So you told Adam that you believed you were entitled to more FMLA hours, correct?

A Yes.

Q And when was this, was this your initial conversation with Adam?

A Yes.

Q Which was June 2021 or was it prior to that?

A No, it was whenever the time I spoke to him, that's what it was about.

Q Okay. And then Adam say he would research it



MAGNA LEGAL SERVICES

more, correct?
A Yeah, and then he got me that letter, Exhibit A.
Q Okay. I'm now going to show you what we will mark as -- the court reporter will mark as Defendant's Exhibit K.
(Exhibit K was marked for identification.)
BY MS. YOUNG:
Q Please take a look at it and when you're done, let me know.
A Okay.
Q You've read it?
A Yeah.
Q Okay. I'm just going to go to the second page of this document. It's the last bullet point. Were your scheduled hours Sunday thru Wednesday 6:00 p.m. to 4:30 a.m.?
A Yes.
Q So do you agree that you worked 4 days a week, 10 hours a day?
A That's what the schedule was, but that ain't what we actually was working.
Q So what do you believe you actually worked?
A Like I said, I was still -- it still was schedule



6:00 to 6:00. But like I said, I would work the 6:00 to 5:00.
Q Okay. So then tell me what hours you believe you worked?
MR. LEVIN: Worked or was scheduled?
BY MS. YOUNG:
Q What you actually worked? Yeah, I asked the question --
A What I actually worked 6:00 to 5:00.
Q Monday thru?
A Sunday thru Wednesday.
Q And when did you work that schedule?
A I worked that schedule -- like I said, that was the schedule that I worked in the beginning when I first was hired. Then like I said, they switched the schedule again to the Monday, Tuesday, off Wednesday. And when it actually changed from that from the last time, that's what I was working all the way up until maybe what May sometime of 2021 when they rechanged the schedule again.
Q So between February 2020 and February 2021 --
A Yes --
Q -- you worked 6:00 p.m. to 5:00 a.m.?
A Yes.
Q So you don't agree that you worked 1,958 hours,



.25 hours?
A No.
Q That was a no?
A You say what?
Q So that was a no, you don't agree that you worked in amount of time, the 1,958 hours?
MR. LEVIN: Object to form.
BY THE WITNESS:
A I'm not really for sure what I worked, that's just what they put down, but I wasn't -- I never did the calculation, but if that's the calculation that they got for working 6:00 to 4:30, that's got to be wrong because I mean, my time sheet should have showed some 5:00 punches on there, too.
BY MS. YOUNG:
Q Okay. So you're saying that you worked 6:00 to 5:00, so an extra 30 minutes --
A Yeah.
Q -- Sunday thru Wednesday?
A Yeah, yeah, yeah.
Q Okay. So an extra 2 hours a week, so you worked approximately 42 hours a week is what you're alleging?
A Yeah.
Q Okay. Now I want to go to what I will mark as



Exhibit K.
THE COURT REPORTER: No, L.
(Exhibit L was marked for identification.)
BY MS. YOUNG:
Q Please review it and let me know when you're done reviewing it.
A Okay.
Q Do you recall seeing this document?
A It wasn't in this form.
Q Okay. What form was it in?
A It was, you know what it might have been on just a spreadsheet or something it could have been, yeah. This -- yeah, I recall this. Yeah, I know what it is, yeah.
Q Okay. And you signed this on July 26, 2021, correct?
A Correct.
Q Okay. So did you see this form?
A Yes.
Q Okay. In this format?
A Yeah, it could have -- yeah. My paper-- I got a paper like this. I got to find it at the house, but I mean, it definitely didn't look like this. But it was



MAGNA LEGAL SERVICES

Page 130

just a bunch of hours that we inputted. It wasn't in this type of with the Ryder and this, this (indicating), but it's -- I don't know how that's -- I didn't -- yeah, I don't know. I mean, it must have been. But I remember this that me and Devin sat down and we put in the hours.
Q Okay. And you said you have a paper similar to this --
A I have to go look if I -- yeah. I have to look and see what it is. But like I say, it could have been like this, maybe it wasn't in color or something so -- I mean, I don't know. Maybe it might have been a black and white copy that, you know --
Q Sorry to cut you off.
Did you receive a document from Ryder that had your FMLA leave?
A Yes.
Q Did you provide that to your attorney?
A I don't think so, no.
MR. LEVIN: That had his FMLA leave?
MS. YOUNG: Yeah. So he said --
THE WITNESS: My hours like this.
BY MS. YOUNG:
Q Let me clarify, that's fine.
You said you received something similar to

Page 131

this --
A Yeah.
Q From Ryder?
A Yes.
Q And it was printed out, correct, it was a hard copy --
A Yeah. I didn't, yeah. Sorry.
Q And I'm asking -- no, you're fine.
A I don't mean to cut you off on that --
MR. LEVIN: Let her --
THE WITNESS: That's why I'm saying, let me shut up because I was about to cut her off.
MS. YOUNG: No, and I know it's like difficult --
THE WITNESS: Yeah --
MR. LEVIN: Just wait until there's a question please and answer the question.
THE WITNESS: I got you.
BY MS. YOUNG:
Q Did you provide the paper that you received -- or the document you received from Ryder that's similar to this to your attorney?
A No.
Q Okay. Can you make sure to provide it to your attorney, please?

Page 132

A Sure.
MS. YOUNG: David, can you make sure to produce it.
MR. LEVIN: Yes.
MS. YOUNG: Thank you.
BY MS. YOUNG:
Q So you signed this document on July 26, 2021, correct?
A Yes.
Q Okay. So by July 26, 2021, you had seen how many FMLA hours you used?
A Correct.
Q Okay. Now you said you went over this document with, did you say Devin?
A (Indicating.)
THE COURT REPORTER: I'm sorry. He didn't --
BY THE WITNESS:
A Yes. Yes, sorry.
BY MS. YOUNG:
Q We're about to go to lunch soon, don't worry.
When did you go over this with Devin, was it on July 26, 2021?
A Yes.
Q Okay. Was it just you and Devin or anybody else in the room?

Page 133

A Just me and Devin.
Q Okay. Do you agree that this document provides you with notice of the FMLA hours that you used as of July 18 -- or July, what does it say, July 18, 2021?
A Yes.
Q Okay. So based on your understanding from the June -- I'm sorry, and this is -- I know it's going back and forth between document, but I just want to go to Exhibit A where you were notified that you had 480 hours.
A Okay.
Q And then that was June 18th. And then on July 26th, you were notified that you had -- this chart is -- I can present to you, you can calculate right now if you really want -- you can calculate if you want but it's approximately 470 hours accounted for on this chart?
A What is, this?
Q Do you want to do the math? Do you want to take a break? But if you not, I can present to you it's approximately 470 hours?
A Okay.
Q Okay. So given that you were aware that you had 480 hours and you had used all of these hours on this chart, were you aware that you were close to exhausting FMLA?



MAGNA LEGAL SERVICES

Page 134

A No.
Q Okay. Why not?
A Because, like I said, the Labor Board was still investigating during this time. The Labor Board and Devin even -- like I said, when we filled this out, she was saying that I have 500 hundred and some hours, that's what Devin said. And the Labor Board also confirmed the same thing that I should have been -- that I should of had 540 hours.
Q Did they confirm that by this July 26, 2021 date?
A You said did they confirm it?
Q Yes.
A Yeah, I'm pretty sure it was if -- yeah, yeah. Because I mean -- yeah. Hold on. Let's go back again and slow it down.
Q Yeah, that's fine.
A You said did Devin know about the 540 hours?
Q No, we can go down and break it down because I don't want it to be confusing at all.
So I am saying on June 18th, Ryder confirmed with you that you had 480 hours, correct?
A June, okay, yes.
Q When you received -- I'm sorry, June 18th when you received this letter, correct?

Page 135

A Uh-huh, yes.
Q Okay. I'm sorry, I'm looking for the investigation.
Yeah, so they calculated it, investigated it, everything and confirmed?
A Yeah.
Q Okay. And then they went through this chart with you on July 26th and let you know how many hours, correct?
A Yeah, yeah.
Q So based on what Ryder had informed you, you had 480 hours, correct?
A Okay, yeah. From this paper here that is supposed to be 480, yeah.
Q Okay. And then you knew how many --
A So when me and Devin sat down with this paper, when we got down and came to our calculations, I let Devin know then, I said, Devin, if I got that many hours used, I said, I'm almost about being exhausted, wouldn't I be. So she was like, well, we don't really know how many hours you have. They were saying at 500 and -- so the investigation from the Labor Board was still going on.
Q Okay.

Page 136

A So because she wasn't clear because I told her I'm like if I got 480 -- I mean, if I'm supposedly have 480 and I got this amount, I said I'll terminated next week. This is what I told her, I said I could be terminated next week. What happens like, you know, I am just trying to figure out like I've been doing from the beginning of this is that the end. You know, I see we put the hours in because, you know, but I was just concerned. So I wasn't -- me and Devin, we put these in and I asked before I signed this, I wasn't clear when I was signing this either. I know I signed this, but when I asked Devin do I have to sign it, she pretty much told me yeah or it would be some consequences behind it. I'm scared, I don't know. I'm like okay, maybe, you know what I'm saying. I wasn't in agreement with all of the hours, you know. Basically I seen what they got on here, these -- these days could actually be accurate.
Q Okay.
A But what I was, you know, I was -- my concern was for that was if I got these many hours, Devin, like I could be terminated next week. She said don't worry. She just -- she never gave me nothing to be like -- she was like -- no, no, she actually did. She said, well, you got 500 and some hours. She did tell me this, I

Page 137

don't know. She say you got 500 and some hours so...
Q And when you say Devin told you you have 500 and something hours, was that 500 and something FMLA leave hours --
A FMLA hours, yes.
Q -- to use --
A Yes -- Oh, no, no, no. Yes, to use.
Q Okay. And then you said that --
A Not -- oh, sorry, I didn't mean to cut you off. But not extra 500, it was just 500, it wasn't the 480. It was 500 and something hours, that's what we was talking about. It wasn't an additional 5 if you was thinking. But the 480 was more, supposed to been more.
Q Okay. And that hadn't been confirmed yet, correct --
A That hadn't been confirmed because the Labor Board was still investigating. That's how they found out about 500, the talk of even 500. How did -- you know, that's how that talk even came up of 500. It was a talk of 500 and some hours during this time.
Q Okay. So the Labor Board hadn't confirmed yet that you had 500 and something FMLA hours to use, correct?
A She said I did. She told -- she said that I



MAGNA LEGAL SERVICES

Page 138

had -- she said their calculations were wrong. The Labor Board, the Abby -- I mean, the Edith lady she was speaking with Abby I guess. So she said the hours that they have for you were wrong. She said your hours should have been calculated at this and that's what it should have been.
Q Okay. But the 480 hours that Ryder had already investigated was confirmed at that time, correct? On July 26, 2021, Ryder had already confirmed that they investigated the amount of hours you should receive and that their calculation was 480, correct?
A Based off of the Exhibit A.
Q Uh-huh.
A Yeah, based off Exhibit A when I talked to -- Adam knew this is what they gave me. But when me and Devin sat down to input the hours in because this was just to -- just to put the hours in because there wasn't nothing in the system. All of that time from March all the way up until this time, nothing was entered in the system, and like I said, I had been taking days off. So when we entered in the system, this is what they came up with and me and Devin sat down there and was like, when we got the total, I told her like Devin, if I got that many, I said, I could be terminated then if I got 480

Page 139

hours. She said, no, you have more.
Q Okay. Did Devin put that in writing?
A She didn't put it in writing, but I, you know, I still was -- when was this -- when did this -- July?
Q July 26, 2021.
A Yeah, yeah. Yeah, I thought it might have been a little earlier than this because I didn't know I was fired until about two, three weeks after this. So I thought this was like maybe a little earlier that we had actually filled this paper out. But, yeah, it could have been right because it was still -- the Labor Board was still doing it's investigation so this could be right, too. But yeah, the 480 was never -- I never -- I had the sign it because I was forced to sign it basically.
Q Okay. So --
A But I wasn't -- I was -- it's correct, though.
Q What is correct?
A The hours that they got on here could be correct. These could have been the hours that I actually used, yes, they could be. But this wasn't what we was filling out this paper for. We just filling out to input the hours. And then when we came up with the total, that's when I was like, Devin, you know, instead of her bringing it to my attention, I brought it to her like if I got 480

Page 140

like I could be terminated. That's when she was like no, you know you got 540 hours.
Q Okay. But just to confirm, all of the hours that are listed here, you agree with that you took these FMLA hours?
A Yes.
MR. LEVIN: Objection. That's misstating his testimony. Go ahead.
BY MS. YOUNG:
Q You believe you took all of these hours on here?
A Yes.
Q Okay. So your dispute then -- so what is your dispute? If you believe that you took all of these hours, your dispute is the amount of extra hours you were supposed to be provide?
A No. My dispute was, is there any kind of accommodation for me after this is being used up, that's what, that's what my whole issue was. That wasn't even so much about the hours. The hours just came up when the Labor Board came up, you know. I mean, well off of my research and I let them know. But then when the Labor Board got in, that's how we ended up -- the hours ended up changing.
Q Okay. And then I want to go back to something

Page 141

you said. You said that you -- Devin told you that there would be consequences if you didn't sign this?
A Yeah.
Q What consequences did Devin tell you there would be?
A I don't know it was something because, I mean, I definitely know the way that I am. I would have been like I'm not signing that because I'm not in agreement with me being terminated if these hours is right. Like, you know, basically she was like you got to sign it because we ain't -- I mean, she -- I mean, I was basically, I had to sign it.
Q Did she say what would happen if you don't sign it?
A Yeah, I'm pretty sure she did. I mean, I don't remember exact, but pretty much it had to probably do with my job like you may be terminated if you don't sign this because we can't, you know. I definitely asked do I have to sign it, so she was like, yeah, because we don't know if these, you know, we don't know if...
Q So Mr. Hatten, I want to go back to one of the earlier exhibits where you have refused a counseling record before, right?
A Yeah.



MAGNA LEGAL SERVICES

Page 142

Q Okay. What was different? Like if you've refused to sign a counseling record before, what was different about this?
A I wouldn't know. I mean, I wouldn't -- that's why, that's why I let her know like, I mean, I have no idea.
Q Okay.
A Yeah.
Q So did you know that you could refuse to sign this since you refused to sign other things?
A I tried, I tried to refuse to sign it, but I couldn't.
Q I have another question. So you say you don't dispute that these hours are accurate, so why did you --
A Yeah, let me just --
Q Can I finish, can I finish my question real quickly.
A Sorry.
Q No. So you say that you agree that these hours are accurate, so why did you want to not sign it?
A Because I'm like, just off of -- just probably -- I mean, just the point of just signing something like I don't really want to be committing myself to a document that I'm really not really 100 percent sure on if I

Page 143

should sign it or not because I got issues with the hours. But I mean, it was -- it's pretty much like I signed it. I mean, I'm in agreements with these hours, so I mean I signed it for that reason, too. But I mean -- so I mean if that just answers yes, I mean I'm in agreement with these because these are the hours that I actually worked. I mean, yeah.
Q Wait just for clarification. These are the hours that you took FMLA leave?
A Yeah, these are the hours that I used my FMLA -- no, these weren't all FMLA hours, though. These were just, you know, some of the FMLA hours -- hold on. No, no, no, no, no. Definitely was -- it definitely is not accurate. I'm looking now like I didn't take -- what is these attendance because I didn't start taking FMLA until the first. That's why that two hours is there. These are considered just work days.
Q You're alleging between February 2nd and February --
A Yeah, yeah. She didn't allow me to use FMLA until March 1st.
Q Okay. So --
A So these points up here, I was on this when it first happened to me. I was off work that 2nd, I was in

Page 144

the hospital that 2nd, they gave me a point for that, you know what I'm saying. But the 3rd, I was in the hospital all of that week.
Q Okay. So just --
A Yeah, so I'm just really looking now like I don't know what this -- that was why I was in disagreements with that, yes. Yeah, I wasn't in agreement with that for that reason. It was something else, yeah.
Q Okay --
A Because I didn't start using -- that's why I'm like is these FMLA hours or my work because these is my work schedule, too, that they definitely shouldn't have been FMLA hours.
Q So Mr. Hatten, are you alleging between February 2nd to February 17th, that's when you first had your eye stroke, correct?
A Yeah, yeah.
Q Are you alleging that you did not use FMLA during that time --
A I didn't use FMLA during that time.
Q Okay. So what did you use for time off --
A The first, and I think I might have said that before I even seen this paper. I started using it the 1st of March.

Page 145

Q That was the first day that you --
A The first day, yes.
Q Okay. So then did you just take PTO between the 2nd and the 17th or how did that work?
A No, I didn't have nothing. I didn't have no time. Yeah, I didn't use nothing. I went to the hospital on the 2nd. I told Devin I'm going to be off for a week. I didn't return to work until the 8th probably.
Q Okay. When you --
A I don't --
Q Mr. Hatten, just let me ask the question. No problem. I just want to make sure that we're not talking over each other so the record --
A Yeah, I'm sorry --
Q -- She can get everything down --
A I'm sorry, yeah.
Q No problem.
So you said that you told Devin that you would be off for a week. When you were gonna be off for a week, what was that -- did you request PTO, did you request FMLA, like what did you expect during that off week?
A Okay. So yeah, I'm trying to think. I think I



MAGNA Legal Services

was just off. I don't think I was getting attendance points or none of that though for it. I think I was -- I mean, yeah, I was off. The doctor had requested that I be off for a week so I guess they just took that notice and the doctor had sent in excuse all days that Tommy is absent. That's the note -- do you all got that because I got a note that said excuse Tommy's days for these or something.

Q So my question is then when your doctor asked to excuse those days, what did you like what was your expectation of how that time would be calculated by Ryder, was that a sick day or --

A Yeah, I was, I was under the impression that that was. I wasn't receiving attendance points for those though --

Q Yeah, these are not attendance points --

A Yeah --

Q -- these are your FMLA hours.

A Yeah, but I mean, that's what I mean. I mean, I wasn't using FMLA for them days, though. I mean, I wasn't even on FMLA.

Q Okay. So then you expected these days or your understanding was that these days would be sick days?

A Yeah.



Q Okay. And were you aware of like that you had enough sick days for these, the February 2nd thru February 17th?

A I don't really know what -- I don't really recall what was going on that day though now that I'm looking at this paper cuz I'm confused here. Because these, a lot of these my regular work day. These can possibly be just all FMLA hours definitely from the 2nd to the 17th.

Q Okay. I will now show you what we will mark as Defendant's Exhibit M.

(Exhibit M was marked for identification.)

BY MS. YOUNG:

Q When you're done reviewing it, Mr. Hatten, let me know.

A Okay, yeah.

Q Okay. So these are your leave of absence requests. And if you look at the bottom, the very bottom chart it says February 2nd thru February 14th; do you see that?

A February --

Q If you look at first -- I'm sorry, let me clarify. Where the column that says first day of leave and then there's a column that says actual last day of



leave; do you see that?

A First day of leave, okay, yeah, I see first day of leave, the bottom column 2/2 of 2021?

Q Yeah. So your first day of FMLA leave was February 2nd, and then the last day of that little portion was February 14th. This is all 2021; do you see that?

A Yes.

Q Okay. And then if you go two columns up, because that next column is just short-term disability. So then you see FMLA leave and that's where you see February 15, 2021 as the first day to July 7, 2021; do you see that?

A Yes.

Q Okay.

A We still in the -- okay. we still here with it?

Q Yeah. I can walk you through.

So I'm looking at this column (indicating).

A Okay.

Q Where it says you took FMLA leave from February 2nd to February 14th?

A Okay.

Q Okay. And then if we go -- because this is just short-term disability.



A Okay.

Q And then if we go up here, it says, February 15th thru July 7, 2021.

A Okay.

Q Okay. So this is reading that you were on FMLA leave from February 2nd to February 14th?

A Oh, I was on, I was on short-term disability. But check this out. Let me just explain that real, real quick. But no, go ahead.

Q No, you can go --

MR. LEVIN: Let her ask -- let her ask the question, please.

BY MS. YOUNG:

Q So this reading that you were on FMLA leave --

A Okay --

MR. LEVIN: What are we pointing at, I'm sorry.

MS. YOUNG: The bottom column --

MR. LEVIN: This isn't going to be on the record correctly.

MS. YOUNG: Sorry, a row, yes.

BY MS. YOUNG:

Q Sorry. The bottom row. So it says USA family medical leave, February 2nd thru February 14th. So you alleging that you were not on FMLA leave during that



MAGNA LEGAL SERVICES

time?
A Correct.
Q Okay. So I will now show you what we will mark as Defendant's Exhibit N.
A Short term disability, let me just -- short term disability --
MR. LEVIN: There's no question pending.
THE WITNESS: That's the FMLA you're referring to, short-term disability because I did go to these people, the short-term disability, and I was also on that, too.
(Exhibit N was marked for identification.)
BY MS. YOUNG:
Q Okay. So please look at this document that the court reporter is marking as Exhibit N and after you review it, let me know when you're done.
A Okay.
Q Oh, you're done?
A Yeah.
Q Okay.
A Yeah.
Q Okay. So this is a notice that you received letting you know it's an FMLA designation notice. Do you recall receiving this?



A Yes.
Q Okay. And on here it says that you've been approved between February 2, 2021 to June 2, 2021, correct?
A Correct.
Q So this is telling you that you were designated FMLA beginning February 2nd, correct?
A Uh-huh.
Q So do you still allege that you were not on FMLA starting February 2nd?
A Correct. You know why?
Q Tell me why.
A Okay. The reason why I'm saying I wasn't on FMLA because I called Devin on one of these, one of these days and I asked her could I use FMLA, could I use FMLA for these -- I think it was one of these absent days in February when I actually was -- it was pending. So what happened was, I hadn't got this paper. I hadn't got this paper for awhile. I didn't get this paper until probably like --
Q March 9th?
A Yeah, exactly.
Q That's the date.
A So the days that I was trying -- the days that I



was trying to use my FMLA, Devin told me I couldn't because she said it haven't been signed yet or something, but I was under the impression since I was on short-term disability, that's a form of FMLA, too. She told me, and I got point for these days.
Q You got attendance --
A I got attendance points for these days.
Q Okay.
A I have attendance points. I will get them too you, though. But I called Devin and asked her one of these February dates. I said, Devin, could I use my FMLA. She was like you, can't use FMLA because it ain't approved. But once when it's approved, any of them dates that we go back she said we'll take off, but she never took off -- she never took off some of the dates. I still end up with attendance points.
Q Okay. So did you request for your FMLA -- like this February 2nd thru February --
A 17th --
Q 17th, did you request that those days or your FMLA hours be applied to those days?
A You said am I what?
Q Yeah, no problem, I'll clarify.
Did you request that you could use your



FMLA hours to cover between February 2nd and February 17th?
A I asked Devin could I use them.
Q Okay.
A Yeah. If I would be approved to use them, but I wasn't. She said that I had to wait until the designation came in. That's why I ended up March 1st taking off for my first FMLA.
Q So you asked Devin if you could use FMLA between February 2nd and February 17th, correct?
A Yes.
Q And Devin told you you had to wait for the FMLA designation notice?
A Correct.
Q Okay. So then you received the FMLA designation notice on March 9th, correct?
A Correct.
Q And they said that you could use your FMLA between to February 2nd and June 2nd, correct?
A Correct.
Q So was it your understanding then that your request to use it during that time --
A That's why -- sorry.
Q -- was approved?



MAGNA LEGAL SERVICES

Page 154

A That's why I called in and asked Devin could I use it because I'm knowing what the -- let me see. I'm trying to think how did this work. Okay. I knew that I had filled out the paper for FMLA, so I asked her could I use it while it was still since she knew that the process was still going through. I'm already on short-term disability at this point with Liberty Mutual, I think it was. Some type of the other people that I was with --
Q Okay --
A -- but I'm on short-term disability now when I come back to work. And I asked Devin one of them days in February could I, could I use my FMLA hours since it was, I guess, pending or whatever. I thought I was still on it, but she said wait. And I ended up receiving attendance points for one or two of them February days.
Q Okay. So I just want to clarify. You asked Devin if you could apply FMLA leave to these February 2nd to February 17th dates, correct?
A Yeah.
Q Devin told you you had to wait until the FMLA designation notice, correct?
A Yes.
Q Okay. So then this notice came in and they approved you to use it then, which is what you requested,

Page 155

correct?
A No, I was -- they didn't -- they never -- I still ended up with attendance points for those, they never took them off.
Q Okay. Yeah, so I'm not asking about attendance points right now.
A Okay, okay, okay.
Q Right now I'm just asking about how you used your FMLA hours. So you received this designation notice and it said that you could use your FMLA hours beginning February 2, 2021?
A Correct.
Q Which is what you requested to happen?
A Yes.
Q Okay. So this February 2nd to February 17th, you requested the FMLA hours be used between this period, correct?
A I didn't request it. I asked could I -- not for all of these days. It was just -- it was a particular day that I was -- I wasn't feeling good, and I asked her, I said, Devin could I use my FMLA. And she was like, you're not on FMLA now. We didn't realize what they had put the dates to until the letter came in later on. You said it was what, January, February, March, you said when

Page 156

it would come in later on --
Q Yes. If you look at where it says sent, it has the date up there Tuesday, March 9, 2021, at 8:50 a.m.
A Okay, yeah, so yep.
Q And I just want to reword my question --
A Yeah, that's fine because I need to --
Q -- so you need to know what you're answering.
A Yeah.
Q So you requested that you use FMLA between February 2nd and February 17th and Ryder approved that request. They didn't notify you until March 9th, but they approved it. And on March 9th, you were notified that the FMLA would be beginning February 2nd, correct?
A No.
Q Okay.
A No. I didn't request FMLA at no time to be used for nothing. I just -- when I called and asked Devin, I didn't ask her specifically like can the February dates be covered because I was on short-term disability during these times. But when I come back to work in February, short-term disability stops now. So now that I have a flare-up, I asked Devin like, this was before even I was approved for this one right here (indicating) I asked Devin could I use my FMLA. And she said that I'm not --

Page 157

I couldn't. I didn't realize the dates, even though I know that I had filled out this paper in February, I didn't realize what dates they was going to use it for because if I got it on March, I'm just assuming that maybe they gonna put it for March or something like. Whenever they give me the paper, that's when I'm gonna know when my FMLA start. But just so happened, when I get this paper, I see the dates on it and I'm like, oh, okay, so they just went back to the day that my injury actually happened and started it from there because I wasn't aware of when they was gonna start. I just knew that I had filled out the paper to get on FMLA. So when I actually realized -- when I got this paper and realized those dates, that's how I realized that I was on FMLA from February, but I'm thinking that my FMLA started in March because that's when the day that I actually was on. Can I use FMLA, and they was like, yes, you can use it. February, you're not on FMLA Tommy. You got to wait 'til the paper come in.
Q Okay. So you received this email in March that tells you it was February 2nd. Did you raise any concerns about the FMLA hours being applied in February too anyone?
A I'm pretty sure I did. I'm pretty sure I let



MAGNA LEGAL SERVICES

Devin and them know that -- that date, I'm pretty sure I did.
Q Okay. So you said Devin, when did you speak with Devin?
A I spoke with Devin in February, the day that I was requesting to use the FMLA day. It was -- I can't -- it was between. It had to been from around the 8th to the 17th, one of them days right there because I was in the hospital on the 2nd all the way until like the 5th. Because I took off -- I was off that whole week, so I had to return to work maybe that, that -- let me see, 8th, 9th, 10th, 11th, 12th. I have to go back and see what the calendar was for the February 11th, 12th, 13th were them -- because I know it's Saturday and Sunday is the weekend, so it had to been -- I'm just thinking like what those other days were between the 10th to the 14th.
So whatever those were, those were the points that I could have received, even though I know we not talking about attendance points, but that's where I was thinking that I wasn't on FMLA until March.
Q Okay. And we'll get to the attendance points later. I don't want you to think I'm ignoring that.
So you spoke with Devin and you asked to use FMLA between February 8th and February 17th, correct?



A Correct.
Q Okay. So you only dispute the February 2nd, February 3rd, and February 7th date, correct?
A Correct.
Q Okay. And you believe you should not have gotten FMLA or needed FMLA hours for those days?
A I was on -- yeah, definitely didn't use them on them days. I was, you know, it's -- I mean, I don't know how they got them. I mean, I know I was on short-term disability if it's still considered like that's FMLA, but that was from that process. Just verbally word this, I didn't know. I had no idea that I was actually on FMLA in February until I received this paper.
Q Okay. So to clarify, when you spoke to Devin, did you request FMLA leave between the 8th and 17th of February, 2021?
A Yes, yes.
Q Okay. o the February 8, 2021, you have 10 hours of FMLA leave; is that accurate?
A No. None of this -- I mean, I'm just, I'm just trying to see here because I never requested FMLA until the 1st. All of these days right here, I'm under the impression short-term disability from the 2nd to the 8th and -- yeah, from the 2nd to the 8th, I'm gonna say that



that's short-term disability. From the 8th to the 17th, I was not on FMLA.
Q Okay. So Mr. Hatten, what did you expect -- when you called off of those days, did you enter PTO, did you enter a sick day, what did you expect when you called off those days or --
A Attendance points.
Q Okay. So you expected to receive an attendance point for the 8th, the 9th, the 10th, the 14th, and the 17th?
A I mean, for some of them days, I might have used some of my sick time. I could have been, but they were not -- What I'm saying is none of these is from the 8th to the 17th is not FMLA.
Q Okay.
A They just regular work days. And yeah, that's it, just regular work days.
Q So that's 1, 2, 3, 4, 5 attendance points --
A I wouldn't say they all attendance points either. They could have been scheduled -- because I definitely know that ain't that many points in a row. So they had to either been sick time that I may have used and called in, but I'm just saying they definitely was not FMLA hours.



Q Okay. When you went over this chart with Devin -- was this Devin or Adam?
A Devin --
Q Devin, correct, on July 26, 2021, did you raise any concerns about this February 2nd to February 17th date of FMLA leave hours?
A Yes, yes.
Q Okay. What concern did you raise?
A That I wasn't -- that she said that I wasn't on FMLA them days, you know. I even brought it up to her that it's -- my FMLA started on the 2nd. But she didn't approve me to take no FMLA days myself verbally, just on putting them in the system until March 1st.
Q Okay. And Mr. Hatten, you said your FMLA leave began on the 2nd. Is that March 2nd or February 2nd?
A March -- no, March 1st I mean. If I said the 2nd, I mean March 1st is when my FMLA actually started that I actually used it that it was okay to use it. Before then, it wasn't okay to say can I get FMLA because it basically was, you know, you're not on FMLA yet.
Q Okay. Do you believe that you took FMLA for any days that are not included on this chart?
A Do I believe --
MR. LEVIN: You're referring to Exhibit L?



MAGNA LEGAL SERVICES

MS. YOUNG: Yes.
BY THE WITNESS:
A Do I believe that I used any FMLA hours that's not on this chart?
BY MS. YOUNG:
Q Yes.
A No.
MS. YOUNG: Okay. All right. I think now will be a good time to take a lunch, so let's take -- off the record.
THE VIDEOGRAPHER: End of Video 2. Off the record 12:55.
(Lunch recess.)
THE VIDEOGRAPHER: This is Video 3, deposition of Tommy Hatten. The time is 1:52. On the record.
BY MS. YOUNG:
Q You ready, Mr. Hatten?
A Yes.
Q Okay. So I just want to go back and follow-up on a couple things we talked about before our last break, okay?
A Okay.
Q Okay. So one of the things, you said that you were approved for FMLA for your flare-ups, correct?



A Yes.
Q Okay. How often did you have -- I'm sorry, you already told me how often you had your flare-ups.
Did you use FMLA for the flare-ups?
A Yes.
Q Okay. Had you ever used FMLA for anything other than the flare-ups?
A Doctors appointments.
Q Okay. Tell me about those doctors appointments?
A Just any time within that time frame that I had doctors appointments that's what I would, you know, I would just use them. From the time that I was approved, that's it.
Q Okay. How often were your doctors appointments?
A Maybe in the beginning once a month.
Q The beginning --
A I mean, what I mean the beginning like as of starting from like March of 2021 all the way up until my termination.
Q So August 2021?
A Yes.
Q Okay. And were all of the doctors appointments related to the eye stroke?
A Yes.



Q Okay. And who were your doctors appointments with, who was the medical provider?
A My primary doctor, Dr. Schubert. Also the retinal doctor, I think it was Pollack, I think. I don't know the name exactly.
MR. LEVIN: Kindly speak up a little bit, please.
BY THE WITNESS:
A Okay. Yeah, just my retinal doctor, that's whatever his name was.
BY MS. YOUNG:
Q And you said Pollack?
A Pollack, yeah, something like -- yeah, one of those.
Q For the record, I believe that's P-O-L-L-A-C-K.
And he was your retina doctor?
A Yes.
Q Okay. Any other doctors you saw during that time for your eye stroke?
A Yes. I was seeing the -- they put me on blood thinners, so I was -- I go to the doctor once a month still currently 'til today to have my bloodwork checked to make sure my blood levels are in line and not too thick, not too thin. So I see the doctor for that once a month still to this day from the time that my injury



happened.
Q So the bloodwork and the blood thinners, that was a result of the eye stroke?
A Yes.
Q Okay. And who is that doctor?
A There's really no particulars, just a clinic so they may -- they be switching different doctors every, pretty much a lot, often --
Q Okay.
A -- you know, so I done seen maybe from the time that it's been I done seen like three different doctors. I don't know their names right off. Just first name Ashley, I think. That's about the main one I know. My first, my first one, I think her name is Ashley. I am not 100 percent sure, could be something else.
Q Okay. And was name of the health center?
A Provena St. Joseph in Joliet.
Q Provena --
A Yeah --
Q St. Joseph, okay. Okay. Did you ever have a flare-up at work where you didn't use FMLA?
A No.
Q Did you ever have a flare-up period where you didn't use FMLA?



MAGNA LEGAL SERVICES

A Not at work. I mean, yeah, no.
Q Okay. And then earlier you also said that your FMLA leave you expected for it to end in February 2022, correct?
A Yes.
Q Okay. Did you understand that it could end earlier than that?
A Yes, I understood that, too.
Q Okay. What was your understanding of how it could end earlier?
A If I use more than what, you know, that's the only way. If I just using it -- if I use it, it's gone, so I mean, yeah, that's, you know, if I use it -- what was the question again.
Q Yeah, no problem.
So I asked you if your FMLA was expected to end in 2022, and then I asked did you understand that if you run out of FMLA before, like you could run out of it before 2022?
A Yeah, I was aware of it, only if I was using it in that kind of manner, yeah.
Q Okay. How were you aware of that?
A Just I mean, just a common knowledge if I'm using, you know, if I use -- if I got a certain amount of



hours, if I got five hours, and I use five hours, then I don't have no more hours left. It's like real kind of like simple math. I knew how much that I supposedly had, and you know.
Q Did anyone tell you at Ryder what would happen if you ran out of FMLA prior to this February 2022?
A No. No one really exactly just said, you know, it wasn't -- no, no. No one said what would happen if I ended it. I mean, I did -- I mean, it's -- I mean, I did but no one really elaborated on telling me that, you know, you will be -- no one just actually said anything about the FMLA talks really. It just was never -- I was just the main one asking questions. No one never did, so when I asked a question -- no one really never just gave me a flat out answer to it. I can't -- you know, I don't recall I was concerned about it. No one gave me -- I don't recall nobody just saying hey, you're fired, but no one told me anything what would happen if, you know what I'm saying -- it's just, nothing --
Q Did you ever ask anybody what would happen if, so you had whether it was 400, however many hours you had --
A Yeah, I brought it up to Devin.
MR. LEVIN: Let her finish, please.
THE WITNESS: Sorry.



BY MS. YOUNG:
Q Did you ever ask, okay, if I run out of these hours, let's say, by October and you're expecting it until February, what happens next?
A Yeah, yeah.
Q Okay. Who did you ask that to?
A I explained that to Devin what would happen. I think it might have been around the time of this paper being signed.
Q So June -- was that June 2018?
A Yeah, we can use that.
Q Okay.
A I told her that if I am this close to the hours that they saying I have, I can be terminated next week. She said -- she just was like nothing basically like just an expression like, no, you got 500. She was just still with the 500 hours, so...
Q Okay. Did Devin say that specifically?
A Yes.
Q That you have 500 hours?
A Yes, she said I have 500 hours. I asked her if after we put these in if the hours is that much, they totaled up to that much, could I possibly, you know, I can be terminated. So she was just like, no you still



have this many, you still have up until 500 some hours, so...
Q So you asked Devin if you could be terminated, correct?
A Yes.
Q Okay. What made you ask that?
A Because just -- I just know that I would be out of -- if I'm out of hours, and you know, I think she even -- I think we may have even talked about that or something. I mean, like I said, there was a lot of verbal conversation concerning because I am very concerned just like I'm, you know, I be concerned about things, so -- but yeah, I'm pretty sure I brought it up to her, and you know. But I mean she just, like I said, it was a lot of communication on that end, it was just verbally, and that's what was said. I let her know that if I got these many hours, she just, you know. So, I mean, did I answer that?
Q Yeah. Did anybody at Ryder -- I know you said Devin didn't give you anything in writing about the amount of FMLA hours -- or the 540 hours --
A Yes --
Q Did anybody at Ryder give you anything in writing saying that you would get more than 480 hours?



MAGNA LEGAL SERVICES

A No.
Q Did you ever ask for anything in writing?
A No.
Q And then I know you mentioned earlier that the Labor Board was involved around July 26, 2021 when we did -- signed the FMLA acknowledgement. So Defendant's Exhibit L. Tell me more about how the Labor Board was involved. Had they spoken to Ryder to your knowledge?
A Yes.
Q Okay. When did they speak to Ryder?
A They were in communication with Ryder all through the June month, definitely all through that June month.
Q When we refer to the Labor Board, this is Edith, correct?
A Edith. Edith, yes, the investigator.
Q Thank you. Who did Edith speak to at Ryder?
A She told me she spoke with Abby.
Q Edith told you she spoke with Abby?
A Yes.
Q When did she tell you this?
A In July sometime when we spoke -- I mean, in June when we spoke, say about June or July was the time frame that the -- so it was any time from June to July.
Q And how did that come up, did you call Edith?



Did Edith call you?
A She called me.
Q Okay.
A And she was just explaining that she spoke with Edith and her understanding -- the first she couldn't get in touch with her, but her understanding is that I had a bunch of hours --
Q Mr. Hatten, I don't want to cut you off because I don't want you to lose your train of thought. But just for clarity, when you say her and she, Edith. Are you say Edith spoke to Abby?
A Edith spoke to Abby.
Q Okay.
A And Edith said that Abby, I guess, told her that I had one amount at this particular time. I supposedly had 3 to 400 hours left in July.
Q Okay.
A I mean, as of June, somewhere in between that time, that's what she was telling me. And then when we spoke again, she said that Abby gave her another number. So she said she was confused because she don't know where's -- she said that if they telling her that they got this number, she said why is they telling me that they got this number. So she was confused because they



was telling her one thing and they was telling me one thing, so she wasn't clear on why that was going on. She said she didn't understand a lot of stuff that was going on with it and she's waiting on Abby to get in touch with her to call her back for a little more clarity on it.
Q Okay. And what number did Edith tell you Ryder told her?
A Edith said that Ryder told her that at this particular time in June, close to July, I guess, that I had 3 to 400 some hours left to use.
Q And what did Ryder tell you?
A Ryder told me that -- let me see. It was just, yeah, I don't remember exact number that Ryder had told me at that -- I'm trying to think who told me this. It had to been Devin because that's the only one I spoke with. So I think the number that -- I'm trying to think. Oh, no. I'm trying to think how it all went.
MR. LEVIN: What did Ryder tell him, we're asking him about how many hours he had left.
MS. YOUNG: I am asking, yes, what Ryder told him about the amount of FMLA hours he had.
THE WITNESS: Versus what Edith was told --
BY MS. YOUNG:
Q Yes.



A Is that what the question was?
Q Yes?
A Okay. Okay.
Q And if you don't ever like understand a question, you can just let me know.
A Okay. I don't think that it was -- Edith and Abby had came up with a number. But then when I called Carol Bates, that's how I ended up coming up with the number that she had. So Edith was saying that Abby told her I had, I guess, 300 and something. Carol Bates was telling me around the time was 400 and something, but I had let Carol know that I had used way much more than that. So I knew that the number that Carol had -- I'm trying to think. I'm trying to think, was this before we entered these hours or after. I'm just trying to get my train of thought together here.
Q Okay. And you can take your time because I want you to be able to provide --
A Yeah --
Q -- the most accurate timeline that you can recall?
A Yeah. I don't know about the time. I just -- I don't know if at the time I was -- I'm trying to think how we came up with this number.



MAGNA LEGAL SERVICES

Page 174

Q When you say we is that --- who are you referring to?
A How --
MR. LEVIN: I think it's getting more confusing because we keep getting away from what the original question was, so...
MS. ORLER: I think Erica would like an answer to the question she just asked without you coaching the witness.
MR. LEVIN: I'm not coaching him. I'm trying to confirm where we're at.
MS. ORLER: I think he understands and will let her know if he doesn't.
BY THE WITNESS:
A Yeah. I don't, I don't really recall how all of that trans -- I really don't recall how all of that played out. I just know that Edith said that Ryder told her, as in Abby, that I had a specific amount of hours, and I'm just trying to think --
BY MS. YOUNG:
Q And I just want to go back for one second. You said we -- you were trying to figure out how we came up with the numbers --
A Yeah, meaning, meaning --
Q -- who is the we?

Page 175

A Meaning if someone from Ryder -- meaning, I'm thinking if I'm going off my number from Carol Bates or it's, it's complicated for me to answer it because I'm just trying to figure out at this point in time when Edith told me about the number of hours was -- did I really know at that particular time how many hours that I actually had.
Q And when you said how many hours you actually had, are you referring to how many FMLA --
A FMLA hours.
Q -- hours you had left or how many FMLA hours you had used?
A Had left.
Q Okay.
A Yeah.
Q Okay.
A I don't know. I just -- Edith told Abby that I had 300 and something hours, and maybe a couple weeks later, maybe I didn't know at this particular time how many hours I did have. So I think when Edith told Abby -- I mean, when Abby told Edith that I had 4 -- 3, whatever it was up there, so they told her the next conversation about a week or two later -- hold on. No, no, no, no. I'm just trying to think of how that all

Page 176

went because I might of didn't have no part in that. It might have just been Edith telling me that Ryder told her that I had this amount and now they telling her that I got this amount. So she just wanted to know how -- what happened in that little time frame that the hours changed.
Q Okay.
A So it wasn't from my knowledge of the hours that I was aware of, it was just Edith, the investigator, telling me that Ryder was telling her two amounts --
Q Okay.
A -- within a time. So she was trying to narrow it down like -- I'm trying to figure out this is what Edith is telling me. She's like I'm trying to figure out why they telling me, why Abby is telling me that you have this amount and now they telling me that you have this amount, which is lesser, way much lesser, maybe a couple hundred more lesser than what she just said that I had a week or two ago.
Q Okay. And what time frame are you referring to?
A From in the June --
Q End of June --
A Not the end of June, but in June sometime. I'll say the middle of June.

Page 177

Q Okay --
A Yeah, because --
Q Was it-- sorry, you could finish.
A The middle of June, end of June, somewhere around there. That's when her investigations was going on.
Q Was it after June 18th when you received the letter from Adam telling you that you have 480 hours?
A Yes.
Q Okay.
A This was June 18th you said?
Q Yes, and it's Defendant's Exhibit A.
A Oh, here we go. Yeah, definitely after that.
Q Okay. So after June 18th is when Edith told you that Ryder gave her a number --
A Yeah
Q -- that was different than this 480 of the hours you were allotted?
A No, that was --
Q I'm sorry, entitle to --
A No, no, no. It wasn't about the hours that I was entitled to --
Q Okay --
A These were the hours that I had left --
Q Okay.



MAGNA LEGAL SERVICES

Page 178

A So Edith said that Abby aid that as of that time when they spoke on the phone in June sometime that I had 3 to 400 hours or something left to be used.
Q Okay.
A Then a couple weeks later, she gave me a call and she was like confused on -- she was like I'm trying to get a little more clarity when I talk to Edith -- I mean, when I talk to Abby I will be able to give you a little more clarity on why they saying that you had this much and why you have this much now.
Q Okay --
A Edith was confused herself.
Q Okay. So then you said that the investigation was still -- or Edith's investigation was still going on on July 26, 2021?
A Correct.
Q What were you aware of about the investigation? What was Edith still investigating to your knowledge?
A Just looking into the -- just trying to get in touch with, I guess, whoever someone can tell her about how the hours was going.
Q Okay. And she had already spoken to Abby at this point, though, right?
A Yes.

Page 179

Q Okay. So was, to your knowledge, was she just waiting to speak to someone else?
A I think she -- she kept saying she was waiting to speak with Abby.
Q Okay.
A That's who she was referring to majority of the time when I talked to, so I think she was in with Abby.
Q Was any of your conversations with Edith written?
A No.
Q Okay. Did she ever send you anything in writing?
A I have some -- I have some emails from her, but email account got messed up and they wouldn't let me reset my password and a lot of that, a lot of that stuff got, with her, got lost into that, my email.
Q So You had emails with --
A I had emails -- sorry.
Q You had emails with Edith, but you don't have access to those emails today, is that what you're saying?
A Yes.
Q Okay. Is there any way for you to get access to those emails?
A I can't. I can't. I can't. They -- Yahoo shut me out. They wouldn't let me reset my password for some reason. I was able to reset it, but the email account

Page 180

that I had when I set up the Yahoo account was years ago. I don't have that information for that email, so I couldn't reset, have the password reset.
Q Okay. What was the email address that you were communicating with Edith on?
A Tommy, T-O-M-M-Y, 6044@yahoo.com.
Q Okay. Was there ever any follow-up from Edith about her investigation closed or was there a result of her investigation, or did she communicate any further with you beyond that June, July, 2021 date?
A Yeah. She -- the last time would have to have been like in July, close to the end of July.
Q Was it after this July 26?
A Yep, yep, yep.
Q Okay.
A Okay (talking to himself). Yeah, it was after that, so it was around about probably the beginning of April -- I mean, August.
Q Okay.
A Yeah, Beginning of August '21, she came up with the -- she said she reached her conclusion, and that's what --
Q And what was her conclusion?
A She concluded that Ryder was able to use the

Page 181

hours for mandatory overtime, but the amount of hours that they allotted me was wrong.
Q And did she say how many hours you should have been entitled to?
A 540.
Q Was that in writing?
A I'm pretty sure -- I'm not for sure. I have emails -- I haven't been in my email account since my termination, so I can't really recall exactly what those emails were really stating, but I definitely know I got emails from her, phone conversations and stuff.
Q Was this the Tommy6044 or was this a separate email address?
A No. It's the 6044 that Edith was communicating.
Q Okay. And so she told you Ryder can use your FMLA leave for mandatory overtime?
A Yes.
Q And then she told you that you're entitled to 540 hours of entitlement?
A Yes.
Q Did she explain to you how she came up with that number?
A No.
Q Okay. Did she explain to you --



MAGNA LEGAL SERVICES

Page 182

A No -- sorry.
Q You can go.
A No, no, no, no. She might have elaborated on it a little bit, but I don't really recall how we -- yeah. I mean, I'm pretty sure she went over it with me, but me just hearing the 540 hours from her, I didn't really need her to go into details about how she came up with the number because I'm just like maybe she figured it out, you know.
Q Okay. And then are you aware -- to your knowledge, did she share the results of that with Ryder?
A Yes.
Q She did, when, if you're aware?
A That -- before she contacted me.
Q Before she contacted you, she shared it with Ryder?
A Yeah. Hold on. Shared what with Ryder?
Q Her results ---
A Her conclusion?
Q Yes.
A Yes.
Q Okay. How do you know that she shared it with Ryder?
A She let me know on the phone all, our last phone

Page 183

call. She said that Ryder let them know when she talked to Abby what the number was and she was like they were able to use the hours, but your hours that were allotted to you was wrong.
Q Okay. And you aid she shared that with Abby?
A Yes.
Q Okay. Do you know when she shared that with Abby because you said she spoke to you August, right?
A Yes.
Q Okay. So would that have been -- I guess it would have to be between July 27th and --
A Yes.
Q -- August 16th or something?
A Yes.
Q After that, did you follow-up with Ryder when you received the results of -- or Edith's results or conclusions?
A I didn't -- no.
Q You didn't follow-up with Ryder?
A I didn't follow-up with them.
Q Why not?
A Because at that time after she gave me her conclusion what she came up with, that next day on the Monday I had a final, written warning for attendance --

Page 184

no, sorry. At that time, when Edith gave me the decision, that first Monday in August was when Jorge Nicholsen told me that they sent him an email, somebody from corporate sent him an email and said that I was exhausted on my FMLA.
Q So just to clarify, why did you not follow-up with Ryder after receiving Edith's conclusions?
A Okay. So after that, I asked -- so when Jorge tell me it could have been like -- okay, when my supervisor Jorge tell me that he got the email from corporate stating that I was terminated, I asked --
Q One second --
A I mean, not terminated. Sorry, sorry. That I was exhausted on FMLA hours and that I would be on attendance policy, I asked him at that time could I, could I see the report on what they came up with for my hours, you know, how did they come up with that. And I just had a lot of questions, but no one -- I had -- I requested to peak with someone at that time.
Q Okay. And I'm going to get into that meeting with Jorge, but really quickly, I want to go back to this Edith conversation that you had.
A Okay.
Q Was it your understanding that Ryder had to

Page 185

accept Edith's conclusion or what did you expect out of Edith's conclusions?
A What did I expect out of Edith's conclusion?
Q Uh-huh.
A Nothing but just they were -- that they were able to take the hours now, and you know, she told me to go get on with the EEOC.
Q Edith told you to go to the EEOC?
A Yes.
Q Okay. When did Edith tell you this?
A She told me right after she told me that they were able to use the hours. She said that they may be able to help you there.
Q And did she say why the EEOC would be able to help you?
A She just said that maybe your rights is being violated in some other way.
Q Okay. Did she say what way?
A She didn't. She didn't actually state it.
Q Did you ask in what way your rights may have been violated?
A Yes, I did. She said that, she said that they only looks into hours and wages, but EEOC look at the equal -- I guess equal employment opportunity. I guess



MAGNA LEGAL SERVICES

Page 186

she's saying to make sure I'm getting equal employment as others or something. You know, she was basically saying that it was an unfortunate situation for me, they was able to take them, and that she just maybe I need to go check with the EEOC because she had never heard of no one taking them at this rate. So she was just like maybe you can see if something else is being done, you know, to you.
Q At least -- I'm sorry to cut you off. Were you finished?
A Yes, I'm finished.
Q Okay. When you say taking them at that rate, are you saying -- what are you referring to?
A For the overtime, that amount of overtime that they was using, the 20 plus hours a week that they was mandatorying for months, she was just saying that in the result of that amount of overtime, I have to use my FMLA for those hours. So she was just like I never heard of no one really jut working that many hours of overtime, that amount, so she just prompt me to go to the EEOC.
Q And how many hours of overtime did you take a week?
A How many hours were we working a week you're saying?

Page 187

Q How many hours of overtime did you take each week?
A For my FMLA.
Q Just in general, your work schedule how many hours a overtime did you work each week?
A Did I actually work or scheduled -- was scheduled to work it?
Q We can start with scheduled?
A Maybe 25 hours.
Q You were scheduled for 25 hours of overtime --
A 25, yes. A total of 65 hours, like 65 hours a week.
Q Okay. So earlier you testified that your schedule was Sunday thru Wednesday 6:00 p.m. to 6:00 a.m. and then it changed from 6:00 to 4:30 a.m., and then you said you worked approximately. And then when we just went through your hours, I want to be very accurate --
A Yeah, because I got another detail to put it.
Q I don't want to misspeak. So when we went through your hours when we were going over Ryder's investigation into your FMLA hours, you said you worked approximately 42 hours a week?
A Yes.
Q So how did we get from like schedule from 25

Page 188

hours of overtime to working 42 hours?
A Okay. So I didn't throw in the two additional overtime days. I just was giving you an overview of my actual work with without the overtime -- that the mandatory that they were, you know, the 12 hour shifts were mandatory. Like I said, it was 6:00 to 4:30.
Q Okay.
A But they never worked that so it ended up being 6:00 to 6:00. I just didn't let you know that when they started -- the mandatory overtime when she, when Devin called me let me know that we were working overtime, those included two additional days, Thursday and Friday. I just didn't let you know how that extra mandatory overtime was in there as well. I just was giving you an example of the 6:00 to 4:30 versus the 6:00 to 6:00, which the actual work week that you were going to come in and work. But when Devin contacted me up in March sometime about they was going to be mandatory, those were two extra mandatory 10 hour days. So two extra Thursday and Friday was the mandatory day they were working.
Q Okay. And was that every --
A Every week.
Q Okay.
A From March to the termination of 2021.

Page 189

Q But you worked on average 42 hours a week, correct?
A Yes. I mean, well, last -- I mean, what a year before I had started that was the 42 hours.
Q Okay.
A That's how they come up with that. That was the year prior to the 2021. 2020 would have been 42 hours, that's how they ended up with the calculation thing going on.
Q Okay. So then from let's say February 2021 to August 2021, how many hours a week did you work?
A From February 2021 to August of 2021?
Q Yes.
A It's hard to answer that because it always been overtime. 6:00 to 6:00 is the mandatory overtime. 6:00 to 4:30 is the regular, so 6:00 to 6:00 is the mandatory starting from day from 2018 when I started it was always 6:00 to 6:00.
Q Okay.
A You know, and I let you know they changed my schedule and all of that. So but as of January '21 it was 6:00 to 6:00 still. March they ended up -- it was always throughout my work week they made mandatory a Thursday or something like that. I'm just trying to get



MAGNA LEGAL SERVICES

accurate --
Q And Mr. Hatten, this is March 2021?
A Yes.
Q Okay.
A Everything is March 2021 here.
Q Okay.
A So from January 2021 all the way up until August. January, we may start in January, we may have days that we work a Thursday and Friday randomly. 6:00 to 6:00 is the mandatory. 6:00 to 4:30 regular shift, 6:00 to 6:00 mandatory. When Devin called me up in March sometime for the additional mandatory, it was Thursday and Friday. So to give you a total from January to August is kind of hard to just be like, hey, we work -- because we didn't work 60 some hours a week starting in January. It was just the mandatory 12's that we were working.
Q Okay. And it started in March?
A March, that's when it actually got a little hard core with the mandatory. It went from just not only just the 12-hour days, now we were -- now it went to two 10-hour days, which would be Thursday and Friday as of March.
Q Okay. So between -- so then let's exit out January and February.



A Okay.
Q From March to August, on average, how many hours did you work?
A 65.
Q That's how many you were scheduled or worked?
A I was scheduled.
Q Okay. So -- and I just want to be very clear. From March to August, you were scheduled for approximately 65 hours a week?
A Yes.
Q And then how many hours did you work?
A 36.
Q Okay. And did you use FMLA for the times that you didn't work?
A Yes.
Q Okay. So now I want to get back to Edith tells you to go to the EEOC for help because your rights were being violated?
A (Indicating.)
Q You can go ahead.
A She didn't say that they were. She said that they may be violated, you know what I'm saying. They may be -- she didn't say that oh, yeah, they violated. She said look into the EEOC because they may be violating



some rights somewhere else.
Q Okay. And then what was your response to Edith?
A I think I asked her what could it be or something like that, that's how I'm coming up with conclusion on they're another division, we don't handle -- she was saying that they just handle things with payments and hourly wages, but the EEOC handles stuff concerning like my rights or something if I felt like -- you know, no one never used the accommodation word but she felt like if I needed a little more help on what was going on, I guess. I don't really know. She just, she just said that and I just did it, you know.
Q You did what?
A I filed with the EEOC. She referred me to them and that's what I did.
Q Did you speak with anyone before filing your EEOC charge?
A No.
Q And I know you said you researched like the FMLA and things such of that earlier, did you research anything additional after Edith referred you to the EEOC?
A No. Just strictly FMLA stuff.
Q Okay. And then was there ever a time where you worked and you didn't clock in?



A No.
Q Was there ever a time you left work and you didn't clock out?
A No.
Q Okay. So you always clocked in when you came --
A Yes, yes.
Q And clocked out when you left?
A Yes.
Q Okay. And then I want to go back because I'm very -- well I'm a little more clear about your conversations with Devin. I think the conversations with Adam we didn't get into a lot of detail on, so I just wants to go to your conversations with Adam.
A Okay.
Q Okay. So when was the first conversation you had with Adam?
A Maybe a couple weeks, maybe about, let me see, May. It probably could have been in May. If this here is for in June because this is from the response from my conversation, but -- so I would assume that it had to been in May sometime.
Q Okay. So your first conversation with Adam was in May of 2021?
A Of 2021, yes.



MAGNA LEGAL SERVICES

Q And how did that conversation -- like how did that conversation begin? That's when -- I'm sorry. Did you testify that Carol referred Adam?
A Carol Bates.
Q Okay. And so did Adam call you?
A I don't know if I got transferred to him or I don't really recall how me and him actually got on the phone.
Q Okay.
A I really don't recall how we ended up on the phone.
Q But it was the phone conversation?
A Yes.
Q Okay. Tell me what was said on the phone conversation specifically, and try to be as specific as is possible to what you can remember?
A Okay.
Q Who started conversation?
A I'm pretty sure I did.
Q Okay. And what did you say when you started the conversation?
A I was -- I was calling -- I was telling him I was just calling to find out if it was something else that they could do or if there's anymore hours that I can --



if anymore hours that I get for them taking so many hours. So that's what it was. I"m like do I get any hours back for you all taking the hours that you all using because I may need to use those hours for medical stuff like that. Like I was just telling them that I was trying to figure out do I get compensated for extra hours if they using my hours.
Q And when you say using the hours --
A Using my hours for FMLA. Sorry, I didn't mean to cut you off --
Q Okay. No, it's fine.
And you're saying they were using your FMLA hours to cover the time that you weren't working?
A Yes.
Q Okay. And then when you expressed to Adam like hey, hours are being used, what did Adam say?
A He just said that I know that they working a lot of overtime, and you know, pretty much a lot of the stuff that -- I don't remember every word, but I was telling them about what I was researching on the internet about FMLA. I was going into a conversation about that and he pretty much was like, okay, I mean, I understand what you're saying. You're like, you know, you pretty much letting me know stuff that I really didn't know. So I'm



like, okay, well, you know, he was just like I can get with the team. He was like, I'm pretty -- he was like they know a lot of stuff about the FMLA, so don't worry about it, we going to get you the answer and that, and all of that, and that's pretty much it, how -- that's it. I can't remember no more what was said, but that's how it actually went. I was calling to find out if I can be compensated for any extra hours for the hours that they were taking for that rate and explaining to him at that time what I was reading over the internet, does that make sense, is that right how it's supposed to be, and he didn't really know. He is just like, you know, it sounded like you know what you're talking about, and you know, I appreciate you calling and knowing, you know what I'm saying, what you really want to be talking about and I'll get back to the leave, absent team and I'm pretty sure they can get back up with you and let you know. And that's what he ended up letting me know, this paper.
Q Okay. Did you talk to him at any point between that May 2021 phone conversation and June 18, 2021?
A What May '21 phone conversation?
Q The one you just told me about.
A With Adam?
Q With Adam, yeah. Did you talk to Adam in between



that conversation that you just spoke about and when he sent this letter on June 18th?
A I think I did. I think I spoke with Adam twice. I can't recall a second conversation though.
Q Do you know when it was?
A It had to been after this letter sometime.
Q So it had to be like end of May, beginning June?
A No, the end of June. I mean, if this paper was -- if this paper was given to me in June -- okay. Yeah, when he gave me this, then I may have called him back after this date.
Q Okay. So it was after this?
A Yes.
Q Okay. I'm following now.
A Okay.
Q Okay. So you spoke to him in May, he was like, hey, this is what's going on, and then he said he would look into it, correct?
A Correct.
Q And then he sent you this letter on June 18th, correct?
A Yes.
Q Saying he looked into it and telling you what he found, correct?



MAGNA LEGAL SERVICES

Page 198

A Correct.
Q Okay. And then you called him to follow-up?
A Yes.
Q Okay. And that was the end of June?
A Had to been. It was shortly after this letter got to me.
Q Okay. Was it like -- I know you don't know exactly, but do you know a range?
A Yeah, I would say about a week after I got this.
Q Okay. So I'll just put one week after letter. Approximately one week after letter.
Okay. So you call Adam, what do you call Adam and say?
A Like I say, I don't remember exactly that, but I called him and was just expressing, okay if, you know, that is he sure that that's right, do -- if he come up with that, if he came up with them hours, I wasn't -- I was telling him that that wasn't really my concern about the hours. I was concerned about how they were using the hours for the mandatory and, you know, the rate that they were taking them out as if I could be compensated any additional hours, that's what my main thing was.
Q So to clarify, you told Adam that you weren't concerned about the amount of hours you received?

Page 199

A Yes.
Q Okay. You were concerned about the way the hours were being applied?
A Yes.
Q And what about the way the hours were being applied that you were concerned about?
A Yes.
Q Well, I'm asking. I'm sorry, let me rephrase. What about the hours --
A Oh, what about the hours --
Q -- hours were being concerned that you were --
A I was just being concerned about how they're being used -- I mean, I wanted -- not how they being used. Exactly how they being used, but the rate that they're being used as, I was just trying to get like, okay, these are medical hours, these are FMLA hours supposedly for medical. So I'm just -- I was just like do I get compensated for anything else because the hours are getting exhausted fast with the overtime. So I was just, you know, like I only had been to the doctor maybe twice since my injury or something like that two or three times from the times. So I'm like, at this rate, I can't even afford to really call off because if they taking these hours, I had to let him know like if they taking

Page 200

these kind of hours and I'm actually working, it's gonna be a whole 60-some hours gone if I don't -- or maybe just an even 40 and not even include the overtime. I'm just -- I was just concerned about hours being used at that rate because if I do decide to even have a doctors appointment with them taking that amount and I'm actually working, that's going to be double that if I'm actually need to actually use it to be off. So I'm just like can I be compensated for anything. Because like I told you before, I didn't know the word accommodation at the time to really tell them what I'm really trying to ask them for.
Q Okay.
A So I would just -- that's what -- the second conversation with Adam was about to find out, okay, if I see the 480 hours, but that really wasn't my concern. My concern was, and I couldn't word it then, my concern was just accommodation for if my hours get used.
Q Okay. And just to clarify, you say you were concerned about the rate of your hours being used?
A Yes.
Q Were you every time -- so like the rate is that like just how often you had taken FMLA leave?
A Just how -- yes. I mean, just how they able to

Page 201

use the hours for these amount of overtime hours that they were working.
Q Did they ever apply FM -- did Ryder ever apply FMLA leave for anything other than like you requesting FMLA leave? Like every time Ryder said, okay, here is two FMLA leave hours, how did Ryder determine that that was two FMLA hours on any given day?
A Okay. So if I'm working -- if I work 40 hours out of the 42 hour, then if I work 40, then they take 2.
Q So was the two hours because you had a flare-up?
A The two hours were because I was on a work -- I was on a reduced work schedule, so the hours that I was approved to work versus the hours that I was actually scheduled to work, that's how that came up out of there. If I was approved to work five to ten hour days, whatever, however many hours a week, that's how that -- I was aware that's how the calculations came out.
Q Okay. So --
A I didn't -- even without me requesting it, that's just how -- I mean, well, I had to always, like I said, I had to always request it if I'm using it, but that's how they came out. I was aware that that's -- if that answers the question, I don't know.
Q I just need a little bit clarification. I'm just



MAGNA LEGAL SERVICES

Page 202

trying to follow you.
A I'm sorry. I might have put too much on it.
Q No, it's completely fine. We'll work through this and get clarification.
Let's just go to this FMLA acknowledgement sheet, Defendant's Exhibit L. And I'm just trying to understand. So, let's say -- let's choose an easy day. April 14, 2021, you have 3.17 FMLA hours. Does this mean that you had to leave work 3.17 hours early because of a flare-up or what was that -- how did they determine 3.17 FMLA hours?
A I guess just off of my schedule. I mean, if I didn't -- if I didn't work the remaining hours of the shift, they just take out the balance of what I didn't work. I mean, that's --
Q So why would you not work the remaining hours of a shift?
A Oh, because I was just working the hours that they were approving me for. I was just working the hours that they were approving me for, for the -- yeah.
Q So let's say you're at 35 hours or like this day, right, it's like 3.17 hours. So even if you didn't have a flare-up, you would not work the 3.17 hours because it was less than what you were approved for? I'm trying to

Page 203

understand like when did you decide the 3.7, 1.7, all of these number, like how did you decide you weren't going to work those extra hours?
A Oh, it would just -- I guess, I mean, I always -- I guess when I came back from the FMLA and I just worked the schedule that they approved, I worked the reduced schedule, that's it. I just worked the reduced schedule and they just took the hours out. I mean, I just -- that's it.
Q So if you had worked 35 hours in a week, but you didn't have a flare-up, does that mean that you're not working the additional hours and you're going to take FMLA leave?
A Yeah, if -- basically if -- yeah. I mean, the only way I can answer that is I just was working the hours that I was approved to work.
Q Yeah. So let me just clarify. I know it can get a little confusing, so I'm just going to clarify.
So let's say you were scheduled to work 12 hours in a day?
A Okay.
Q Okay. You worked 10 hours, let's say that's your max, right?
A Okay.

Page 204

Q So for those extra two hours, did you just not work because it was beyond your max or was it a flare-up that caused you not to work the extra two hours?
A Some was flare-ups, some was just to rest my body, you know.
Q Okay. Unrelated your eye stroke?
A It was related, but I mean, like I say, it was just -- I mean, yeah. I mean, basically, yeah. I mean, I worked the reduced -- I just worked the hours that I was -- even if it wasn't a flare-up, I would still work my reduced hours if that answered it like. Without a flare-up or not, I would still work my reduced hours.
Q Okay. Got it. Okay. So you had the conversation with Adam one week later, you told him the concerns. Did Adam follow-up with you or say anything else?
A No.
Q Okay. And was that your last conversation with Adam?
A Yes.
Q Okay. Anybody else that you did not already tell me about, I have Devin, I have Adam, and I have Carol Bates and Edith. Did you talk to anybody else between February and July 2021 about FMLA or your hours or FMLA,

Page 205

anything related to FMLA and your eye stroke?
A No.
Q Okay. So just Adam, Carol, and Devin, correct?
A And Edith.
Q And Edith?
A Yes.
Q Okay. Okay. Now earlier I asked you to, when I was asking you about why you brought the lawsuit, you had mentioned that you felt like you was discriminated against. How did you feel like you was discriminated against?
A Did I use that word or did I feel like my rights was just being violated.
Q You said that your rights were violated and then I asked you can you get into more detail. You told me that you weren't treated equally, but then we kind of clarified that that's not the case, and then you went into discriminated. I just didn't follow-up at that time.
A Okay.
Q And if you don't feel like you were discriminated -- let's start there. Do you feel like you were discriminated against at Ryder?
A Yes.



MAGNA LEGAL SERVICES

Q Okay. How?
A By being -- by not -- it was a couple of things.
Q Okay.
A I mean, I felt like it was a little negligent for them, for me to -- okay. I called -- at the time of my injury, I called and let Devin know, and she requested that I get on FMLA. Like I say, I didn't know how to process working. I didn't know nothing about this thing going on with this FMLA thing or what, like I don't -- this happened to me, I asked for FMLA. And the reason why I feel like my rights were being violated or I was being discriminated is because if you come to me and I was feeling like they were sympathetic to the situation by letting me know go to human -- I mean, go to fill out and get on FMLA for your eye just in case you may need any additional medical stuff, you know, you can be able to use that, and you know, without being -- but just the point of I was on FMLA, they approved me for work, for work schedule, and I was doing -- I mean, well, basically I felt like I was being discriminated against because I didn't -- no one actually communicated with me no time during this FMLA period. Like I was reaching out and speaking to some -- everybody who I could possibly speak with concerning I'm worried about my hours being used up.



And just by them how everything went. I was told through an email that wasn't actually sent to me, to my supervisor, I was told through an email that I'm exhausted, and the next day, they got paperwork -- even though -- when they said I was exhausted, I had asked to speak to someone then. So the next day I was issued a final warning for attendance with the paperwork in front of me. So I'm just like if I reached out to Ryder or human resource or whoever, Jorge could have referred the message back to that I had asked about seeing hours and concern about my FMLA, I didn't see what hours they still had, had me down for using. And just off of the investigation with Edith how that went after the investigation was over, I just was terminated. Just I mean, like I say, nobody -- and I'm not looking for nobody to be hey, hey, hey. You know, I was -- they didn't have to accommodate me, but I'm just looking like the reason why I'm feeling like I'm discriminated because I know you may not have to feel like you may not have to accommodate me or nothing. But there was never a process to even speak with me to see if what type of accommodation that I needed. And like I say, I'm speaking out. I just don't know the terms and words to use because I don't do this stuff. I don't know about



it, so I can't just be like, hey, you all, can you all give me an accommodation. I'm just lost. All I'm worried -- I'm just worried about my hours being used up and no one's reaching out to me, and I'm reaching out to different people. Like if I go to the Labor Board just off of that, is I would think that someone would be like, okay, Tommy, I see that you -- what is it that you looking for. What is you trying to -- what is it that you need because if we told you we can use these hours, what are up looking for. You know, so I felt like I was discriminated against because no one gave me an insight on other options that was out there for me for me to been this type of injury to my eyes. Forty years, wake up completely blind in your eye is serious, it affects me.
So I was just, you know, I understand you don't have to accommodate me, but I just felt like I was discriminated for that reason.
Q Okay. And then you said that they were sympathetic to the situation --
A In the beginning, Devin.
Q Okay. Devin was sympathetic?
A Yeah.
Q Okay. How was Devin sympathetic?
A Just by telling me what options I had for my



injury. You tell me my options then, but when I actually need the hours to be making sure I'm health, you don't give me no option for that. So I'm just like, you know, you approved -- I'm just doing what you all approve me for. Am I getting penalized for taking off now, and you know, am I being penalized for it now that I'm taking off and now you all can't communicate nothing to me to let me know there's other options for me. And so you know, I would have felt a little better if they would have been like hey, Tommy, don't worry about your hours, we still need to use those, I would have had no problem with it, oh, okay. But you know what I'm saying, we gonna accommodate after those hours are being -- after those hours are gone. You know, I didn't feel like nobody came to me and was trying to help me, you know, no types of options or nothing. It's just on, you know, things that I've been reading and say you don't have to say a magic word for anyone to know that you need an accommodation. Just the point of you asking for some type of something, you know, can spark an interactive process.
Q Okay.
A That never got started.
Q Okay. So I just want to go through this really quickly. You said that you was scheduled approximately



MAGNA LEGAL SERVICES

65 hours per week and then you worked approximately 36 hours a week, so let's say 20 hours less --
A Okay --
Q -- than what you were scheduled. Did you understand that those 20 hours you didn't work would be counted as FMLA leave?
A Yes.
Q Okay. So you were aware that 20 hours a week were going to be for FMLA?
A Yes.
Q Okay.
A Yes.
Q And when did you start FMLA again, March --
A 1st --
Q Utilized March 1st, right?
A Yes.
Q Okay. And you said Devin was sympathetic in the beginning. When do you feel like she stopped being sympathetic?
A I wouldn't say she -- that's me just assuming she wasn't sympathetic. You know, everybody showed their expressions the way they show it.
Q Why do you assume?
A I'm just assuming because if you telling me what



to do in the beginning like just right off the top, I call her, Devin, I'm in the hospital, I lost my vision in my right eye. Oh, Tommy, I'm sorry to hear that. Maybe, you know, you should get on FMLA just in case you need further doctor visits, you can use these hours -- she was, you know, she was letting me know you can use these hours, doctor visits, or you know, you can take -- you can take it how, you know, intermittently if you don't decide to do it that way. But that's why I felt like she was sympathetic in the beginning. She gave me a little bit more knowledge on what I could do for my situation.
Q Okay.
A But when it was time for my situation to end and get into the end of it and no one spoke to me then.
Q Okay. And then you said no one spoke to you, but I think throughout the day -- throughout the day you testified you spoke to Devin two times a week, you spoke to Adam on three separate occasions, and you spoke to --
A Two separate occasions.
Q Two separate -- I'm sorry, you're right, two separate occasions. And you spoke to Carol Bates. Do you not consider that them speaking to you or?
A The thing with that is that was me speaking to them concerning my situation of -- not -- I can't call --



I was calling out to them to see if it was something that they can do for me for the hours that they taken. I don't know, you know, I can't be like, hey, you shouldn't be taking these hours for me or something like that. You know, I was just calling out. I don't know the law. I can't -- you know, I was just trying to see versus what I was reading because me doing my own homework, I felt like I shouldn't have had to do if the job was sympathetic to what I was trying to -- what I was really trying to do.
Q Okay. Were you seeking anything other than like FMLA hours, additional FMLA hours?
A You say were you seeking?
Q Yeah, did you want anything --
A I was seeking anything that can help stop me from being terminated at the end of my FMLA hours being used for the mandatory.
Q And why did you leave believe you would be terminated -- I'm sorry. Sorry.
A Okay.
Q Why did you believe you would be terminated?
A Because like I say, I can't just -- no one could give me any kind of clarity on what happens after my hours was used up, so I'm just using my own common knowledge and be like if I don't have no more hours and



what I've been reading anyway, I had to go off of that because nobody is helping me out. So I'm just thinking like, you know, I may have, I may have -- I'm pretty sure I have brought that up to them. I'm that kind of person to investigate my situations all the way thoroughly. So I'm pretty sure I got that to them, but they never -- you know, I know I'm saying if my hours is being used, what happens after that. So somewhere along there, I'm already getting impression that just, you can just look at the gestures of people sometime and be like, okay, well, it's basically you saying, oh, well. Like nobody can give me an answer, so I'm just going off my own gut feeling to be like I'm gonna be fired, so I might need to take action. I might need to seek legal representation or something, somebody that can help me to give me a little more clarity on what happens if my FMLA ends. So I ended up going to the wage and hour division.
Q Okay.
A That worked out all the way up until my termination.
Q Did you ever specifically say to Ryder or anyone at Ryder that you were specifically seeking something other than FMLA hours?
A No, I didn't know nothing.

Page 214

Q Okay. So I asked you the way you thought you were being discriminated. You said that Ryder was negligent. Any other ways?
A No.
Q Did you ever report to Ryder that you believed you were being discriminated against?
A Yes, I told Devin.
Q What did you tell Devin specifically?
A I told Devin, I said, Devin, I think maybe my rights be getting violated here.
Q And what did Devin say?
A Oh, Tommy, no. You know, basically a run off story like it might just be you thinking that. It never was a clear answer basically.
Q Did you ever specifically say that you thought you were being discriminated against?
A I didn't say discriminated, but I just -- like I told her that I felt like my rights may be being violated for not -- you know, I didn't use for nothing. I just said I just felt like my rights may be being violated for the hours that's being used or something like that because I'm thinking that I suppose to get more hours or something. I'm just trying to get a little clarity on it. So whether I do or don't, so I went to the Labor

Page 215

Board, and I don't. I don't get anymore hours. But that don't mean that they can't accommodate you.
Q Okay. So you told Devin that you thought your rights were being violated, correct?
A Yes.
Q But didn't specifically say you thought you were being discriminated against, correct?
A Correct.
Q Did you tell anyone at Ryder that you felt like you were being discriminated against?
A Let me see, no.
Q Okay. And then so you told Devin you thought you rights were being violated and Devin just didn't respond?
A Yeah, she didn't. It wasn't a response to get, you know, it wasn't a response to get me anywhere to make me feel like I wasn't gonna be terminated, or I mean, it wasn't nothing. I don't know how it wasn't nothing. I mean, I'm pretty sure you all can see the way I'm trying to explain things like I could have actually been asking and I'm very concerned about it, you know. That's how I be, I be concerned. I can't -- you know, if nobody is reaching out, I don't do this everyday, so I can't, I don't know the laws. I don't know the words to be wording things. I'm crying out for help.

Page 216

Q Okay. Do you believe that Ryder took any action against you because you had a disability, like because of your eye stroke?
A To tell you the truth, I really don't know why this actually happened. I always said that this could have really been avoided the way I'm looking at it. I wouldn't even expect us to been here today for the way this thing is is real simple to me like okay just tell him what he can and can't do. You know, if you can accommodate me or you can't, have interactive process with me to know what I'm trying to seek or anything. Don't just fire me after the Labor Board makes their conclusion, then I'm fired. So I mean, I don't know what they motive was behind. I don't want to -- I mean, I don't really want to make no kind of assumptions for why they did what they did, I really don't know.
Q Okay. Yeah, no, that works.
So can we go back to Defendant's Exhibit A.
A Okay, yeah.
Q And so it says, a review commenced to examine your concern that your FMLA entitlement should be greater than 480 hours. So this letter is reading that your concern was your FMLA entitlement and Ryder investigated

Page 217

and address that concern, correct?
A You say what?
Q Ryder investigated -- let's start.
First was your concern that your FMLA entitlement should be greater?
A That wasn't what -- they sent this, but that wasn't what I was talking to Adam about.
Q Was that --
A They -- sorry.
Q No. Was that your concern -- was that one of your concerns that your FMLA entitlement should be greater than 480 hours?
A That wasn't my concern.
Q Okay.
A It wasn't my concern. I just found out that through doing the homework. I just was using this because I'm just -- when I was reading things over the internet concerning FMLA and mandatory overtime, I only was saying, talking about my hours because I was just thinking that if you're using these hours, I supposed to be compensated for it, that's what I was just under the impression. But I think they may have been thinking, oh, he's concerned about his hours. But by me not knowing what the actually say, I'm just like, hey, if my hours



MAGNA LEGAL SERVICES

are being used, don't you all owe me more hours. So I think he might have been under the impression that hey, Tommy is worried about hours, but that really wasn't my concern. I was okay with the 480 if you all can use them for the mandatory and I can be compensated off of that. I was okay with everything until I seen the rate that my hours were being used. I didn't have no problem with the 480.
Q So Mr. Hatten, let me ask you this. When you received this letter from Adam James and he's like this is your concern, this what we investigated, this is what we determined?
A Yes.
Q Did you ever have any conver -- because you spoke to him a week later.
A Yeah.
Q Did you ever tell him like what you investigated is not what I'm concerned about?
A Yes.
Q Okay --
A Yes --
Q -- what specifically did you say?
A So I told him I said, yeah, I see that you all got the 480, Adam. I said, but that wasn't what I was



worried about. I don't know -- like I said, I don't know the wording for this, so that's why I'm just telling him like, no, I'm not talking about the 480 hours, Adam. I'm just trying to see don't you all owe me more if you using them. So he was just like, no, you get the 480 and that's it. So I'm like after the 480 is over, like, yeah, unfortunate.
Q So if you weren't concerned about the 480 hours, why did you have the -- what was the point of going to the Labor Board to review how many hours you should get?
A The Labor Board came with the hours here that I'm supposed to have more. Because when I went to the Labor Board, my reason for going to the Labor Board was if they use it, am I entitled to more hours. So that's how everybody kept coming up with, okay, instead that we trying to figure out if you get more hours, let's just see if the hours that you got is right --
Q Okay. Mr. Hatten --
A Sorry --
Q I'm going to stop you right there. Because you kind of just answered it. And I just want to make sure we're not like --
A Okay. Cool --
Q I just want to make sure you're answering the



question, that's only reason why I cut you off.
A All right.
Q So you just said that the concern was do you get more than 480 hours, correct?
A Yes.
Q Okay. So your concern that you raised to Ryder was do you get more than 480 hours, correct, that's what you just said?
A Could I say something else?
Q Can you answer that question -- Answer that question first --
A Okay, yeah --
Q -- and then, yeah, you can say something else --
A Okay. Okay. So what was the question --
MR. LEVIN: Is that correct, yes or no?
BY MS. YOUNG:
Q Okay. Is it correct that your concern that you raised to Ryder, was that your FMLA entitle -- or did you get more than 480 hours, correct?
A My concern was it wasn't do I get more than 4 -- it was only do I get more than that because of the hours that they using.
Q Mr. Hatten, just flat out yes or no.
A Okay.



Q Is your concern -- was your concern that you should get more than 480 hours?
A Yes, yes --
Q Okay. And did Ryder investigate whether you should get more than 480 hours?
A Yes.
Q Okay. So Ryder investigated the concern you raised to them, correct?
A It wasn't the concern I had, it just sounded like that was my concern.
Q Did Ryder investigate what it sounded like your concern was?
A Yes.
Q Okay. I think this would be a good time for a break.
MS. ORLER: Yeah.
MS. YOUNG: Do you want to take a break, like a --
MS. ORLER: Five minute --
MS. YOUNG: -- five minute break?
THE WITNESS: Yeah, I'm cool.
MS. YOUNG: Okay. Let's take a five-minute break.
THE VIDEOGRAPHER: End of Video 3. Off the record, 3:12.
(Short break.)



MAGNA LEGAL SERVICES

Page 222

THE VIDEOGRAPHER: This is the video 4. Deposition of Tommy Hatten. The time is 3:26. On the record.
BY MS. YOUNG:
Q You ready, Mr. Hatten?
A Yes.
Q Okay. So you mentioned earlier today that you were expecting to talk to Ryder about additional FMLA or what happened if your FMLA was exhausted, correct?
A Correct.
Q Okay. So if that conversation occurred, what would did you expect, like what would have sought from Ryder?
A If the conversation, what conversation wouldn't occurred?
Q If exhausted FMLA, what next? What were you seeking from Ryder?
A You said if that wouldn't have came up? Hold on --
Q No, yeah. I'll start over.
A Yeah, just -- yeah.
Q Okay. So you said that you were waiting to speak with Ryder --
A Okay --
Q -- about like what happens after your FMLA was

Page 223

exhausted correct?
A Correct.
Q Okay. If you had spoken to Ryder, what were you seeking after your FMLA leave was exhausted?
A After the FMLA had exhausted --
Q Uh-huh --
A Just to keep doing what I'm doing. And, you know that's it. If I can -- I mean, what other type of -- any type of -- I was cool with doing what I was doing until it expired or something like that.
Q So when you say doing --
A Okay. Sorry, sorry --
Q -- what you were doing, what are you saying?
A The accommodation that I have for FMLA would have worked for me the same as any other accommodation that, that would have pretty much been what I would have been asking if I had to speak with them and we would have got into any type of accommodation talks. I would have seen if I can stay with the schedule that I was currently on.
Q And just to confirm, can we go to Exhibit N. I'm sorry about that, let's go to Exhibit D.
A Okay. Yes, I'm ready.
Q Okay. So this is the accommodation -- the accommodation here is what you would have wanted?

Page 224

A Correct.
Q Okay. And then you said your flare-ups lasted until December 2022, correct?
A Correct.
Q Okay. So would you have needed that FMLA leave until December 2022?
A It's hard to say. It's -- I mean, I really don't know how to answer that. That's a whole year away. Like I said, it got a little bit better from 2021 to 2022, like so I can't say -- I really can't say if I would have needed an accommodation, you know. I would have had to actually, if I was able to, would have waited until the February 20, 25th (sic) date to see what I would have followed up with the doctor and all of that, so...
Q So --
A Sorry.
Q No, I cut you off. You can finish.
A Yeah, that's it. That's all.
Q So you wouldn't want to continue FMLA leave through at least February 2022?
A Correct.
Q And then you had flares though until December 2022?
A Yes.

Page 225

Q So then what would have happened between February and December?
MR. LEVIN: Objection. Calling for a hypothetical. You can answer.
BY THE WITNESS:
A I can't say. I really don't -- I don't know. If I would have needed an accommodation from that time, I can't really say.
BY MS. YOUNG:
Q Okay. But February 2022 minimum?
A Yes.
Q Okay. What do you allege was the reason for your termination?
A What do I allege?
Q Uh-huh.
A FMLA hours being exhausted.
Q So do you believe your termination of employment was because of your attendance?
MR. LEVIN: Objection. Asked and answered. But go ahead.
BY MS. YOUNG:
Q You can answer.
A No, definitely not.
Q Okay. So then you say FMLA hours being



MAGNA LEGAL SERVICES

Page 226

exhausted, can you elaborate?
A Let's go over that question again.
Q Yeah, and I can ask it (talking to herself) -- so you said -- I said, do you believe your termination of employment was because of your attendance. And you said, no, correct?
A Correct.
Q Okay. And then you said it was because your FMLA hours were exhausted, correct?
A Correct.
Q Okay. So can you explain a little more about like how because your FMLA hours were exhausted, you were terminated?
A To tell you the truth, I don't know why I was terminated, but I don't feel I was terminated because of attendance. So it's kind of hard for me to really say because, you know, it's kind of hard for me to say. I just -- I definitely don't think it was -- you know, I really don't know why I was terminated, but I definitely don't feel, you know, I just think the points was just to cover up to make it a lot easier, but I really don't feel like that was it because this whole situation could have been avoided I think.
Q How could -- first, what situation?

Page 227

A Me being terminated, hours, just -- yeah, me being terminated. I feel like it could have been avoided with just a little conversation.
Q In addition to the ones you had, correct?
A Yes.
Q Okay. The approximately six conversations you had, correct?
A Yeah, the ones I initiated.
Q Okay. So we talked about you receiving -- we talked about your receiving your final warning for exhausting FMLA, did you call off of work at any time after that?
A After when?
Q You exhausted -- you Were you notified that you exhausted FMLA?
A Yes, I called off after that.
Q Okay. When did you call off after that?
A Had to been around of the beginning of August, so it would have been that -- not the first week of August, but the second week, the Sunday and the Monday of that following week from the beginning of August. So go around about the 7th, the 8th, somewhere around there. It was the beginning of August. Those from the time I had exhausted, those were call-offs.

Page 228

Q Okay. And then were you assessed attendance points for those?
A Yes.
Q And did those attendance points lead to your termination?
A Yes.
Q Do you believe your termination was due to any unlawful action by Ryder?
A Yes.
Q What unlawful action?
A Not taking upon the interactive phase to see if there was an accommodation that could have actually helped.
Q Why do you believe that caused your termination?
A Because it exhausted my FMLA hours that I had to -- you say why do I feel like it --
Q Yeah, so we can go back. I said, do you believe your termination was due to any unlawful action by Ryder, correct?
A Yes.
Q And then you said yes?
A Yes.
Q So I was just asking for a little bit more detail about why, like what unlawful action, we'll start there?

Page 229

MR. LEVIN: Objection. Calls for a legal conclusion, but you can answer.
BY THE WITNESS:
A Okay. Based off, based off my research and what I know now, I would say it was unlawful because they didn't -- they didn't even attempt to engage in an accommodation phase for me to even ask -- hold on.
Okay. I felt it was unlawful because of you -- I think it was unlawful just because of they didn't even try to initiate an interactive phase with me to try to see if it was something that they could accommodate for that wouldn't cause undue hardship on the company.
Q Anything else you believe was unlawful about your termination?
MR. LEVIN: Objection. Calls for a legal conclusion, but you can answer.
BY THE WITNESS:
A No.
BY MS. YOUNG:
Q So now I'm going into your current employment your kind of -- your post-Ryder employment.
So your employment with Ryder ends in August 2022 -- I believe August 16, 2022 or somewhere



MAGNA LEGAL SERVICES

Page 230

around there?
A Yeah.
Q Did you begin looking for another job right away?
A Yes.
Q What other jobs did you apply for?
A Well, I ended up -- I ended up working with an app. You know, I ended up doing application jobs, Instacart and Walmart Sparks.
Q Okay. I'm familiar with Instacart, let's start with Instacart. When did you begin working for Instacart?
A In August of 2021, right after.
Q Around like a week, two weeks?
A A week.
Q Okay. One week after?
A Yep.
Q How many hours a week did you work for Instacart?
A About 40 hours minimum.
Q Okay. Did you ever work more than 40 hours?
A I'm pretty sure I did. I don't know. I wouldn't know exactly what day or time that was, but I'm pretty sure I worked a bunch of -- you say have I worked more than 40 hours, yeah, yeah.
Q Yes. At Instacart specifically.

Page 231

A Yeah.
Q So around -- so 40 hours was minimum?
A So, yeah, worked 8 hours, 7 days a week. Some days, I may work 8 hours, 5. But I do work 7 days.
Q Can you request FMLA through Instacart?
A No.
Q It's kind of like contractor, right --
A Yeah --
Q -- kind of? Okay. So you worked 8 hours, 7 days a week. Were you having flare-ups at all during that time?
A Sure.
Q How often?
A Same. Twice, twice a week, maybe.
Q Did you still work even when you had flare-ups?
A Not when I'm working flare-ups. It would like -- like I get up early in the morning and start. Some mornings when I start, my flare-ups be there, so I don't get to start maybe -- I like to start around 6:00 a.m., so a lots of times it had me to start maybe around about 11:00 or 12:00 in the afternoon.
Q okay. So even with flare-ups two times a week approximately, you still worked 8 hours a day, 7 days a week approximately.

Page 232

A Yes.
Q Okay. When did you stop working at Instacart?
A I didn't.
Q Okay. So you still work for Instacart?
A Yeah.
Q Okay. And then you said, did you say Walmart --
A Walmart Sparks.
Q What is that?
A That's another delivery app.
Q And when did you start working for Walmart Sparks?
A Like September of 2021.
Q Do you still work there?
A Yes.
Q Okay. And around approximately how many hours a week do you work with them?
A 40 minimum.
Q Okay. Hold on.
A Okay. Let me clarify that up because I'm doing two apps.
Q Yes.
A Okay. So let me -- I may work four hours with one app, four hours with another app if that helps. So I mean, what majority of my -- well, since September of

Page 233

2021 when I start applying with Walmart Spark, I pretty much work that app majority of the time now from September to current. I started off with Instacart in August working a minimum of, like I say, 40 hours. When I got activated for Walmart Spark, September, I pretty much don't do the Instacart unless I just actually need some extra money and the Walmart Spark app didn't come in like I need it to. I may turn on the app, so I mean that's how that works. I mean, it's no set amount of hours for one app because I may be able to do them both. So it's kind of hard to say, oh, I'm working 40 with this one and 40 with this one. How does you do that, you know. I cannot make that happen like. So I'm just trying to simplify it and just let you know that I work two apps.
Q Okay. So let's see if we can break this down in a way that I think I can understand a little more.
A Okay.
Q Okay. So you said you worked 40 hours minimum per week, but like 8 hours to 7 hours a day. That is between Instacart and Walmart Sparks, correct?
A I can make it easier.
Q Okay. Make it easier.
A Okay. s of August of 2021 from the time of my



MAGNA LEGAL SERVICES

Page 234

termination, I worked 40 hours minimum with Instacart all the way to like maybe the beginning of September -- I mean, the middle of September.
Q 2021?
A Yeah, 2021.
Q Okay.
A I started working the Walmart Spark app. So that was from that time up until now those are -- I'm working that app along 40 hours.
Q Okay. So Instacart 40 hours minimum from August 2021 to September 2021?
A Uh-huh.
Q Walmart Sparks from September 2021 until current?
A Yes.
Q Make sure I'm getting all of this down. September 2021 until current, you work 40 hours, approximately 40 hours a week?
A Yes.
Q And then you may supplement additional hours with Instacart?
A Possibly, yes.
Q Okay.
A So it wouldn't be 40 hours with Instacart.
Q Okay. Any other employment since August 2022?

Page 235

A No.
Q I'm sorry, August 2021?
A No.
Q Did you use any recruiters, staffing agencies, outplacement firms, anything to help you find a job?
A No.
Q How did you find the Instacart and Walmart jobs?
A Just download them, they was faster and convenient so I ended up downloading them, and you know, the work process takes a little longer than you downloading an app and getting money right away. What I needed at the time from my termination, so, yeah. That was just download it and work it.
Q Okay. And how much do you make with Instacart, let's start there, on average a week?
A Back then maybe $500 dollars a week.
Q Mr. Hatten, what's back then?
A Sorry. Back in 2021, August of 2021 to September, around 500 every week.
Q And September is September 2022 --
A '21.
Q 2021, right?
A Yep, 2021.
Q Okay. And you said around 500 a week?

Page 236

A Yes.
Q Okay. What about between September 2021 when you started Walmart Sparks to now on average, how much do you make a week with Instacart?
A With Walmart Spark, I don't do --
Q Let's stick with Instacart first --
A Oh, okay --
Q On average --
A From September to now?
Q Yeah?
A $100 a week.
Q Okay. Now we're going to switch to Walmart sparks.
A Okay.
Q So you started Walmart Sparks in September 2021?
A Uh-huh.
Q How much did you make a week with Walmart Sparks?
A A minimum of 500.
Q And that's a week?
A That's a week.
Q And has that been consistent from -- I know it's not going to be the exact same, but has it been around there?
A It's consistent 500 a week, but that's the

Page 237

minimum. So I -- it can be way greater than that, a lot.
Q Okay. So that's the minimum?
A Yeah.
Q Give me the average?
A 900.
Q So just to clarify, you make on average $900 a week between September 2021 and now?
A No. Not all -- you said on average -- hold on. You said from 2021 until now?
Q Yes. On average. So like --
A For which app?
Q Yeah, let me break this down. So you gave me $500 and $900 and I kind of think you gave me the minimum and the max. Is $900 the most you'll make in a week?
A Yes.
Q Okay. And 500 is the minimum you'll make in a week?
A Yes, yes.
Q Okay. So somewhere in between there is how much you make on average a week?
A Yes --
Q With Walmart sparks?
A Yes, correct.
Q And has that been consistent from September 2021



MAGNA LEGAL SERVICES

Page 238

through now?
A Yes.
Q Okay. And then just to clarify, Instacart is now approximately up $100 a week?
A Correct.
Q After September 2021?
A Correct.
Q Okay. Got it.
Did you update your resume after your employment with Ryder?
A I don't even know. I don't think so, no.
Q Okay. Have you submitted any other resume or job applications for any positions?
A No.
Q And this is -- I'm sorry. To clarify, this is after August 2021?
A Correct.
Q Okay. Did you produce all written documentation that shows your job search? Do you know what I mean when I say produce?
A Yeah, what you mean?
Q Okay. Have you provided your attorney with all documents showing all jobs that you may have looked for or applied for after your employment with Ryder ended?

Page 239

A Yes. Like -- could I clarify it a little bit to see if that's what you, like W-2 forms or some things like that?
Q Yeah, W-2 forms, resumes, job applications --
A Okay.
Q If you did like one of those Indeed type profiles --
A Yeah --
Q -- something such as that?
A Okay. Yeah, none of that. But I did provide them with like W-2s and stuff what I was making throughout the year.
Q Okay. Have you taken any vacations since August, 2021, since your termination with Ryder ended?
A No, no.
Q And this could even be like a weekend vacation --
A Yeah.
Q -- or like any vacation?
A No. I wouldn't say a vacation. I mean -- no, I wouldn't, no.
Q Okay. You say wouldn't say a vacation so is there anything that you think is similar or on that line that you --
A No, no vacations. No.

Page 240

Q Okay. Have you received any education or training since your employment with Ryder ended?
A No.
Q In the last five years, have you attended school or taken any classes --
A No.
MR. LEVIN: Let her finish the -- I'm sorry, he cut you off --
MS. YOUNG: Oh, that was it.
MR. LEVIN: Okay.
MS. YOUNG: Yeah, thank you though.
BY MS. YOUNG:
Q Were there periods of time after August 2021 that you were unavailable to work due to an illness or injury?
A Yes, yeah.
Q Okay. When?
A May 2nd of 2023 I was involved in an automobile accident.
Q And how long were you not able to work?
A Two weeks.
Q What injury did you suffer?
A Chest, like a chest injury like pretty much almost like a fracture. Yeah, it was like a pain into my chest from the airbag it was just something like that,

Page 241

very painful in my chest.
Q Okay. And you say you were out for two weeks, was that from Instacart and Walmart Sparks?
A Correct.
Q Okay. Any other time where you haven't been able to work because of an illness or injury?
A No.
Q Outside of your employment with Ryder, have you had any other sources of income from let's say August 2021 thru now?
A No.
Q And other than Walmart -- Walmart Sparks and Instacart that you told me about?
A No.
Q And then did you file taxes in 2020?
A No.
Q You didn't?
A No, I didn't file my taxes.
Q Did you file taxes in 2021?
A No.
Q What is your current monthly income?
A 2000 minimum.
Q What's your max?
A 36.



MAGNA LEGAL SERVICES

Page 242

Q 3600 hundred?
A 3600, sorry, sorry.
Q Okay. Okay. Do you allege that you suffered any mental or emotional distress from Ryder's actions?
A Of course.
Q How?
A I mean, at times I mean I feel down, you know, anxiety. Just, you know, I have -- I've been -- I had anxiety anyway from my eye. When that happened, it's like I wake up and just be like -- it's crazy. I wake up and be breathing heavy or something, have to kind of calm myself down, and you know, couldn't sleep. When, you know, at the time of my termination with my eye the way, you know, I wasn't sleeping well.
Q Mr. Hatten, just to go back, so you said your anxiety started when you first had the eye stroke from your eye, is that what you said?
A Yeah.
Q Okay.
A Yeah --
Q So --
A So -- sorry, sorry --
Q No, no, no. When you had your eye stroke, was that the first time you had experienced some type of

Page 243

anxiety?
A Yes.
Q Okay. You can go, I'm sorry.
A Okay, yeah. No, I was just saying it started in the beginning like when my eye first happened, but if I more lost sleep and all of that, that started coming in after the termination.
Q Okay. And you said -- first I want to go through this, you said you were feeling down?
A Yeah.
Q Like how were you feeling, like can you explain to me --
A Well, just, like -- just like a feeling that come over you like a hopelessness. Just -- I mean, I can't really explain it. It's just a -- it's just a feeling that I get, you know, like nothing you can do about it. I mean, it's just a feeling that I get, you know. I can't even really explain it. I just at sometime, you know, I just, I be feeling a little, you know, yeah, just a little, you know, feeling down at times. Like just awful. Man, I just feel like I might have got the short end of the stick with -- you know, I just felt -- I be feeling like all of this could have been avoided, you know what I'm saying like I mean, it's just I just be

Page 244

feeling I have a lot of mixed emotions about a lot of things.
Q When did you start feeling down?
A Right after my termination. Well, actually before that because -- I'll just go in real quick. Before that at the time when I was trying to see if I can help myself with the situation. As of July, I would say, when I seen seemed like I wasn't getting answers to what I was trying to see if I can be helped for with the accommodations or something instead of being fired. I just was trying to stop from being fired.
Q Did you ever feel down prior to July, like let's say in February after you had your eye stroke --
A Yeah, yeah, yeah. It started then, anxiety feeling down and all of that, so...
Q I got the anxiety. I'm trying to see did you ever feel down at any point before July --
A Oh, okay.
MR. LEVIN: Any point in his life before July of '21 --
BY MS. YOUNG:
Q Let's say between the past 10 years, have you felt down?
A No. Have I felt down in the last 10 years?

Page 245

Q Uh-huh.
A No, no.
Q Okay. So your first time feeling down was in July --
A Yeah --
Q -- of 2021?
A Yeah, no, yeah -- I mean, yeah. Around the time I was trying to see -- yes, that's right, you're right, yeah, around the July time.
Q Okay. And just to clarify, you did not feel down in February after the eye stroke?
A No.
Q And then you said loss of sleep, when did you start experiencing loss of sleep?
A Back in August. I mean, after my termination.
Q On average, how many hours of sleep would you say you get after August 2021?
A After August of '21, I will say I probably get maybe four hours asleep.
Q Prior to August of '21, how many hours would you say you got of sleep?
A Prior to August eight, nine, maybe longer. Definitely a full eight.
Q And was this consistently, let's say, for the



MAGNA LEGAL SERVICES

Page 246

past five years?
A Yes.
Q And do you still feel like you only get four hours of sleep now?
A I do, you know. Yeah, I do because like I say, I just when this injury happened to me, I was waking up and that's how I found out I would sleep. And now ever since then, I be feeling like wow, I hope I don't wake up and my other eye go out or something like -- it just got me all types of emotions going on, you know, so...
Q So your concerns now is like you're scared you're going to have another eye stroke or explain for me --
A I mean, I'm not scared of nothing. I just be feeling down, you know. I'm not afraid or nothing like that, I just be feeling like, you know, it just made me feel like I was hopeless, like I couldn't help myself and I was crying out for help. So it like I be like going into like anxieties thinking like could I have done something different or could I have said something more differently to make them hear me well or something like that. So it's, you know, a lot of that stuff going on, mixed feels about a bunch of stuff.
Q So you said you experience anxiety, is that constant or sporadic?

Page 247

A It's sporadic.
Q How often would you say? Let's -- actually let's -- can we break that down a little because we're talking about a large time span.
A Okay.
Q I know you said you started feeling anxiety after you had the eye stroke, so that's February 2021. So let's go -- let's do three months or no, let's do February 2021 to June 2021, how often do you feel like you experience anxiety?
A Ooh, maybe twice a week.
Q What triggers it?
A Just, I guess, me just thinking about it. I guess, just, you know -- I just when I think about it it's like why -- you know, it's like I say, it's 40 -- like I say, when I think about it sometime. And that's when, you know, I guess I get worked up and I start like breathing a little heavy when I just think about a lot of things that just happened from February to, you know, with the whole employee thing going through this lawsuit stuff. Everything is playing a part in it. Just a bunch of stuff, you know. I just be feeling a little overwhelmed with things.
Q Okay. Let's say between August 2021 to December

Page 248

2021, how often do you feel anxiety?
A From when you say the date again?
Q August 2021 to December 2021?
A Still twice a week.
Q And then let's do January 2022 until now?
A I'll say once a month.
Q Have you ever -- are you currently receiving treatment for anxiety?
A No.
Q Have you ever seen anyone about your anxiety?
A No.
Q Okay. And then loss of sleep, you said that started in August of 2021, correct?
A Yes.
Q Is that sporadic or constant?
A That's sporadic.
Q How often on -- let's break that down, too.
A Okay.
Q Between February and July 2021, how often did you experience loss of sleep? I'm sorry, that started in August --
A August.
Q So between August and December 2021, how often did you experience loss of sleep?

Page 249

A Maybe three, four times a week.
Q And then what about from January 2022 until now?
A It's still sporadic, it's still, you know, it's not as bad as it was. So I mean it may be weeks that I'm actually sleeping good then. So I will say maybe once a month, I would say, somewhere like that.
Q Have you ever seen anyone for your loss of sleep?
A No.
Q Are you currently seeing anyone?
A No.
Q Now this feeling down which we can't really identify feeling down. Between -- and that started in August -- no, that started in July 2021, correct?
A Yeah.
Q Okay. Was that sporadic or constant between February -- I'm sorry, between July and December 2021?
A How often do I start feeling down or something like that from that time --
Q Yeah. First was it sporadic or constant?
A It was constant.
Q Okay. So when you say constant, is that everyday?
A Everyday.
Q Okay.



MAGNA LEGAL SERVICES

Page 250

A Yes.
Q And then what about from August 2022 until now?
A Yeah, I'm pretty decent.
Q Constant or sporadic?
A Sporadic.
Q How often would you say you feel down?
A Maybe once a month.
Q Did you see anybody for the feeling down?
A No.
Q Any other mental or emotional distress that you experienced?
A No.
Q As a result of Ryder's actions specifically?
A No.
Q Did you incur any medical expenses as a result of Ryder's alleged conduct?
A You said did I incur any medical expenses?
Q Yes.
A Yes.
Q Okay. What medical expenses?
A Doctor bills for my eyes, doctor visits and stuff.
Q That was because of Ryder's actions?
A Let me -- rephrase that again.

Page 251

Q Yeah, no problem. Did you incur any medical expenses as a result of Ryder's alleged actions?
A Oh, okay, I gotcha. No.
Q Okay. And Mr. Hatten, do you recall your salary at the end of your employment with Ryder?
A Not exactly. I definitely know it was over $19.
Q That's fine if you don't remember the exact.
Other than the eye stroke and the accident, have you had any other illnesses or medical conditions in the last five years?
A No.
Q Have you seen any physicians or healthcare providers in the last five years for any issue other than the eye stroke?
A No.
Q Were you prescribed any medication in the last five years?
A Yes. I take low Amlodipine for blood pressure and Warfarin for blood thinners.
Q How often do you take those?
A Everyday.
Q (Inaudible)
THE COURT REPORTER: I'm sorry?
MS. YOUNG: Sorry. I had starting when.

Page 252

THE COURT REPORTER: And you said, I'm sorry
BY THE WITNESS:
A Starting February of 2021.
BY MS. YOUNG:
Q And who prescribed those medications?
A Dr. Schubert, my primary care doctor.
Q Does this medication have any affects on you or affect your ability to do your job?
A No.
Q So other than for the eye stroke and the -- and these questions are going to sound similar, they're not exactly.
A Okay.
Q So other than for, I know you had the car accident and then the eye stroke, have you been hospitalized for any other issue during the past five years?
A No.
Q And then we went over all of your mental or physical issues that you attribute to Ryder. Is there anything you didn't tell me about mental or emotional distress?
A That's it.
Q Okay. Apart from the medication you just told me

Page 253

about, have you taken any medications including over-the-counter medications regularly during the last five years, so it can be like Aleve?
A No.
Q Allegra --
A No.
Q Apart from what we have talked about, have you seen any other healthcare provider or counselor or anyone else regarding any anguish or emotional problems?
A No.
Q Tension?
A No.
Q Anxiety?
A No.
Q And this can include, I just want to clarify, physical therapist, mental healthcare therapist, psychiatrist, psychologist, all -- this is all inclusive?
A You asked have I been to them, have I had to see any of that?
Q Yeah, any medical provider.
A Yes. With the accident in May, the May 2nd accident, I was hospital -- I mean, I had to go to the hospital for that, and I did therapy for about maybe, let me see, from May 5th to possibly July of 2023.



MAGNA LEGAL SERVICES

Page 254

Q And that was just for the --
A Physical therapy --
Q Physical therapy From the accident --
A -- my neck and back, yeah.
MS. YOUNG: Okay. We're going to take a break, probably a five-minute break.
THE VIDEOGRAPHER: Off the record 4:10.
(Brief recess.)
THE VIDEOGRAPHER: One moment, please. On the record, 4:15.
BY MS. YOUNG:
Q So, Mr. Hatten, are there any facts other than what we spoke about today that supports your claims against Ryder, other than what you've already told me about?
MR. LEVIN: Object to form, but you can answer.
BY THE WITNESS:
A You said do I have anymore facts?
BY MS. YOUNG:
Q Yeah, anything that you want to bring up that we didn't talk about already that is related to your claims against Ryder?
A No. I think I pretty much touched basis on everything.

Page 255

Q Okay. Thank you.
David, no further questions, sorry. No further questions.
MR. LEVIN: Okay. Mr. Hatten, I have a few follow-up questions.
EXAMINATION
BY MR. LEVIN:
Q So Ms. Young asked you if there have been any times since August of 2021 that you were unable to work due to illness or injury. And you said, May 2, 2023, the auto accident you couldn't work for two weeks?
A Correct.
Q So have there been any times since August of 2021 that you were unable to work due to your condition with your eye?
A No. You asking me am I --
Q Has there been any time since August of 2021 that you were unable to work due to your eye condition?
A No.
Q Okay. A little earlier Ms. Young asked you if you spoke with anyone before you filed your EEOC charge, and you said no. You had a lawyer who filed that for you, right, it wasn't me --
A Yes --

Page 256

Q -- but a different lawyer, right?
A Correct.
Q You spoke to him about it or her, right?
A Correct.
Q Okay --
A You're right --
Q So you did speak with the lawyer before filing it?
A Yes, you're right, yeah. I'm sorry about that.
Q It's okay.
Ms. Young asked you, I think it was back to this morning, who at Ryder was aware of your eye stroke condition, and you said just Devin. That's the only person you know of who was aware of that condition?
A I believe so. Hold on. I mean, let me make sure I got the question right.
Q You were asked who at Ryder is aware of your eye condition, the eye stroke?
A Yeah.
Q And you said just Devin. You submitted a form that your doctor filled out in order to get the right to take FMLA leave, correct?
A Yes --
MS. YOUNG: Objection. Asked and answered.

Page 257

BY MR. LEVIN:
Q Okay. And so someone at Ryder could have reviewed that form, correct?
A Yes.
Q So is Devin the only person that you know of?
MS. YOUNG: Objection. Asked and answered.
MR. LEVIN: I'm clarifying the difference between --
THE WITNESS: Okay, okay.
BY MR. LEVIN:
Q Is Devin the only person at Ryder who you are aware of --
MS. YOUNG: Objection. Asked and answered.
BY THE WITNESS:
A No. I mean -- I mean it's -- I mean, yeah -- I mean, yes -- I mean -- I mean, she can't be the only one that know, yes, you're right. She's not the only one who knows because now that I'm looking at the broad -- the reason why I'm answering that way is because I'm just looking at who I actually vocaled (sic) it to, but far more as papers and stuff like that I'm pretty sure, I wouldn't know exactly who actually knows, but I'm just pretty sure that it's some other people. But I don't know, you know, I didn't verbally speak to other people concerning it, so I guess the absent team, everybody



MAGNA LEGAL SERVICES

that's at Ryder and the absent team would possibly know about my illness, too.

Just you know, I was actually thinking about just who I verbally called and told, that's what I was just thinking who I called and verbally said it to, but I'm pretty sure with me filling out the FMLA papers and everything, it opened up a broader -- like I say, I don't know who could have looked at the papers. I don't want to just be -- but, yes, I'm pretty sure it is. I couldn't just say Carol know or this because I never really just verbally said it, but I'm pretty sure with the documents that's going around with me being approved for FMLA, I'm pretty sure there's a lot more people in there that knows about my injury.

BY MR. LEVIN:

Q And do you still have Exhibit A there somewhere in that stack the letter from Adam James?

A Yes.

Q You see where it says, Dear Mr. Taylor, did you know somewhere at Ryder named Mr. Taylor, do you know who that would be?

A No. No. I don't know who that is. I wasn't trying to hold nothing back or nothing, I'm just -- I couldn't



Q That's okay. There's no question. I understand.

I don't think I have any other questions.

MS. YOUNG: I have just a few follow-ups.

FURTHER EXAMINATION

BY MS. YOUNG:

Q So you said you spoke with someone about your charge of discrimination and you said your attorney. Who was your attorney at the time?

A Spielberg, Spielberg Lawfirm.

Q Was there a specific attorney or do you just know the lawfirm?

A I think his name was Gary. I can get it. I can find out who it was exactly, but I believe his name is -- I might could look in my phone and get --

Q Does Gary Mordico (phonetic) ring a bell?

A It could be.

Q But you don't know for sure?

A Yeah.

Q But Gary?

A Yeah.

Q Okay. And when did you first speak with him? I don't need to know what you spoke about but when did you speak with Gary?

A In August of 2021.



Q Before your termination with Ryder or after?

A It was after, yeah. Definitely after.

Q Approximately how many weeks after?

A One week -- oh, sorry. Hold on. I spoke with him a week before my termination. Yeah, that's what I spoke with him a week before my termination and he wasn't able to take it on at that particular time.

Q Okay.

A So a week later after I was terminated, that's when he picked the case up.

Q Okay.

A I'm sorry about that.

Q And then can we just look at Defendant's Exhibit A, again, Defendant's Exhibit A.

A Okay.

Q Is that your name at the top, Tommy Hatten?

A Yes.

Q And is that your email address?

A Yes.

Q Okay. And so this was sent to Tommy Hatten at this email address, correct?

A Possibly. I didn't, I don't -- I didn't get it from there, I got a actually letter, I think.

Q Okay. You got a hard copy?



A Yeah.

Q Okay. But this is your name and email address, correct?

A Yes.

Q Okay. No further questions.

Thank you for your time today, Mr. Hatten --

THE WITNESS: Yeah, I appreciate --

MS. YOUNG: I know it's a long day.

THE WITNESS: Yeah, I appreciate it.

MR. LEVIN: We'll reserve signature.

THE VIDEOGRAPHER: This concludes the deposition. The time is 4:26. Off the record.

* * * * * * * *



MAGNA LEGAL SERVICES

REPORTER'S CERTIFICATE

The within and foregoing statement of the witness, TOMMY HATTEN, was taken before DEANNA L. TUFANO, CSR, and Notary Public, at 300 South Wacker Drive, Suite 1050, Chicago, Illinois, County of Cook, at 9:06 a.m. on the 29th of August, A.D., 2023.

The said witness was first duly sworn and was then examined upon oral interrogatories; and the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, correct, and accurate record of all of the questions asked of and answers made by the said witness, TOMMY HATTEN, at the time and place hereinabove referred to.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public in and for Cook County, Illinois on this 15th day of November, 2023.

DEANNA L. TUFANO, CSR,
CSR No. 084-003819
MAGNA LEGAL SERVICES
SEVEN PENN CENTER
1635 MARKET STREET, 8TH FLOOR
PHILADELPHIA, PA 19103
(866) 624-6221



MAGNA LEGAL SERVICES

**A**

**A-L-I-S-H-E-A**
20:21
**A-N-G-E-L-A**
12:10
**A-R-Y-Z-T-A**
22:12
**A.D**
262:6
**a.m**
1:18 4:7 81:17 126:17 127:22 156:3 187:14,15 231:19 262:5
**Abby**
55:19 138:2,3 170:17 170:18 171:11,12 171:14,20 172:4 173:7,9 174:17 175:17,20,21 176:15 178:1,8,22 179:4,7 183:2,5,7
**ability**
8:4,8,15 252:8
**able**
32:24 37:12 42:1,4 47:15 54:23 55:2,21 55:22 70:24 80:9 87:6 88:16 100:2 110:18,23 112:11 112:15 118:7 119:6 173:18 178:8 179:24 180:24 183:3 185:5,12,13 185:14 186:4 200:24 206:16 224:12 233:10 240:19 241:5 260:7
**absence**
147:17
**absent**
90:18,18 91:22 92:9 104:10 106:7 146:6 151:16 196:16 257:24 258:1
**absentee**
50:23
**absolutely**
31:6
**accept**
185:1
**access**
179:18,20
**accident**
240:18 251:9 252:15 253:21,22 254:3 255:11
**accommodate**
43:21 207:17,20 208:16 209:13 215:2 216:10 229:12
**accommodated**
54:9
**accommodating**
42:5
**accommodation**
26:5 40:20 41:20,21 42:13,14,22 43:6,8 43:9,11,23 54:13,15 54:16,17,18 124:8 140:17 192:9 200:10,18 207:22 208:2 209:18 223:14,15,18,23,24 224:11 225:7 228:12 229:7
**accommodations**
22:22 89:6 244:10
**account**
179:12,24 180:1 181:8
**accounted**
133:15
**accurate**
8:5 53:4 57:8 60:20 63:2 73:1 94:15 100:13 104:19 123:21 136:17 142:14,20 143:14 159:19 173:20 187:17 190:1 262:12
**acknowledged**
93:11
**acknowledgement**
170:6 202:5
**acting**
262:10
**action**
6:20 213:14 216:1 228:8,10,18,24
**actions**
242:4 250:13,23 251:2
**activated**
233:5
**activities**
68:5,8,17 69:6
**actual**
14:11 36:22 84:4 97:15 101:17 147:24 188:4,16
**ADA**
43:14,15
**Adam**
38:7,8,9,11,15 39:4 48:9 50:18 54:5,8,9 54:20 56:15 117:5 120:16,22 124:24 125:5,6,6,15,19,24 138:15 161:2 177:7 193:12,13,16,22 194:3,5 195:15,16 196:23,24,24 197:3 198:12,13,23 200:15 204:14,15 204:19,22 205:3 211:18 217:7 218:10,24 219:3 258:17
**add**
34:11 55:7
**added**
94:1
**addition**
227:4
**additional**
104:9 137:12 188:2 188:12 190:12 192:21 198:22 203:12 206:16 212:11 222:7 234:19
**address**
17:10 20:6 180:4 181:13 217:1 260:18,21 261:2
**administrative**
20:1
**admit**
102:17,18
**advised**
77:7
**affect**
8:15 252:8
**afford**
199:23
**afraid**
121:4,6 246:14
**afternoon**
231:21
**agencies**
235:4
**ago**
12:15,16 14:5 18:14 18:18 19:1 24:12 94:18 176:19 180:1
**agree**
7:12 99:13 126:19 127:24 128:5 133:2 140:4 142:19
**agreed**
108:12
**agreement**
136:15 141:8 143:6 144:7
**agreements**
143:3
**ahead**
36:10 113:3 140:8 149:9 191:20 225:20

**aid**
178:1 183:5
**ain't**
75:10 99:7 126:21 141:11 152:12 160:21
**airbag**
240:24
**alcohol**
8:11
**alerted**
114:6,8,13 115:2
**Aleve**
253:3
**Alishea**
20:21
**all's**
39:19
**allegations**
11:22 12:1,21 14:10
**allege**
67:4 112:24 114:8,12 115:2 151:9 225:12 225:14 242:3
**alleged**
250:16 251:2
**alleging**
128:22 143:18 144:14,18 149:24
**Allegra**
253:5
**allotted**
116:8 117:3 123:22 177:17 181:2 183:3
**allow**
143:20
**alluded**
89:4,19
**alterations**
89:12
**amended**
58:23 67:22
**Amlodipine**
251:18
**amount**
36:20,22 37:17 69:3 76:17 97:24 123:21 128:6 136:3 138:10 140:14 166:24 169:21 171:15 172:21 174:17 176:3,4,16,17 181:1 186:14,17,20 198:24 200:6 201:1 233:9
**amounts**
176:10
**Angela**
12:8 13:14
**anguish**
253:9
**answer**
7:2,9,18 18:5,10 30:13,15,24 31:1 35:10 40:2,3,10 44:2,13,16,24 56:1 67:8 73:19 89:8 106:14 109:10 111:1 114:10,19 125:9 131:16 167:15 169:18 174:7 175:3 189:14 196:4 203:15 213:12 214:14 220:10,10 224:8 225:4,22 229:2,17 254:16
**answered**
11:18 35:19 36:9 50:20 113:2,2 204:11 219:21 225:19 256:24 257:6,12
**answering**
34:8 55:12 156:7 219:24 257:18
**answers**
5:23 6:9,17,19 35:9 143:5 201:23 244:8 262:9,13
**anticipate**
6:8,9
**anxieties**
246:18
**anxiety**
242:8,9,16 243:1 244:14,16 246:23 247:6,10 248:1,8,10 253:13
**anybody**
17:13 32:6 34:16 62:14 69:11,17 70:15 89:18 124:17 132:23 167:20 169:19,23 204:21 204:23 250:8
**anymore**
38:5 194:24 195:1 215:1 254:18
**Anytime**
75:14
**anyway**
85:15 121:13 213:1 242:9
**Apart**
17:17 252:24 253:7
**apologize**
66:5 107:24
**app**
46:13,16,17 121:19 230:7 232:9,23,23 233:2,7,8,10 234:7 234:9 235:11 237:11
**application**
230:7
**applications**
238:13 239:4
**applied**
44:9,10,22 71:7 152:21 157:22 199:3,6 238:24
**apply**
70:14,20,20,23 88:9 154:17 201:3,3 230:5
**applying**
233:1
**appointment**
200:6
**appointments**
163:8,9,11,14,22 164:1
**appreciate**
196:14 261:8,10
**appropriate**
6:18
**approve**
161:12 209:4
**approved**
71:8,14 72:4,5,23 73:3 88:14 97:16 151:3 152:13,13 153:5,24 154:24 156:10,12,23 162:24 163:12 201:13,15 202:24 203:6,16 206:18 209:4 258:12
**approving**
202:19,20
**approximately**
26:16 78:21 88:14 128:22 133:15,19 187:16,22 191:9 198:11 209:24 210:1 227:6 231:23 231:24 232:15 234:17 238:4 260:3
**apps**
232:20 233:15
**April**
47:20 48:23 49:8,11 51:6 53:24 54:4 57:14 84:12,13 91:22,23,23 92:2 118:20 119:3 120:1 180:18 202:8
**April-ish**
84:11
**arrested**
18:3,12
**arriving**
90:16

**Aryzta**
22:10 23:19,24 24:5
**Ashley**
2:8 31:7 165:13,14
**asked**
6:16 27:14 32:13 36:9 44:6 53:24 78:3 106:18 127:7 136:10,12 141:18 146:9 151:15 152:10 153:3,9 154:1,4,11,16 155:18,20 156:17 156:22,23 158:23 166:16,17 167:14 168:21 169:3 174:8 184:8,11,15 192:3 205:7,15 206:10 207:5,10 214:1 225:19 253:18 255:8,20 256:11,17 256:24 257:6,12 262:12
**asking**
12:19 13:10 14:12,13 32:17 40:1 44:13 49:7,10 52:10,16 54:13,15 55:11 106:14 115:7 119:10,13 131:8 155:5,8 167:13 172:18,20 199:8 205:8 209:19 215:19 223:17 228:23 255:16
**asleep**
76:4 245:19
**assess**
97:1
**assessed**
104:9 108:13,23 228:1
**assessments**
98:11
**assists**
24:16
**assume**
7:9,13 193:20 210:23
**assuming**
157:4 210:20,24
**assumptions**
216:15
**attempt**
229:6
**attend**
21:13
**attendance**
39:1 90:3,6,12 92:8 94:16,19,21 97:1 98:11,15,20 99:2 100:5,8 103:11,12 104:18 110:12 113:7 143:15 146:1 146:14,16 152:6,7,9 152:16 154:15 155:3,5 158:19,21 160:7,8,18,19 183:24 184:15 207:7 225:18 226:5 226:16 228:1,4
**attended**
22:1,2 240:4
**attention**
139:24
**attorney**
6:24 9:14,18 10:19 10:23 17:14 102:8 130:17 131:21,24 238:22 259:7,8,10
**attorneys**
9:9 11:17
**attribute**
252:20
**August**
1:17 4:6 14:16,20 15:23 16:10,10 42:15 75:1 76:9 78:5,8,17,20,24 79:2,8 80:15 87:2,5 87:9,14 110:12 112:19 113:12 114:1,9,16 115:4 163:20 180:18,20 183:8,13 184:2 189:11,12 190:7,13 191:2,8 227:18,19 227:21,23 229:24 229:24 230:12 233:4,24 234:10,24 235:2,18 238:16 239:13 240:13 241:9 245:15,17,18 245:20,22 247:24 248:3,13,21,22,23 249:13 250:2 255:9 255:13,17 259:24 262:6
**auto**
255:11
**automobile**
240:17
**average**
74:11 189:1 191:2 235:15 236:3,8 237:4,6,8,10,20 245:16
**avoided**
216:6 226:23 227:2 243:23
**aware**
45:14,15 47:18,22 49:19 69:8 87:16 111:9 115:19 116:4 116:7,21 120:20 121:16 133:21,23 147:1 157:11 166:20,22 176:9 178:17 182:10,13 201:17,22 210:8 256:12,14,17 257:11
**awful**
243:21
**awhile**
73:13 76:7 151:19

**B**

**B**
2:3 3:7,8 58:12,13 67:22 113:15,17
**back**
15:22,23 29:14 33:18 41:24 44:4 47:19 49:5 51:17,18,22 53:23 58:8 62:19 64:12,13,14 85:10 86:8 95:24 97:18 98:10 101:4 113:14 115:6 116:10 118:15,17 120:22 123:22 133:7 134:14 140:24 141:21 152:14 154:11 156:20 157:9 158:12 162:19 172:5 174:20 184:21 191:16 193:9 195:3 196:16,17 197:11 203:5 207:10 216:18 228:17 235:16,17,18 242:15 245:15 254:4 256:11 258:23
**background**
20:4
**backgrounds**
5:18
**bad**
103:22 249:4
**badder**
75:3
**balance**
202:14
**bankruptcy**
18:1
**based**
117:6,12 123:7,8 133:6 135:11 138:12,14 229:4,4
**basically**
54:18 98:8 100:12 136:16 139:14

141:10,12 161:20 168:15 186:2 203:14 204:8 206:19 213:11 214:12,14
**basis**
31:21 254:23
**Bates**
50:19,21,22 52:16 53:2,12 120:21 121:10,21 125:5,6,6 173:8,10 175:2 194:4 204:23 211:21
**bed**
79:21
**began**
57:17 62:20 81:3 118:17 119:13,13 161:15
**beginning**
47:9 64:17,22 65:13 65:19,20 74:13,16 74:18,18,20 75:3,11 76:23 82:1 105:23 105:23 127:14 136:7 151:7 155:10 156:13 163:15,16 163:17 180:17,20 197:7 208:20 210:18 211:1,10 227:18,21,23 234:2 243:5
**begins**
4:2
**behalf**
2:6,11 4:16,18 5:3
**believe**
8:3,15 33:19,20 59:16,17 61:12,19 114:12 122:18,22 126:23 127:3 140:10,13 159:5 161:21,23 162:3 164:14 212:17,20 216:1 225:17 226:4 228:7,14,17 229:14 229:24 256:15 259:13
**believed**
107:14 125:15 214:5
**bell**
259:15
**benefit**
6:5
**Benton**
21:6
**best**
6:23 7:4 27:21 57:3
**better**
7:8 27:10 75:6,7 78:19 122:3 209:9 224:9
**beyond**
180:10 204:2
**bills**
250:21
**birth**
21:3
**bit**
5:18 7:8 24:16 44:5 58:9 75:6 78:18 83:14 108:16 115:6 164:6 182:4 201:24 211:11 224:9 228:23 239:1
**biweekly**
103:10
**black**
130:11
**blind**
208:14
**blood**
164:19,22 165:2 251:18,19
**bloodwork**
164:21 165:2
**blurriness**
75:10
**blurring**
74:3
**blurry**
73:9 76:13 77:4,16 108:1,16 109:17
**blurs**
74:4
**board**
40:14 61:24 98:10 117:11,20 118:1,5 118:12 134:3,4,7 135:22 137:17,21 138:2 139:11 140:20,22 170:5,7 170:13 208:5 215:1 216:12 219:10,11 219:13,13
**body**
204:5
**born**
21:5
**Boteng**
65:18 82:12
**bottom**
94:5 147:18,18 148:3 149:17,22
**Boulevard**
2:3
**brain**
24:20
**break**
7:16,17,19 12:22 13:12 26:23 50:7 60:6,12,13 90:23,24 133:18 134:18 162:20 221:15,17 221:19,21,24 233:16 237:12 247:3 248:17 254:5 254:6
**breathing**
242:11 247:18
**Brief**
254:8
**briefly**
14:21
**bring**
31:23 32:13 119:17 119:24 254:20
**bringing**
139:23
**broad**
257:17
**broader**
258:7
**broken**
42:1
**Brooks**
2:7 4:10,17
**brought**
81:1 85:10 139:24 161:10 167:22 169:13 205:8 213:4
**bullet**
126:15
**bunch**
130:1 171:7 230:22 246:22 247:21
**busy**
81:21

**C**

**C**
2:1 3:9 59:21,22 60:19 113:17
**C.S.R**
1:24
**calculate**
36:13 133:13,14
**calculated**
36:22,23 135:4 138:5 146:11
**calculation**
128:11,11 138:11 189:8
**calculations**
124:1 135:17 138:1 201:17
**calendar**
158:13
**call**
37:11 70:1 98:17 101:15 102:23 170:24 171:1 172:5 178:5 183:1 194:5

198:12,12 199:23 211:2,24 227:11,17
**call-offs**
227:24
**called**
5:3 47:19,21 48:8 49:20 50:17 52:16 53:2,8,12 57:14 69:24 70:18 120:10 120:21 121:11,12 121:20 151:14 152:10 154:1 156:17 160:4,5,22 171:2 173:7 188:11 190:11 197:10 198:2,15 206:5,6 227:16 258:4,5
**calling**
194:22,23 196:7,14 212:1,5 225:3
**calls**
67:7 89:7 98:16 229:1,16
**calm**
242:11
**camera**
30:21
**car**
252:14
**care**
83:6 252:6
**Carol**
50:19,21,22 51:2,11 52:10,16 53:2,12,23 53:24 120:21 121:10,20 125:5,5,6 173:8,10,12,13 175:2 194:3,4 204:22 205:3 211:21 258:10
**case**
4:5 11:5 12:4,12,17 12:19 14:22 17:13 61:20 62:15 95:12 101:2 109:7 205:17 206:15 211:4
260:10 262:16
**cause**
229:12
**caused**
204:3 228:14
**CDL**
21:21
**center**
165:16 262:22
**Central**
21:14
**certain**
6:24 36:20 41:1 57:24 68:19 92:14 92:14 96:14 97:24 166:24
**CERTIFICATE**
262:1
**Certified**
1:15
**change**
6:19 83:20,22,24 84:9 85:17 86:2,13 100:3
**changed**
69:5 78:11 83:21 84:7,17 86:3,12,14 86:15 127:17 176:6 187:15 189:20
**changes**
6:18,20
**changing**
140:23
**charge**
13:17,20 14:2 15:19 16:1,8 17:8 20:1 192:17 255:21 259:7
**charges**
19:11,15
**chart**
100:9 133:12,15,23 135:7 147:19 161:1 161:22 162:4
**check**
98:23 99:14 122:4
149:8 186:5
**checked**
98:21 164:21
**chest**
240:22,22,24 241:1
**Chicago**
1:17 2:9 4:9 11:4 262:5
**children**
20:18 21:1
**choose**
202:7
**chronological**
57:3
**civil**
1:12 32:3,4,16,17
**claim**
13:23 15:8 19:3 118:4
**claimed**
19:6
**claims**
7:5 59:16 62:15 115:9,10 254:13,21
**clarification**
27:13 143:8 201:24 202:4
**clarified**
205:17
**clarify**
12:18 13:10 16:24 41:4 48:19 49:2 66:11 81:9 119:12 130:23 147:23 152:23 154:16 159:14 184:6 198:23 200:19 203:17,18 232:19 237:6 238:3,15 239:1 245:10 253:15
**clarifying**
29:8 52:5 257:7
**clarity**
78:12 118:9,12,17 124:5 171:10 172:5
178:7,9 212:22 213:16 214:23
**classes**
240:5
**clear**
13:1,5 26:21 37:22 40:2,2,10 44:2 46:8 54:14 55:9,14 63:15 103:4 117:9,9,14 136:1,10 172:2 191:7 193:10 214:14
**clearer**
109:8
**client**
30:14
**clinic**
165:6
**clock**
100:22,23 192:24 193:3
**clocked**
193:5,7
**close**
68:11 114:6,9,13 115:3,24 133:23 168:13 172:9 180:12
**closed**
180:8
**cluttered**
48:12
**coaching**
174:8,9
**Code**
1:12
**cold**
23:18,19
**color**
130:10
**column**
147:23,24 148:3,10 148:17 149:17
**columns**
148:9
**come**

11:4 25:13,15 29:21 31:11 53:17 92:13 96:12 100:19 154:11 156:1,20 157:19 170:24 184:17 188:16 189:6 198:16 206:12 233:7 243:13
**comes**
31:11 123:15
**coming**
5:8 41:2 45:19 46:19 73:12,22 74:2 97:21 97:22,23 173:8 192:4 219:15 243:6
**commenced**
56:18 216:21
**comment**
6:19
**Commission**
19:13
**committing**
142:23
**common**
166:23 212:23
**communicate**
180:9 209:7
**communicated**
206:21
**communicating**
37:23 41:16 180:5 181:14
**communication**
30:12 46:7,8 169:15 170:11
**companies**
29:20
**company**
22:8 25:1,2,4 229:13
**compensated**
36:17 37:18 123:5 124:6 195:6 196:8 198:21 199:18 200:9 217:21 218:5
**complaint**
14:12 58:22,23 59:14 59:18 67:22 73:5 113:14
**complete**
7:5 22:2 80:9 110:9
**completed**
56:11
**completely**
7:16 202:3 208:14
**complicated**
34:24 175:3
**computer**
101:22
**concern**
39:18,18 44:1 45:19 119:17 136:19 161:8 198:18 200:16,17,17 207:11 216:22,24 217:1,4,10,13,15 218:4,11 220:3,6,17 220:20 221:1,1,7,9 221:10,12
**concerned**
41:3 42:7,23 49:23 50:1,3,15 54:10 57:15,17 118:6 119:1,20 121:13 136:9 167:16 169:12,12 198:19 198:24 199:2,6,11 199:12 200:4,20 215:20,21 217:23 218:18 219:8
**concerning**
10:8 11:4 12:12 14:9 38:18 39:10 61:20 169:11 192:7 206:24 211:24 217:18 257:24
**concerns**
82:23 157:22 161:5 204:15 217:11 246:11
**concluded**
180:24
**concludes**
261:12
**conclusion**
6:14 53:18 67:7 89:7 180:21,23 182:19 183:23 185:1,3 192:4 216:13 229:1 229:16
**conclusions**
183:17 184:7 185:2
**condition**
8:15 68:4 255:14,18 256:13,14,18
**conditions**
251:10
**conduct**
250:16
**confirm**
10:19 11:18 16:10 56:23 89:5 101:3 108:15 109:16 111:23 113:10 134:10,11 140:3 174:10 223:20
**confirmation**
107:5
**confirmed**
134:7,21 135:5 137:14,16,21 138:8 138:9
**confused**
51:8 117:16,17 124:2 147:6 171:21,24 178:6,12
**confusing**
84:21 111:3,5,5 134:19 174:4 203:18
**confusion**
99:1
**conscious**
122:6
**consent**
95:7 96:9,11,23 97:9
**consequence**
27:16
**consequences**
136:13 141:2,4
**consider**
211:22
**consideration**
33:4,12
**considered**
73:13 74:24 92:13,16 92:18,23 95:2 113:17 123:4 143:17 159:10
**consistent**
87:13 236:21,24 237:24
**consistently**
76:11 245:24
**Constangy**
2:7 4:10,17
**constant**
246:24 248:15 249:15,19,20,21 250:4
**constructed**
70:10
**consumed**
8:11
**contact**
9:9 17:10 70:4 100:5
**contacted**
125:5 182:14,15 188:17
**contains**
6:15
**continue**
7:2 40:14 81:3 224:19
**continuous**
40:12 71:11,15
**contractor**
231:7
**convenient**
235:9
**conver**
218:14
**conversation**
15:21 30:20,20 40:18

42:3 48:20,24,24 49:12 51:10,11 54:8 115:19 120:12 125:19 169:11 175:23 184:22 193:15,20,22 194:1 194:2,12,15,18,21 195:21 196:20,21 197:1,4 200:15 204:14,18 222:10 222:13,13 227:3
**conversations**
16:20 39:19 40:13 41:24 43:24 57:6 179:8 181:11 193:11,11,13 227:6
**convicted**
18:7
**Cook**
1:17 262:5,18
**cool**
219:23 221:20 223:9
**cope**
75:5
**copies**
59:24
**copy**
60:20 109:8 130:12 131:6 260:24
**core**
190:19
**corporate**
184:4,11
**correct**
8:22 11:3,15,16 14:17 40:10,11 42:8 51:11,12,14 57:15 62:24 80:10,11 85:4 89:22 91:20,21,24 92:1,3,5 93:3,12,23 93:24 94:3,4 104:7 104:11 105:17 106:3,19,22,22 107:2,3 108:5,8,9 108:11 109:19,20 109:21,22 110:1,12 110:14 112:20 113:12,13 115:5,13 115:14,17 116:15 116:16,18,23,24 118:18,19,21 120:3 121:2,3 122:10,11 122:20 124:5,22 125:16 126:1 129:17,18 131:5 132:7,11 134:21,24 135:9,12 137:15,23 138:8,11 139:16,17 139:18 144:16 150:2 151:4,5,7,11 153:10,14,16,17,19 153:20 154:18,21 155:1,12,17 156:13 158:24 159:1,3,4 161:4 162:24 166:4 169:4 170:14 178:16 189:2 197:18,19,21,24 198:1 205:3 215:4,7 215:8 217:1 220:4,7 220:15,17,19 221:8 222:8,9 223:1,2 224:1,3,4,21 226:6 226:7,9,10 227:4,7 228:19 233:21 237:23 238:5,7,17 241:4 248:13 249:13 255:12 256:2,4,22 257:3 260:21 261:3 262:11
**corrected**
106:10 107:6,14
**corrections**
106:10
**correctly**
149:19
**counsel**
4:13 31:7 262:16
**counseling**
94:9 97:4 98:5 99:12 106:5,19 112:20 113:1 141:22 142:2
**counselings**
97:15
**counselor**
253:8
**counted**
210:6
**counts**
92:9
**County**
1:17 262:5,18
**couple**
5:17 9:24 12:15,16 59:2 65:21 162:20 175:18 176:17 178:5 193:17 206:2
**course**
113:3 242:5
**court**
1:1,12 4:4,11,20,22 5:21 6:5,14 12:20 13:14 17:3,5 24:2 36:4 66:23 103:22 126:4 129:2 132:15 150:15 251:23 252:1
**courtesy**
122:4
**courtroom**
17:22
**cover**
153:1 195:13 226:21
**covered**
156:19
**crash**
77:18
**crazy**
29:18 242:10
**crime**
18:7
**crying**
54:18 215:24 246:17
**CSR**
2:13 262:4,20,21
**curious**
106:1
**current**
12:5 17:1,7 20:6 229:21 233:3 234:13,16 241:21
**currently**
164:21 223:19 248:7 249:9
**cut**
39:13 48:15 130:13 131:9,12 137:9 171:8 186:9 195:10 220:1 224:17 240:7
**cutoff**
60:10,11
**cuts**
95:17
**cuz**
147:6

**D**

**D**
3:1,9 72:11,12 223:21
**date**
13:22 18:13 21:3 48:11 52:13 62:24 63:2,10,11,14,15 64:17 71:2 88:24 90:9 105:7 120:4 134:10 151:23 156:3 158:1 159:3 161:6 180:10 197:11 224:13 248:2
**dates**
14:5 45:23 94:15 99:14,15,16 100:10 100:13 105:17,19 107:1 108:16,17,19 108:22 109:9,17 118:17 120:8 152:11,13,15 154:18 155:23 156:18 157:1,3,8,14
**David**
2:3 4:15 10:20 55:7

102:16 109:7 132:2 255:2
**day**
23:3 26:22 27:1,5,22 74:14,19 75:13 80:1 82:22 85:8 86:18,18 86:20,20 95:6 96:12 99:6,18 100:14 112:12,15 115:23 126:20 145:1,2 146:12 147:5,7,23 147:24 148:2,2,4,5 148:12 155:20 157:9,16 158:5,6 160:5 164:24 183:23 188:20 189:17 201:7 202:7 202:21 203:20 207:4,6 211:16,16 230:21 231:23 233:20 261:9 262:19
**days**
37:16 52:24 53:16,16 82:2 83:17 85:11,16 86:14 95:1,16 96:5 98:3 106:8 112:13 126:19 136:17 138:20 143:17 146:5,7,10,20,22,23 146:23 147:2 151:14,16,24,24 152:5,7,20,21 154:11,15 155:19 158:8,16 159:6,8,22 160:4,6,11,16,17 161:10,12,22 188:3 188:12,19 190:8,20 190:21 201:15 231:3,4,4,9,23
**Deanna**
1:15,24 2:13 4:12,22 262:3,20
**Dear**
258:19
**December**
78:8 79:8 104:7,10 105:16 106:11,24 224:3,6,22 225:2 247:24 248:3,23 249:16
**decent**
250:3
**decide**
200:5 203:1,2 211:9
**decision**
64:8 184:2
**declared**
18:1
**deeper**
31:17
**Defendant**
1:8 2:11 5:3
**Defendant's**
56:6 58:12 59:21 67:21 72:11 90:22 91:8 93:14 103:20 107:20 109:4 110:4 113:15 114:5 116:10 126:4 147:10 150:4 170:6 177:11 202:6 216:18 260:13,14
**definitely**
27:17 50:11 52:9 59:11 90:11 112:3 117:18 129:24 141:7,18 143:13,13 144:12 147:8 159:7 160:20,23 170:12 177:12 181:10 225:23 226:18,19 245:23 251:6 260:2
**delivery**
232:9
**Department**
19:16,18
**depend**
86:18
**deposition**
1:10 4:2,8 5:14 6:14 7:23 8:19,22 9:1,14 10:4,9,17,23 11:2,4 31:19 91:5 102:24 162:14 222:1 261:12
**depositions**
1:14
**depth**
105:21
**Derrick**
58:4,6 65:17,18,21 66:1 82:12,13
**designated**
151:6
**designation**
72:22 150:23 153:7 153:13,15 154:21 155:9
**desk**
98:16 101:15
**detail**
11:1 15:9 112:5 187:18 193:12 205:15 228:23
**details**
9:10 43:5 91:18,22 182:7
**determine**
201:6 202:10
**determined**
56:20 218:12
**Devin**
38:7,10,12 39:3,6,7 40:9,19 42:3 45:15 45:18 46:15,22 47:3 47:18 48:1,5,6,16 48:20 49:10,12,16 51:11,23 52:11,16 53:7,8,9,15 54:4,20 57:2,14,18 69:10,15 69:16,20 70:1,4,12 70:19 89:20 115:13 115:15 116:1 117:7 117:15 118:20 119:7,14,17,21 120:15,16,22 122:10 124:22,24 130:5 132:13,20,23 133:1 134:5,7,17 135:16,18,18 136:9 136:12,20 137:2 138:16,22,23 139:2 139:23 141:1,4 145:7,19 151:14 152:1,10,11 153:3,9 153:12 154:1,11,17 154:20 155:21 156:17,22,24 158:1 158:3,4,5,23 159:14 161:1,2,3,4 167:22 168:7,18 169:3,20 172:15 188:10,17 190:11 193:11 204:22 205:3 206:6 208:20,21,23 210:17 211:2,17 214:7,8,9,9,11 215:3,12,13 256:13 256:20 257:5,10
**difference**
257:7
**different**
34:15 95:13 115:8 142:1,3 165:7,11 177:16 208:5 246:19 256:1
**differently**
34:17 246:20
**difficult**
31:2 60:9 80:2 131:13
**dilated**
74:9
**diminish**
41:15
**direct**
66:8
**disability**
67:4,4,10,11 148:10 148:24 149:7 150:5 150:6,9,10 152:4 154:7,10 156:19,21 159:10,23 160:1

216:2
**disagreements**
144:6
**discipline**
90:5
**discoverable**
61:7
**discovery**
1:10,14
**discrepancy**
94:7
**discriminated**
32:8 205:9,10,18,21 205:23 206:12,20 207:18 208:11,17 214:2,6,16,17 215:7 215:10
**discrimination**
14:2 15:19 16:8 17:8 19:12,15 259:7
**discuss**
11:11 30:10 60:3
**discussed**
12:4 17:13
**dispute**
93:7 94:8,21 96:7 104:15,16 106:2 108:19 109:23 110:16,22 111:19 140:12,13,14,16 142:14 159:2
**disputed**
94:19 98:9 104:17 111:7 113:7
**disputing**
101:14
**distress**
242:4 250:10 252:22
**district**
1:1,1 4:4,5 125:7
**division**
1:2 4:5 40:16 61:24 62:11 192:5 213:17
**dlevin@toddflaw.c...**
2:5
**doctor**
38:24 146:3,5,9 164:3,4,8,15,20,23 165:5 199:20 211:5 211:7 224:14 250:21,21 252:6 256:21
**doctors**
163:8,9,11,14,22 164:1,17 165:7,11 200:5
**document**
56:5 58:11,16,20 59:20 60:1,7,24 61:3 72:10,15 91:16 101:8,9 126:15 129:9 130:14 131:20 132:6,12 133:2,8 142:23 150:14
**documentation**
238:18
**documented**
97:13
**documents**
8:24 9:3,4 90:20 97:14 102:20 103:9 238:23 258:12
**doing**
28:14 37:6 41:16,21 43:3 62:2 76:5,5 83:24 84:24 120:14 122:24 136:6 139:12 206:19 209:4 212:7 217:16 223:7,7,9,9,11,13 230:7 232:19
**dollars**
235:16
**double**
200:7
**download**
46:16 121:19 235:8 235:13
**downloading**
235:9,11
**Dr**
164:3 252:6
**drain**
76:5
**drawing**
98:10
**Drink**
50:9
**drive**
1:16 2:9 4:9 68:18,23 69:1 77:16 262:4
**driving**
68:18,21
**drop**
108:19
**drugs**
8:7
**due**
123:19 228:7,18 240:14 255:10,14 255:18
**duly**
5:4 262:7
**duties**
77:13 88:16,23 89:13

**E**

**E**
2:1,1 3:1,7,10 90:22 91:8,10
**earlier**
47:8 67:3 82:10 89:4 89:19 106:21 115:7 115:12,16 118:15 122:18 124:11 139:7,9 141:22 166:2,7,10 170:4 187:13 192:20 205:7 222:6 255:20
**early**
79:22 83:6 90:16 92:5,10 94:2 95:8,9 95:21 96:1,15 99:18 106:7 202:9 231:17
**easier**
226:21 233:22,23
**Eastern**
1:2 4:5
**easy**
202:7
**Edith**
62:3,4,6,8 138:2 170:13,15,15,16,18 170:24 171:1,5,10 171:11,12,14 172:6 172:8,22 173:6,9 174:16 175:5,17,20 175:21 176:2,9,13 177:13 178:1,7,12 178:18 179:8,17 180:5,7 181:14 184:1,22 185:8,10 191:16 192:2,21 204:23 205:4,5 207:13
**Edith's**
178:14 183:16 184:7 185:1,2,3
**education**
21:18 240:1
**EEOC**
12:20 13:17,19,22,24 14:12 185:7,8,14,23 186:5,20 191:17,24 192:7,14,16,21 255:21
**eight**
8:12 23:4,6,7,13 26:13,23 27:1,4,5,5 77:3 108:7 245:22 245:23
**eight-hour**
23:3 26:22
**either**
107:7,10 112:10 136:11 160:19,22
**elaborate**
83:14 226:1
**elaborated**
167:10 182:3
**else's**
35:11
**email**

102:23 157:20 179:12,14,24 180:2 180:4 181:8,13 184:3,4,10 207:2,3 260:18,21 261:2
**emails**
179:11,15,16,17,18 179:21 181:8,10,11
**emotional**
242:4 250:10 252:21 253:9
**emotions**
244:1 246:10
**employee**
17:7 123:19 247:20
**employees**
17:2 87:16
**employer**
19:4,22 20:1
**employment**
19:12 22:5 23:16 25:8 27:8 29:13 64:19 88:6 93:3 185:24 186:1 225:17 226:5 229:21,22,23 234:24 238:10,24 240:2 241:8 251:5
**ended**
23:17,19 27:9 64:23 65:18 82:5 84:5,7 84:19 85:19,19 118:12 120:21 140:22,22 153:7 154:14 155:3 167:9 173:8 188:8 189:8 189:22 194:10 196:18 213:17 230:6,6,7 235:9 238:24 239:14 240:2
**ends**
95:17 213:16 229:23
**engage**
229:6
**enter**
50:5 57:18 160:4,5
**entered**
51:20 122:10 138:19 138:21 173:15
**entering**
57:19
**entire**
66:12
**entitle**
177:19 220:18
**entitled**
33:2 39:23 56:20 116:14 124:18 125:16 177:21 181:4,18 219:14
**entitlement**
56:19 181:19 216:22 216:24 217:5,11
**equal**
19:12 185:24,24 186:1
**equally**
32:5 33:20,21 34:14 205:16
**equipped**
124:9
**equivalent**
19:18
**Erica**
2:8 4:17 78:23 90:23 174:7
**errors**
6:18
**everybody**
38:20 42:3 56:2 87:18 98:10 100:13 206:23 210:21 219:15 257:24
**everyday**
39:15 215:22 249:22 249:23 251:21
**evidently**
104:18
**exact**
13:22 14:5 18:13 48:11 63:10,14,15 71:2 78:21 90:9 141:16 172:13 236:22 251:7
**exactly**
11:11 13:8 15:21 16:3 28:11 39:9 47:16,24 49:24 51:15 53:10 70:8 82:18 103:4 112:6 115:23 117:18 121:24 122:7 151:22 164:5 167:7 181:9 198:8,14 199:14 230:21 251:6 252:12 257:21 259:13
**Examination**
3:4,4,5 5:6 255:6 259:4
**examine**
56:19 216:21
**examined**
5:4 262:8
**example**
5:23 35:16 99:11 188:15
**excuse**
146:5,7,10
**exhausted**
42:6 44:1 114:3,7,9 114:14 115:3 117:2 135:19 184:5,14 199:19 207:4,5 222:8,15 223:1,4,5 225:16 226:1,9,12 227:14,15,24 228:15
**exhausting**
114:7 133:23 227:11
**exhaustion**
42:10
**exhibit**
3:8,8,9,9,10,10,11,11 3:12,12,13,13,14,14 56:6,7,10 58:12,13 59:21,22 60:19 67:22 72:11,12 90:21,22 91:8,10 93:15,16 103:20,24 107:20,21 109:4,5 110:4,5 113:15 116:11 126:2,5,6 129:1,3 133:9 138:12,14 147:10 147:11 150:4,11,15 161:24 170:7 177:11 202:6 216:18 223:20,21 258:16 260:13,14
**exhibits**
141:22
**exit**
190:23
**expect**
145:22 160:3,5 185:1 185:3 216:7 222:11
**expectation**
146:11
**expected**
88:15,22,23 146:22 160:8 166:3,16
**expecting**
168:3 222:7
**expenses**
250:15,17,20 251:2
**experience**
246:23 247:10 248:20,24
**experienced**
242:24 250:11
**experiencing**
245:14
**expired**
223:10
**explain**
63:6 68:7 73:6 110:21 111:10 149:8 181:21,24 215:19 226:11 243:11,15,18 246:12
**explained**

46:15 52:20 83:19 120:18 168:7
**explaining**
171:4 196:9
**expressed**
195:15
**expressing**
198:15
**expression**
168:16
**expressions**
210:22
**extent**
43:4 109:11
**extra**
23:3,4,7,13 26:12 37:16 99:7 105:17 128:17,21 137:10 140:14 188:13,19 188:19 195:6 196:8 203:3 204:1,3 233:7
**eye**
67:16,16,17 68:7,13 69:1,9,17,20 70:10 71:2,8 73:9,22 74:1 74:9 75:1 87:22 88:12 89:6,15 144:15 163:23 164:18 165:3 204:6 205:1 206:15 208:14 211:3 216:3 242:9,13,16,17,23 243:5 244:13 245:11 246:9,12 247:7 251:8,14 252:10,15 255:15 255:18 256:12,17 256:18
**eyes**
208:13 250:21
**eyoung@constang...**
2:10

**F**

**F**
3:10 93:15,16 103:20
**fact**
12:15 34:18 65:3 69:15
**facts**
61:20 254:12,18
**fair**
35:16
**fall**
76:3
**familiar**
41:1 58:19 230:9
**family**
11:19 149:22
**far**
7:24 29:14 43:5 257:19
**fast**
37:19,22 118:11 199:19
**faster**
41:15 235:8
**favorable**
35:11
**favorably**
34:17 35:17
**February**
47:19 51:5 52:23 53:1 62:23,23 63:2 63:16,17 67:20 69:22 71:4 72:3 74:21 75:1 76:8 80:15 84:11 85:3 87:5,9,14,22,24 88:1,6,12,21,22 89:24 90:2 127:20 127:20 143:18,18 144:14,15 147:2,3 147:19,19,21 148:5 148:6,11,20,21 149:2,6,6,23,23 151:3,7,10,17 152:11,18,18 153:1 153:1,10,10,19 154:12,15,17,18 155:11,15,15,24 156:10,10,13,18,20 157:2,15,18,21,22 158:5,13,24,24 159:2,3,3,13,16,18 161:5,5,15 166:3 167:6 168:4 189:10 189:12 190:24 204:24 224:13,20 225:1,10 244:13 245:11 247:7,9,19 248:19 249:16 252:3
**federal**
12:20 13:14 17:3 18:9
**feel**
32:2,17 33:1,7 35:5,7 39:21,21 40:5,9 47:12 73:21 74:2,8 104:19 205:10,12 205:21,22 206:11 207:19 209:14 210:18 215:16 226:15,20,21 227:2 228:16 242:7 243:21 244:12,17 245:10 246:3,16 247:9 248:1 250:6
**feeling**
32:8 34:4 73:23 155:20 206:13 207:18 213:13 243:9,11,13,15,17 243:19,20,23 244:1 244:3,15 245:3 246:8,14,15 247:6 247:22 249:11,12 249:17 250:8
**feels**
246:22
**fell**
39:23
**felt**
31:24 32:20,22 33:3 33:7,8,10 34:13,16 34:23 35:1,3,3,24 36:17 47:8 192:8,9 205:9 206:4,20 208:10,16 209:9 211:9 212:7 214:18 214:20 215:9 229:8 243:22 244:23,24
**figure**
136:6 174:21 175:4 176:13,14 195:6 219:16
**figured**
182:8
**file**
19:9 241:15,18,19
**filed**
12:20,21 13:14,17 15:18 16:1 17:3 19:3,11,15,24 58:23 59:7,12 192:14 255:21,22
**filing**
14:1 16:7 192:16 256:7
**fill**
39:2 206:14
**filled**
13:23 134:5 139:10 154:4 157:2,12 256:21
**filling**
139:20,21 258:6
**fin**
27:22
**final**
104:7 106:6,6 108:4 183:24 207:7 227:10
**find**
16:16 79:18 98:17 109:8 122:3,7 129:23 194:23 196:7 200:15 235:5 235:7 259:13
**finding**
27:10
**fine**
7:17 24:13 50:9 57:6

71:7 112:7,8,18 115:1 130:23 131:8 134:16 156:6 195:11 202:3 251:7
**finish**
6:10,11 96:14 101:6 114:18 142:16,16 167:23 177:3 224:17 240:7
**finished**
186:10,11
**fire**
216:12
**fired**
139:8 167:17 213:13 216:13 244:10,11
**firms**
235:5
**first**
6:10,11 13:21,23 14:4,6 15:4 48:3 50:4 52:22 62:20,22 63:3 65:17 69:20,22 71:21 81:15 82:22 85:8,11 91:19 100:4 100:19 109:18 115:9 120:2,5,9,17 127:14 143:16,24 144:15,22 145:1,2 147:22,23 148:2,2,4 148:12 153:8 165:12,14,14 171:5 184:2 193:15,22 217:4 220:11 226:24 227:19 236:6 242:16,24 243:5,8 245:3 249:19 259:21 262:7
**five**
18:18,20 48:13 57:10 167:1,1 201:15 221:18,19 240:4 246:1 251:10,13,17 252:16 253:3
**five-minute**
221:21 254:6
**fixed**
101:12,20
**flare-up**
73:7,7,14 74:12,24 75:15 77:8,12,22 80:1,10 156:22 165:21,23 201:10 202:10,23 203:11 204:2,10,12
**flare-ups**
73:6 78:6,9,10,22 79:2,11,13,15 162:24 163:3,4,7 204:4 224:2 231:10 231:15,16,18,22
**flares**
72:23 224:22
**flaring**
73:11
**flat**
123:8 167:15 220:23
**FLOOR**
262:22
**FM**
201:3
**FMLA**
22:20 26:3 30:3 33:17 35:12 36:3,5 36:21,22 39:20 40:21 41:6,8 42:4 42:10,23,24 43:11 43:12,12,15,17,20 44:1,7,9,10,18,19 45:8,9,10,17,18 46:5,9,9 47:3 49:13 52:22,23 53:1,4,13 53:17 56:19 57:19 57:21 67:13 70:11 70:14,20,21 71:7,15 71:21 72:5,19 87:21 87:23 88:2,5,9,13 89:1,13,16 90:3 113:11 114:3,7,8,13 115:3,17,20 116:2,4 116:7 117:5 118:14 118:18,23 119:1,8,8 119:15,17 120:6 121:16 123:1,4,8,23 124:9,18 125:16 130:15,19 132:10 133:3,24 137:3,5,22 140:4 143:9,10,11 143:12,15,20 144:11,13,18,20 145:22 146:18,20 146:21 147:8 148:4 148:11,20 149:5,14 149:24 150:8,23 151:7,9,13,15,15 152:1,4,12,12,17,21 153:1,8,9,12,15,18 154:4,12,17,20 155:9,10,16,21,22 156:9,13,16,24 157:7,12,14,15,17 157:18,22 158:6,20 158:24 159:6,6,10 159:12,15,19,21 160:2,14,23 161:6 161:10,11,12,14,17 161:19,20,21 162:3 162:24 163:4,6 165:21,24 166:3,16 166:18 167:6,12 169:21 170:6 172:21 175:9,10,11 181:16 184:5,14 186:17 187:3,21 191:13 192:19,22 195:9,13,21 196:3 199:16 200:23 201:4,5,6,7 202:5,8 202:11 203:5,13 204:24,24 205:1 206:7,9,10,15,18,22 207:11 210:6,9,13 211:4 212:11,11,15 213:16,23 216:22 216:24 217:4,11,18 220:18 222:7,8,15 222:24 223:4,5,14 224:5,19 225:16,24 226:8,12 227:11,15 228:15 231:5 256:22 258:6,13
**focused**
43:15
**follow**
122:6 202:1
**follow-up**
103:6 105:9 162:19 180:7 183:15,19,20 184:6 198:2 204:15 205:18 255:4
**follow-ups**
259:3
**followed**
224:14
**following**
85:1 197:14 227:21
**follows**
5:5
**forced**
139:14
**foregoing**
262:2,11
**forgot**
83:19 85:14 96:2
**forklift**
24:1,3 26:2 63:4,18 66:11,12 77:17
**form**
31:11,14 35:19 44:12 44:24 73:18 80:12 84:23 106:13,24 111:1 125:3 128:7 129:10,11,19 152:4 254:16 256:20 257:3
**formal**
21:17
**format**
129:21
**former**
12:5 17:2,6,7
**forms**
239:2,4

**forth**
118:17 133:8
**Forty**
208:13
**found**
121:21 137:17 197:24 217:15 246:7
**four**
28:18 48:12 52:14 76:10,11,14,14,20 76:24 93:2 232:22 232:23 245:19 246:3 249:1
**fracture**
240:23
**frame**
15:24 57:10 59:8 117:21,24 163:10 170:22 176:5,20
**freeze**
24:20
**Friday**
23:5 27:3 84:14 85:20 188:12,20 190:9,12,21
**Friedman**
2:2 4:16
**friends**
11:19
**front**
207:7
**full**
60:1 110:17 245:23
**further**
3:5 110:21 180:9 211:5 255:2,3 259:4 261:5

G

**G**
3:11 103:21,22,23,24
**Gary**
259:12,15,19,23
**general**
20:3 85:13 187:4
**George**
58:6
**gestures**
213:10
**getting**
23:19 24:20 34:12,22 42:7 48:11 73:22 75:7 78:18 79:20 83:22 94:16,23 95:1 96:20 97:14 123:23 146:1 174:4,5 186:1 199:19 209:5 213:9 214:10 234:15 235:11 244:8
**give**
8:4 14:6 18:15 39:11 39:12,13 72:7 78:21 84:22 95:20,21 97:8 99:9 101:14,23 105:7 112:8 117:22 123:21 125:8 157:6 169:20,23 178:8 190:13 208:2 209:3 212:22 213:12,15 237:4
**given**
133:21 197:9 201:7
**gives**
96:23
**giving**
188:3,14
**glasses**
74:10
**go**
5:17,18 8:2 10:3 15:9 29:14 32:12 33:18 35:1 36:9 43:18,22 44:4 51:18,22 53:23 56:1 62:19 78:4 79:10,21 94:11,12 95:24 97:10,18 98:10 99:18 100:12 100:20 101:2 112:5 113:3,14,21 116:10 118:15 123:22 126:14 128:24 130:8 132:19,20 133:8 134:14,18 140:8,24 141:21 148:9,23 149:2,9,10 150:9 152:14 158:12 162:19 164:20 174:20 177:12 182:2,7 184:21 185:6,8 186:4,20 191:17,20 193:9,13 202:5 206:14,14 208:5 209:23 213:1 216:18 223:20,21 225:19 226:2 227:21 228:17 242:15 243:3,8 244:5 246:9 247:8 253:22
**going**
6:8,9 8:2 9:8 10:5 14:21 15:5,6,14 20:3 26:15 29:14 30:12 33:24 37:19 37:21 39:22 43:14 46:6 47:22 49:22 51:10,17 53:10 58:8 60:3,10 61:6 70:20 72:10 74:22 79:6,22 81:9,12,16,22 83:20 83:23 85:6,9,15 86:23 87:12 90:19 90:21 93:14 107:8 107:10,24 109:16 111:8,11,21 113:21 115:6 118:15 119:2 119:4,5,22,22 120:8 120:9,10,12 121:7 121:24 122:2,24 126:3,14 133:7 135:22 145:7 147:5 149:18 154:6 157:3 172:2,3 175:2 177:5 178:14,21 184:20 187:20 188:16,18 189:8 192:10 195:21 196:4 197:17 200:7 203:2 203:12,18 206:9 210:9 213:12,17 219:9,13,20 229:21 236:12,22 246:10 246:12,17,21 247:20 252:11 254:5 258:12
**gonna**
37:11,12 40:4,19 83:21 85:18 119:24 122:2 145:20 157:5 157:6,11 159:24 200:1 209:12 213:13 215:16
**good**
74:6 80:6 105:1 107:16 155:20 162:9 221:14 249:5
**Google**
37:2 124:12,15
**gotcha**
6:1 251:3
**gotten**
93:5 107:16 159:5
**governed**
36:2,5
**graduate**
21:15
**Great**
63:20
**greater**
216:22 217:5,12 237:1
**guess**
10:3,4 13:21,23 16:4 32:3 42:22 45:13,13 62:13 72:3 74:24 75:4 88:17 92:12 99:24 100:2,8 120:1 138:3 146:4 154:13 171:14 172:9 173:10 178:20 183:10 185:24,24 192:10 202:12

203:4,5 247:13,14 247:17 257:24
**guidelines** 72:8
**gut** 213:12

**H**

**H** 3:7,11 107:20,21
**H-A-T-T-E-N** 5:13 20:22
**half** 84:20 92:13,14,16,21 92:22,23
**hand** 4:23
**handle** 192:5,6
**handles** 192:7
**happen** 67:19 74:12 75:12,13 75:15 78:1 79:15,17 79:19,24 122:2 141:13 155:13 167:5,8,18,20 168:7 233:13
**happened** 29:19 48:12,14 52:11 53:9 69:22 84:22 98:12 100:14 101:18 120:7 143:24 151:18 157:7,10 165:1 176:5 206:10 216:5 222:8 225:1 242:9 243:5 246:6 247:19
**happening** 74:13
**happens** 38:19,20 40:1 44:2 73:7,12,16 99:20 118:9 136:5 168:4 212:22 213:8,16 222:24
**happy** 31:4
**Harbor** 21:6
**hard** 29:14 105:24 131:5 189:14 190:14,18 224:7 226:16,17 233:11 260:24
**hardship** 229:12
**hat** 98:23
**hate** 54:22
**Hatten** 1:4,11 3:3 4:2,3,16 5:2,8,12 20:12,21 30:8 41:4 48:15 51:7 60:21 90:20 91:5 108:15 141:21 144:14 145:12 147:14 160:3 161:14 162:15,17 171:8 190:2 218:9 219:18 220:23 222:2,4 235:17 242:15 251:4 254:12 255:4 260:16,20 261:6 262:3,13
**he'll** 101:15,21 109:10 125:8
**head** 5:24
**health** 165:16 209:2
**healthcare** 251:12 253:8,16
**hear** 30:15 211:3 246:20
**heard** 186:5,18
**hearing** 182:6
**heavy** 242:11 247:18
**held** 10:17 29:15 66:20
**help** 12:17 34:15 48:24 54:18,19 75:23 83:23,24 110:22 185:13,15 191:17 192:10 209:15 212:14 213:15 215:24 235:5 244:7 246:16,17
**helped** 228:13 244:9
**helpful** 48:21 57:6 87:1
**helping** 213:2
**helps** 7:8 30:2 119:12 232:23
**hereinabove** 262:14
**hey** 35:13 40:18,22 41:19 43:23 70:19 96:13 99:17 101:3 121:11 121:12 167:17 190:14 195:16 197:17 207:16,16 207:16 208:1 209:10 212:3 217:24 218:2
**hidden** 55:4
**high** 21:13
**hire** 63:15 64:8
**hired** 63:3 80:23 81:16,19 82:3 127:15
**hold** 21:20 22:5 28:12 48:3 50:6 51:5 52:21 54:11 65:17 66:11 114:21 134:14 143:12 175:23 182:17 222:17 229:7 232:18 237:8 256:15 258:23 260:4
**home** 20:6 78:4
**homework** 38:1 41:16,22 212:7 217:16
**hope** 30:8,16 246:8
**hopeless** 246:16
**hopelessness** 243:14
**hospital** 70:3,9,18,19 83:8 144:1,2 145:7 158:9 211:2 253:22,23
**hospitalized** 252:16
**hour** 10:15 23:6,8 40:16 61:24 62:11 84:19 92:19,21,22 110:17 118:7 119:8 188:5 188:19 201:9,15 213:17
**hourly** 192:7
**hours** 8:12 23:4,13 26:17 26:23 27:1,4 32:20 32:20,22,23 33:2,5 33:6,10,11,13,15,15 33:17 34:6 35:2,8 35:13 36:16,18,20 36:22 37:9,10,12,15 37:16,17,21 38:5,6 38:19,21,23 39:23 40:1,6,24 41:3,5,6,8 41:14,18 42:2,4

43:12,12,17 44:1,7
45:4,5,16,20,22,24
46:1,2,5,14,18,20
47:3,11,14,18,23
48:6 49:9,13,18,19
49:21,22,24 50:2,3
50:12,12,13,16,16
51:15,15,19,24 52:2
52:17,19 53:4,6,10
53:17,18,19 54:1,9
54:10,23 55:3,22
56:20 57:15,18,19
57:23 58:1 62:12
71:21 72:5,24 76:10
76:11,15,20,24 77:3
81:19 84:1,7 86:15
87:6,8,10,12 92:12
92:15,16,17 95:16
97:24 110:18,19,24
111:24 112:4
115:17,20 116:2,5,8
116:14,17,22 117:2
117:3,6,8,12,16,17
118:8,8,10,13,23
119:2,5,15,17,20
120:2,6,7,11,11,13
120:19,23 121:4,8,9
121:10,12,15,16,23
122:2,5,10,12,20,23
123:3,4,7,9,10,11
123:22 124:6,18
125:16 126:16,20
127:3,24 128:1,6,21
128:22 130:1,5,21
132:10 133:3,9,15
133:19,22,22 134:6
134:9,17,21 135:8
135:12,18,21 136:8
136:16,20,24 137:1
137:3,4,5,11,20,22
138:3,4,7,10,16,17
139:1,18,19,22
140:2,3,5,10,14,14
140:19,19,22 141:9
142:14,19 143:2,3,6
143:8,10,11,12,16
144:11,13 146:18
147:8 152:21 153:1
154:12 155:9,10,16
157:22 159:6,18
160:24 161:6 162:3
167:1,1,1,2,21
168:3,13,17,20,21
168:22 169:1,8,17
169:21,21,24 171:7
171:16 172:10,19
172:21 173:15
174:17 175:5,6,8,10
175:11,11,18,20
176:5,8 177:7,16,20
177:23 178:3,21
181:1,1,3,19 182:6
183:3,3 184:14,17
185:6,12,23 186:15
186:18,19,21,23
187:1,5,9,10,11,11
187:17,20,21,22
188:1,1 189:1,4,7
189:11 190:15
191:2,9,11 194:24
195:1,2,3,3,4,6,7,8
195:9,13,16 196:8,8
198:17,19,20,22,24
199:2,5,9,10,11,16
199:16,18,24 200:1
200:2,4,16,18,20
201:1,1,6,7,8,10,11
201:12,13,16 202:8
202:9,11,13,16,18
202:19,21,22,23
203:3,8,10,12,16,20
203:22 204:1,3,9,11
204:12,24 206:24
207:10,11 208:3,9
209:2,10,13,14
210:1,2,2,5,8 211:5
211:7 212:2,4,11,11
212:15,23,24 213:7
213:23 214:21,22
215:1 216:23
217:12,19,20,23,24
218:1,3,7 219:3,8
219:10,11,14,16,17
220:4,7,19,21 221:2
221:5 225:16,24
226:9,12 227:1
228:15 230:17,18
230:19,23 231:2,3,4
231:9,23 232:15,22
232:23 233:4,10,19
233:20,20 234:1,9
234:10,16,17,19,23
245:16,19,20 246:4

**house**
129:23

**Huh**
21:8

**human**
19:16,18 37:10 38:12
38:12 81:1 99:23
114:5 206:14 207:9

**hundred**
134:6 176:18 242:1

**hypothetical**
225:3

## I

**I-R-I-S-H-A**
64:2

**I"m**
106:1 195:2

**idea**
142:6 159:12

**identification**
56:8 58:14 59:23
72:13 91:11 93:17
104:1 107:22 109:6
110:6 126:7 129:4
147:12 150:12

**identified**
17:15

**identify**
4:13,20 31:3 249:12

**ignoring**
158:22

**IL**
2:4,9

**Illinois**
1:1,13,16,17 4:5,9
19:16 20:8 262:5,18

**illness**
240:14 241:6 255:10
258:2

**illnesses**
251:9

**impair**
8:8

**impression**
36:14 71:18 80:24
146:13 152:3
159:23 213:9
217:22 218:2

**improper**
112:24

**inaccurate**
59:13 61:2 108:20

**inappropriate**
30:17

**inappropriately**
45:3

**inaudible**
66:22 251:22

**incident**
91:19

**incidents**
96:4

**include**
21:21 200:3 253:15

**included**
108:16,17 161:22
188:12

**including**
68:5 253:1

**inclusive**
253:17

**income**
241:9,21

**Incorporated**
4:4,19

**incorrect**
106:22 124:5

**incur**
250:15,17 251:1

**indicating**

57:16 113:18 116:11,19 130:2 132:14 148:18 156:23 191:19
**individuals**
61:5,6,8,15
**information**
17:10 61:7,19 180:2
**informed**
135:11
**initial**
125:18
**initiate**
229:10
**initiated**
227:8
**injury**
38:22 67:3 74:21,23 157:9 164:24 199:21 206:6 208:13 209:1 240:14,21,22 241:6 246:6 255:10 258:14
**input**
46:16 47:17 95:22,23 138:16 139:21
**inputted**
116:1 130:1
**inputting**
117:8
**insight**
208:11
**Instacart**
230:8,9,10,11,17,24 231:5 232:2,4 233:3 233:6,21 234:1,10 234:20,23 235:7,14 236:4,6 238:3 241:3 241:13
**instance**
48:8
**instruct**
30:13
**instructing**
30:14
**Integrated**
1:7 4:3,18
**interactive**
209:20 216:10 228:11 229:10
**interested**
262:15
**intermittent**
71:11,14,16 72:22 78:3 114:3
**intermittently**
211:8
**internet**
37:2,3 195:20 196:10 217:18
**interrogatories**
262:8
**interrupt**
12:18
**interview**
63:20,23 64:5
**interviews**
64:6
**investigate**
213:5 221:4,11
**investigated**
56:19 135:4 138:8,10 216:24 217:3 218:11,17 221:7
**investigating**
62:12 134:4 137:17 178:18
**investigation**
118:1 135:3,22 139:12 178:13,14 178:17 180:8,9 187:21 207:13,14
**investigations**
177:5
**investigator**
62:2,9 170:15 176:9
**investigators**
118:4
**involved**
53:7 117:11,20 118:5 170:5,8 240:17
**Irisha**
63:24 81:2,24,24 83:2,3,10 85:10 104:21,23 105:3,5,9
**issue**
80:19 95:5 111:7 140:18 251:13 252:16
**issued**
110:12 207:6
**issues**
90:3 98:13 143:1 252:20
**it--**
177:3

**J**

**J**
3:12 110:4,5
**James**
56:15 218:10 258:17
**January**
47:19 51:5 79:10 155:24 189:21 190:7,8,8,13,15,24 248:5 249:2
**job**
19:7 22:17,20,22,24 23:17,20 24:9,10 26:3,5,7 27:9,14 37:20 38:3,4,24 47:9,12 54:21 77:13 89:12 94:23 98:2 141:17 212:8 230:3 235:5 238:12,19 239:4 252:8
**jobs**
24:10 29:16 230:5,7 235:7 238:23
**Joliet**
20:7 21:14 165:17
**Jorge**
58:3 65:4,14,18,22 66:4 82:13 114:2 184:2,8,10,21 207:9
**Jorge's**
66:6
**Joseph**
165:17,20
**judge**
30:23 31:6
**July**
94:2 117:24 129:16 132:6,9,21 133:4,4 133:4,11 134:10 135:8 138:9 139:4,5 148:12 149:3 161:4 170:5,21,22,23 171:16 172:9 178:15 180:10,12 180:12,13 183:11 204:24 244:7,12,17 244:19 245:4,9 248:19 249:13,16 253:24
**jumping**
114:4
**June**
39:8 46:23,24 47:2 48:24 49:17,18 52:11 53:21 56:15 56:18 63:12 109:18 109:21 115:13,15 115:21,24 116:4,7 116:13,17,22 117:23,24 121:2 122:9,12 125:21 133:7,11 134:20,22 134:23 151:3 153:19 168:10,10 170:12,12,21,22,23 171:18 172:9 176:21,22,23,23,24 177:4,4,6,10,13 178:2 180:10 193:19 196:20 197:2,7,8,9,20 198:4 247:9
**Junior**
21:2
**justice**
31:10,10,11,16,17,18

**jut**
31:17 186:19

**K**

**K**
3:13 126:5,6 129:1
**keep**
26:15 34:7 100:18 101:10,13 174:5 223:7
**kept**
25:7 179:3 219:15
**kin**
262:16
**kind**
11:17 32:11 41:24 48:11 49:4 57:4 70:6 73:21 74:9 75:5 79:23 80:4 89:4 100:11 140:16 166:21 167:2 190:13 200:1 205:16 212:22 213:4 216:15 219:21 226:16,17 229:22 231:7,9 233:11 237:13 242:11
**kinda**
12:24
**Kindly**
164:6
**knew**
43:1,3,22 46:9 47:14 50:16 51:14,19 52:19 53:11 116:22 117:2,10 122:12 135:15 138:15 154:3,5 157:11 167:3 173:13
**knock**
101:4,4
**knocked**
107:17
**know**
7:7,12,17 11:2,3 12:16 13:1,2,5,22 14:4,9 15:7,22,24 15:24 16:1 17:10 18:16 19:21,24 20:14 25:8,17 32:5 32:6,6,7,19,19 33:22 34:1,4,5,7,7,8 34:21 35:1,3,5,6,9 35:10,12,12 36:12 36:13 37:9,14 38:1 39:18,21,22 40:2,3 40:15,18,19,20,21 40:22,22 41:12,19 41:20,23 42:1,6,12 42:22,24 43:4,4,4,7 43:9,11,13,13,16,17 43:18,19,20 44:6,15 45:4,6,6,7,8,8,11,18 45:22,24 46:4,5,6 46:11,18 47:11,15 47:17,24 48:2,14 49:12,20,22,22,23 50:1,4,17 52:2,8 53:2,7,11 54:14,17 54:19,21,23 55:3 56:11 57:4,22 58:7 58:17 60:22 62:5 64:3,8,16,16 65:5 67:10 68:9,10,18 69:13,15,17 70:2,19 71:2,10,11,11 72:16 73:10,12,21 74:22 76:6,23,24 77:6 80:22 81:8 82:1,1,5 82:16 83:7 84:21,23 85:17,18 87:21 90:11,16 91:13,18 93:19 94:14,18,24 95:3,4,15,15,17,22 96:4,5,14 97:2,2,8 97:12,13,14,19,21 98:3,4,4,11,12,16 98:17 99:1 100:3,10 100:11 101:9,9,12 101:12,12,13,15 102:22 104:4 105:6 106:1 107:7,10,16 107:18 108:1,16 109:14 110:8 111:9 111:10,12,13,14,21 111:21,22 112:7,9 112:14,16 113:15 115:23 117:2,12,18 118:10,10,16 120:8 120:10 121:7,9,13 121:15,20,24 122:1 122:2,3,6,16,17 123:2,6,7,8 124:1,2 124:8,9 125:9,11 126:10 129:6,12,14 130:3,4,11,12 131:13 133:7 134:17 135:8,18,20 136:5,7,8,11,14,14 136:16,19 137:1,18 139:3,7,23 140:2,20 140:21 141:6,7,10 141:18,20,20,20 142:4,5,9 143:12 144:2,6 147:4,15 150:16,23 151:11 156:7 157:2,7 158:1 158:14,18 159:8,8,9 159:12 160:21 161:10,20 163:11 164:5 165:10,12,13 166:11,13,24 167:4 167:7,11,15,18 168:23 169:7,8,12 169:14,16,17,19 170:4 171:21 173:5 173:12,22,23 174:12,16 175:6,17 175:19 176:4 181:10 182:9,22,24 183:1,7 184:17 185:6 186:2,7 188:5 188:9,11,13 189:20 189:20 191:22 192:8,11,12,19 194:6 195:17,18,23 195:24,24 196:1,3 196:12,12,13,14,14 196:17,18 197:5 198:7,7,8,15,20 199:20,24 200:10 201:23 203:17 204:5 206:6,7,8,14 206:16,17 207:16 207:19,23,24 208:10,15 209:3,6,8 209:8,12,14,15,16 209:18,20 210:21 211:4,6,6,7,8 212:3 212:3,5,5,6 213:3,7 213:7,24 214:12,19 215:15,17,20,21,23 215:23 216:4,9,11 216:13,16 219:1,1 223:7 224:8,11 225:6 226:14,17,18 226:19,20 229:5 230:7,20,21 233:13 233:14 235:9 236:21 238:11,19 242:7,8,12,13,14 243:16,17,19,19,20 243:22,24 246:5,10 246:14,15,21 247:6 247:14,15,17,19,22 249:3 251:6 252:14 256:14 257:5,16,21 257:23,23 258:1,3,8 258:10,20,20,22 259:10,17,22 261:9
**knowing**
53:10 95:9 98:2 121:7,8,9 154:2 196:14 217:23
**knowledge**
59:14 61:19 62:14 69:8,18 71:22 121:6 166:23 170:8 176:8 178:18 179:1 182:11 211:11 212:24
**knowledgeable**
125:14

**knows**
257:17,21 258:14
**Kojro**
2:15 4:11

**L**

**L**
1:15,24 2:8,13 3:13 129:2,3 161:24 170:7 202:6 262:3 262:20
**L-I-L-A-C**
20:7
**labor**
40:14 61:24 117:11 117:20 118:1,5,11 134:3,4,7 135:22 137:16,21 138:1 139:11 140:20,21 170:5,7,13 208:5 214:24 216:12 219:10,11,12,13
**lack**
46:6,8
**lady**
120:21 138:2
**Lane**
20:7,7
**large**
247:4
**Larry**
97:20 98:7
**lasted**
76:8 224:2
**lasting**
72:24
**late**
65:11,11,13 79:23 90:16 92:13,22,22 94:1 95:2 104:10
**law**
2:2 4:15 212:5
**lawfirm**
259:9,11
**laws**
18:17 36:2,5,7,8,12 37:1 215:23
**lawsuit**
7:4 9:6 11:20 12:1,20 13:13,14 17:2,17 19:9 30:9,11,17 31:21,23 32:14 34:20 67:2,3 205:8 247:20
**lawyer**
255:22 256:1,7
**lead**
51:23 228:4
**learn**
42:13,18 69:20,23
**learned**
47:3
**leave**
30:3 57:21 67:14 71:17,20 72:2,8 78:3 87:21,23 88:5 88:9,13 89:13,16 90:3 92:10,11 95:7 95:21 96:1,15,24 97:13 98:7 100:20 113:11 114:3,7,9,13 115:3,17 116:8 118:23 121:17 130:15,19 137:3 143:9 147:17,23 148:1,2,3,4,11,20 149:6,14,23,24 154:17 159:15,19 161:6,14 166:3 181:16 196:16 200:23 201:4,5,6 202:9 203:13 210:6 212:17 223:4 224:5 224:19 256:22
**leaving**
57:23,24 83:13 90:16 118:11
**led**
53:9
**left**
47:16 50:4 52:17,19 65:1,3 83:12 92:5 92:12 94:2 95:9 122:16 167:2 171:16 172:10,19 175:11,13 177:23 178:3 193:2,7
**legal**
1:21 4:11,12 12:17 14:21 16:16 35:6 63:9 67:7 89:7 213:14 229:1,16 262:21
**length**
57:24 92:14
**lesser**
176:17,17,18
**let's**
13:12,13 17:2 23:13 23:15 24:22 29:10 31:17 55:9 60:13 61:5 62:19 65:24 79:10 84:16 90:23 90:24 99:11,18 101:2 114:21 134:14 162:9 168:3 189:10 190:23 202:5,7,7,21 203:19 203:22 205:22 210:2 217:3 219:16 221:21 223:21 226:2 230:9 233:16 235:15 236:6 241:9 244:12,22 245:24 247:2,2,8,8,8,24 248:5,17
**letter**
55:1 56:13,16,24 60:4,10 72:18 116:13 126:2 134:24 155:23 177:7 197:2,6,20 198:5,10,11 216:23 218:10 258:17 260:23
**letting**
12:16 40:18 45:17 46:4,4 53:2 56:18 82:5 112:14 150:23 195:24 196:18 206:14 211:6
**level**
98:18
**levels**
164:22
**Levin**
2:3 3:4 4:15,15 10:20 12:18 16:4 18:5,8 30:10,16,19,24 35:19 36:9 44:12,24 49:2,5 55:9,11,14 55:23 56:1 57:12 59:24 60:5,9 67:7 67:23 73:18 78:12 80:12 89:7 101:6 102:18,23 103:2,4 103:21 106:13 109:10 111:1 113:2 113:22 114:18,23 125:3 127:5 128:7 130:19 131:10,15 132:3 140:7 149:11 149:16,18 150:7 161:24 164:6 167:23 172:18 174:4,9 220:15 225:3,19 229:1,16 240:7,10 244:19 254:16 255:4,7 257:1,7,9 258:15 261:11
**Liberty**
154:7
**LICENSE**
2:13
**licenses**
21:20
**life**
68:5,8,17 69:6 244:19
**Lilac**
20:7
**limited**
68:6,8,17 69:5

**limits**
68:5
**line**
33:13 37:20 38:3,4 39:1 47:9,13 58:6 164:22 239:22
**LinkedIn**
12:1
**list**
60:11
**listed**
59:17 61:8,9,16,21 62:15 63:5,6 140:4
**listen**
50:6
**little**
5:18 7:8 24:16 34:11 41:16 44:4 58:8 73:11 75:5 78:18 83:14 105:21 108:1 108:16 111:3 115:6 119:12 139:7,9 148:5 164:6 172:5 176:5 178:7,8 182:4 190:18 192:10 193:10 201:24 203:18 206:4 209:9 211:10 213:16 214:23 224:9 226:11 227:3 228:23 233:17 235:10 239:1 243:19,20 247:3,18 247:22 255:20
**lived**
20:9
**LLP**
2:7 4:10
**load**
66:15,18
**location**
87:16
**Logistics**
1:7 4:3,18
**long**
9:22 10:13 20:9 22:18 25:19 31:2 76:1,1 94:18 240:19 261:9
**longer**
72:22 235:10 245:22
**longest**
76:8
**look**
37:1 41:13 54:24 61:7 94:14 95:8 99:17 100:12 104:3 108:1 109:15 126:9 129:24 130:8,8 147:18,22 150:14 156:2 185:23 191:24 197:18 213:9 259:14 260:13
**looked**
23:17 41:13 45:20 54:24 109:14 124:11 197:23 238:23 258:8
**looking**
27:9 31:14 34:4 36:20 37:13 38:2 53:6 81:8 108:18 113:20 135:2 143:14 144:5 147:5 148:17 178:19 207:15,17 208:8,10 216:6 230:3 257:17 257:19
**looks**
31:18 185:23
**lose**
171:9
**losing**
32:11
**loss**
245:13,14 248:12,20 248:24 249:7
**lost**
67:16 70:9 179:14 208:2 211:2 243:6
**lot**
32:20 35:2 46:1,9 54:21 57:5 86:22 93:9,9 94:19,21,24 95:13 96:4 98:8,9 99:1 107:12 113:7 118:16 147:6 165:8 169:10,15 172:3 179:13,13 184:18 193:12 195:17,18 196:3 226:21 237:1 244:1,1 246:21 247:18 258:13
**lots**
231:20
**low**
251:18
**lunch**
100:20 132:19 162:9 162:13
**Lupe**
98:4

**M**

**M**
2:2 3:14 4:15 21:7 147:10,11
**magic**
209:17
**Magna**
1:21 4:11,12 262:21
**main**
100:4 165:13 167:13 198:22
**majority**
82:17 92:11 179:6 232:24 233:2
**making**
103:1 125:10 209:2 239:11
**man**
54:20 243:21
**manager**
83:18 85:13 97:12,15 97:20 114:2
**mandatoried**
84:15
**mandatory**
23:4,5 27:15,18,22 27:23,24 28:10,13 28:15,17,21 29:5 33:6 37:11 41:9,14 46:21 47:23 82:21 84:3 85:9 95:5,6,11 95:12 96:12 97:21 97:22 110:18,19,24 111:24 112:3,10,13 119:2,4,21,24 120:2 120:5 121:14 181:1 181:16 188:5,6,10 188:13,18,19,20 189:15,16,23 190:10,11,12,16,19 198:20 212:16 217:18 218:5
**mandatorying**
37:16 81:20 84:19 120:10 186:16
**manner**
38:2 166:21
**March**
47:20,20 48:23 49:7 49:11 51:5,6 52:22 53:24 54:4 57:14 71:23 72:3 78:5,17 78:20,24 79:2 84:11 88:18 92:2 108:5 109:1 118:20 119:23 120:3,17 138:18 143:21 144:24 151:21 153:7,16 155:24 156:3,11,12 157:4,5 157:16,20 158:20 161:13,15,16,16,17 163:18 188:17,24 189:22 190:2,5,11 190:17,18,22 191:2 191:8 210:13,15
**mark**
18:23 56:6 58:12 59:21 72:11 90:22 103:20 107:19

109:3 110:3 126:4,4 128:24 147:9 150:3
**marked**
56:7 58:13 59:22 72:12 91:10 93:16 95:2 103:24 107:21 109:5 110:5 126:6 129:3 147:11 150:11
**MARKET**
262:22
**marking**
91:8 95:9 150:15
**married**
20:14
**math**
133:17 167:3
**matter**
4:3 12:15 40:23 65:3 87:19,20
**max**
76:14 77:2,3 203:23 204:2 237:14 241:23
**maxed**
38:19
**mean**
10:3 12:15 16:2 27:10 28:19 29:20 31:22 32:5,9,9 34:2 34:3,7,18,23,23 35:8 37:2 38:8 44:7 45:2,5,6 48:10 54:10,20 59:11 62:11 63:12 68:9,18 74:17,20 76:3 81:24 84:23 88:24 92:22 95:3,5,11,19 96:3,5 97:19,22 98:3 99:5 100:16,21,21 101:11 105:13,20 107:1,2 108:12 109:23 111:10 112:12 113:5,7 115:24 119:19,19 120:1 123:8,11 128:13 129:24 130:4,11 131:9 134:14 136:2 137:9 138:2 140:20 141:6 141:11,11,15 142:4 142:5,22 143:2,3,4 143:5,5,5,7 146:3 146:19,19,19,20 159:8,9,20 160:11 161:16,17 163:17 163:17 166:1,13,23 167:9,9,9 169:10,14 169:18 170:21 171:18 175:21 178:7 180:18 182:5 184:13 189:3,3 195:9,22 197:8 199:13 200:24 201:20 202:8,12,15 203:4,8,11,14 204:7 204:8,8,8 206:4,14 206:19 207:15 215:2,16,18 216:13 216:14 223:8 224:7 232:24 233:8,9 234:3 238:19,21 239:19 242:7,7 243:14,17,24 245:7 245:15 246:13 249:4 253:22 256:15 257:14,14 257:14,15,15,15
**meaning**
174:23,23 175:1,1
**media**
12:1
**medical**
32:22 33:3 34:19 77:6 149:23 164:2 195:4 199:16,17 206:16 250:15,17 250:20 251:1,9 253:20
**medication**
75:18 251:16 252:7 252:24
**medications**
8:7 252:5 253:1,2
**meet**
9:18 119:14
**meeting**
9:22 10:16 184:20
**meetings**
97:3
**mental**
8:14 242:4 250:10 252:19,21 253:16
**mentioned**
67:2 170:4 205:9 222:6
**message**
207:10
**messed**
179:12
**met**
10:14 115:13 118:20 119:7,16 122:9
**Michigan**
21:6,9
**mid**
65:24
**middle**
65:9 78:19 80:1 114:19 176:24 177:4 234:3
**military**
21:11
**mind**
43:15
**minimal**
76:20
**minimum**
26:13 77:1 78:7 225:10 230:18 231:2 232:17 233:4 233:19 234:1,10 236:18 237:1,2,13 237:16 241:22
**minute**
72:15 91:13 92:21 93:19 221:18,19
**minutes**
10:11 128:17
**missed**
99:6
**misspeak**
187:19
**misstating**
140:7
**mistake**
13:11 107:14
**mixed**
99:2 244:1 246:22
**moment**
254:9
**Monday**
23:5 27:3 84:13 85:20 127:10,16 183:24 184:2 227:20
**money**
233:7 235:11
**month**
23:14,15 28:6,7,10 28:12,13,13,14,19 28:21,24 48:2,13 52:14 59:8 72:23 83:18 84:10 85:15 116:15 117:22 118:2,3 120:6,18 123:23 163:15 164:20,24 170:12 170:12 248:6 249:6 250:7
**monthly**
241:21
**months**
22:14 57:11 58:5 65:21 78:12 86:3 93:2 121:14 186:16 247:8
**Mordico**
259:15
**morning**
79:20,22 83:6 231:17 256:12
**mornings**
80:2 231:18

**mother**
83:6,8
**motive**
216:14
**multiple**
64:6,18 68:5
**Mutual**
154:7

**N**

**N**
2:1 3:1,14 150:4,11 150:15 223:20
**name**
4:22 5:10,12 11:6 20:11 24:19 25:1,2 25:3,5 29:20 31:7 38:8,9,15 55:21 62:2,5 64:3 66:6 83:19 85:14 164:5,9 165:12,14,16 259:12,13 260:16 261:2
**named**
258:20
**names**
20:20 82:10 165:12
**narrow**
48:13 176:12
**nearly**
10:15,15 22:19
**necessarily**
18:9
**neck**
254:4
**need**
7:16 18:9 23:11 30:5 30:23 33:12 38:23 43:23 50:7 84:1 121:24 122:1 125:9 156:6,7 182:6 186:4 195:4 200:8 201:24 206:15 208:9 209:2 209:11,18 211:4 213:13,14 233:6,8 259:22
**needed**
32:21 33:10 73:6 105:22 106:11 159:6 192:10 207:22 224:5,11 225:7 235:12
**negligent**
206:4 214:3
**never**
8:21,23 34:19 40:2,2 41:13 43:22 44:2 55:20 81:9 118:9 128:10 136:22 139:13,13 152:14 152:15 155:2,3 159:21 167:12,13 167:14 186:5,18 188:8 192:9 207:20 209:22 213:6 214:13 258:10
**new**
116:17
**Nicholsen**
58:3 65:4 66:7 184:3
**Nicolas**
114:2
**night**
79:23
**nine**
20:10 245:22
**nods**
5:23
**Nope**
20:2
**normal**
88:16,23 110:17
**Northbrook**
2:4
**Northern**
1:1 4:5
**Notary**
262:4,10,17
**note**
146:6,7
**notes**
9:5
**notice**
79:7,21,23 80:2 133:3 146:4 150:22 150:23 153:13,16 154:21,23 155:9
**noticing**
78:18 120:7
**notified**
82:20 85:8 98:14,20 133:9,12 156:12 227:14
**notify**
156:11
**November**
262:19
**number**
4:6 53:3 60:3,4 67:23 78:21 91:4 171:20 171:23,24 172:6,13 172:16 173:7,9,13 173:24 175:2,5 177:14 181:22 182:8 183:2 203:2
**numbers**
61:15 174:22
**numerous**
39:10

**O**

**o**
159:18
**object**
6:24 7:1 35:19 44:12 44:24 73:18 80:12 106:13 111:1 125:3 128:7 254:16
**objection**
18:5,8 30:10,22 36:9 67:7 89:7 113:2 140:7 225:3,19 229:1,16 256:24 257:6,12
**objections**
31:5
**obtain**
7:5
**occasions**
94:22 211:18,19,21
**occlusion**
67:15
**occur**
46:22
**occurred**
222:10,14
**October**
86:5 94:2 104:11 105:16 106:11,18 168:3
**odd**
46:2
**offense**
91:19 99:12 104:7 106:5,6
**offer**
43:8
**offhand**
124:16
**Offices**
2:2 4:15
**official**
262:17
**oh**
6:23 21:10 23:15 25:16 27:13,17,17 27:17 31:24 48:3 49:9 60:2 61:11 63:8 76:21 88:2,22 96:2 137:7,9 149:7 150:18 157:8 172:17 177:12 191:23 199:10 202:18 203:4 209:12 211:3 213:11 214:12 217:22 233:11 236:7 240:9 244:18 251:3 260:4
**okay**
5:9,17,20 6:5,23 7:3 7:20 8:2,21 9:13,22 10:6,10,13,16,22 11:17 12:4,24 13:7

13:9,11,16,19 14:1
14:8,15,19 15:2,9
15:11,16,22 16:5,18
17:13,17 18:12 19:1
19:3 20:5,18 21:10
21:17 22:18 23:10
23:12,16,21 24:5,15
24:18,18,18 25:3,10
25:12,14,16,24
26:16,21 27:2,6,11
27:13,20 28:2,16,22
28:22,23 29:5,6,7
29:17,23 30:1,3,8
31:10,14,17,19,20
31:21 32:4,15 33:15
33:18 36:7 37:1,5
37:14,20 38:3,14,17
38:22 39:3,17 40:5
40:8,12,24 41:10
42:7,16,20 44:4,17
44:20,23,23 45:12
46:22 47:2,6,14
48:2,3,5,22 49:1,14
49:14,19 50:1,9,20
50:24 51:1,4,7,16
51:21 52:1,3,4,6,7
52:12,13 53:5,12,18
53:21,23 54:7,12
55:9,10,13,15,17,24
55:24 56:3,12,15,23
57:2,4,4,14 58:2,8,9
58:10,11,19,22
59:13 60:12,19,23
61:2,11,18 62:1,4
62:14,19,21 63:3,18
64:5,8,11,15,21
65:2,5,13,16 66:2
66:14,20 67:2,17
68:4,15,23 69:5,11
69:20 70:8,18 71:7
71:14 72:10,17,21
73:5 74:1,4,7,11
75:1,7,12,18,21
76:1 77:6,12,20
79:2,15 80:3,5,7,9
80:14,20,21 81:11
81:15 82:20 83:12
83:14 85:8,11 86:2
86:7,10,21 87:1,5
87:13,19,21 88:3,5
88:9,12,20 89:2,4
89:10,18,24 90:2,5
90:8,10,13,19,21,24
91:8,15,18 92:2,7
92:19,19,24 93:2,11
93:14,21,22 94:5,8
94:11,13,17 95:21
96:2,2,3,3,8,15,19
97:3,8,11,17,18,20
98:7,12,19,23 99:15
99:21 100:1,6,9,14
101:1,1,8,10,23
102:2,5,8,12,16
103:14,15,18,19
104:5,6,9,13,16,20
105:3,5,9,12,16,19
106:1,24 107:5,17
107:19 108:3,7,15
108:22,22 109:3
110:3,10,11,14,16
111:16,18,23 112:2
112:7,18,21 113:10
113:14,19,19,23
114:1,10,22 115:6
115:19 116:4,7,10
116:12,13 117:1,4
117:20 118:15
119:7,16 120:14,23
121:4,7,18 122:9,12
122:15,18 123:3,12
123:14,16,24
124:10,14,17,21
125:13,15,24 126:3
126:11,14 127:3
128:16,21,24 129:8
129:11,16,19,21
130:6 131:23 132:9
132:12,23 133:2,6
133:10,20,21 134:2
134:22 135:2,7,13
135:15,24 136:14
136:18 137:8,14,21
138:7 139:2,15
140:3,12,24 142:1,7
143:22 144:4,9,21
145:3,10,24 146:22
147:1,9,16,17 148:2
148:9,14,15,19,22
148:23 149:1,4,5,15
150:3,14,17,20,22
151:2,13 152:8,17
153:4,15 154:3,9,16
154:23 155:5,7,7,7
155:15 156:4,15
157:9,20 158:3,21
159:2,5,14,18 160:3
160:8,15 161:1,8,14
161:18,19,21 162:8
162:19,21,22,23
163:2,6,9,14,22
164:1,8,17 165:5,9
165:16,20,20 166:2
166:6,9,22 168:2,6
168:12,18 169:6
170:10 171:3,13,17
172:6 173:3,3,6,17
175:14,16 176:7,11
176:20 177:1,9,13
177:22,24 178:4,11
178:13,22 179:1,5
179:10,20 180:4,7
180:15,16,19
181:15,24 182:10
182:22 183:5,7,10
184:8,9,20,23
185:10,18 186:12
187:13 188:2,7,21
188:23 189:5,10,19
190:4,6,17,23 191:1
191:7,13,16 192:2
192:23 193:5,9,14
193:15,22 194:5,9
194:14,17,20
195:11,15,22 196:1
196:19 197:9,12,14
197:15,16 198:2,4,7
198:10,12,15 199:2
199:16 200:13,15
200:19 201:5,8,18
203:21,22,24 204:6
204:13,13,18,21
205:3,7,7,20 206:1
206:3,5 208:7,18,21
208:23 209:12,21
209:23 210:3,8,11
210:17 211:12,15
212:10,19 213:10
213:18 214:1 215:3
215:12 216:1,8,17
216:20 217:14
218:4,6,20 219:15
219:18,23 220:6,12
220:14,14,17,24
221:4,7,14,21 222:6
222:10,21,23 223:3
223:12,22,23 224:2
224:5 225:10,12,24
226:8,11 227:6,9,17
228:1 229:4,8 230:9
230:15,19 231:9,22
232:2,4,6,15,18,19
232:22 233:16,18
233:19,23,24 234:6
234:10,22,24
235:14,24 236:2,7
236:12,14 237:2,16
237:19 238:3,8,12
238:18,22 239:5,10
239:13,21 240:1,10
240:16 241:2,5
242:3,3,19 243:3,4
243:8 244:18 245:3
245:10 247:5,24
248:12,18 249:15
249:21,24 250:20
251:3,4 252:13,24
254:5 255:1,4,20
256:5,10 257:2,8,8
259:1,21 260:8,11
260:15,20,24 261:2
261:5
**okayed**
97:12
**old**

20:23
**once**
28:6,7,10,12,13,13 28:20,20 38:21 39:15 73:13 79:6,9 79:12 152:13 163:15 164:20,23 248:6 249:5 250:7
**one's**
208:4
**ones**
105:17 227:4,8
**Ooh**
77:3 247:11
**opened**
258:7
**operator**
24:1,3 26:2 63:4,18 66:12
**opportunity**
6:17 19:12 185:24
**option**
43:19 209:3
**options**
208:12,24 209:1,8,16
**oral**
262:8
**order**
24:13,16 57:3 256:21
**original**
174:5
**Orler**
2:8 30:14,18,22 31:4 31:7 60:6,12 78:23 90:23 103:1,3 174:7 174:11 221:16,18
**ourself**
46:18
**outplacement**
235:5
**outside**
29:13 89:13 124:18 241:8
**over-the-counter**
253:2
**overtime**
22:24 23:2 26:7,11 26:19 27:14,15,19 27:23 28:3 29:2 30:6 36:12 45:4 46:20,21 47:21,22 47:23 50:2 54:22 57:23 82:21 84:15 84:16 85:9 87:6,17 95:5,6,6,11,13,15 119:4,6,21 120:18 123:1,17,19 181:1 181:16 186:14,14 186:17,19,21 187:1 187:5,10 188:1,3,4 188:10,11,14 189:15,15 195:18 199:19 200:3 201:1 217:18
**overtimes**
41:9
**overview**
188:3
**overwhelmed**
247:23
**owe**
218:1 219:4
**owed**
36:18

**P**

**P**
2:1,1
**P-O-L-L-A-C-K**
164:14
**p.m**
126:16 127:22 187:14
**PA**
262:23
**page**
3:2 51:18 52:8 113:22 126:14
**pages**
59:24 60:2
**pain**
240:23
**painful**
241:1
**paper**
45:10,24 55:1,4,18 58:18 129:23 130:6 131:19 135:13,16 139:10,21 144:23 147:6 151:18,19,19 154:4 157:2,6,8,12 157:13,19 159:13 168:8 196:18 197:8 197:9
**paper--**
129:22
**papers**
257:20 258:6,8
**paperwork**
51:19 207:4,7
**paragraph**
67:21,22,24 72:21 113:15,21 114:4
**part**
176:1 247:21
**participate**
10:16
**particular**
31:15 82:5 111:11,14 121:20 155:19 171:15 172:9 175:6 175:19 260:7
**particulars**
165:6
**parties**
262:16
**password**
179:13,23 180:3
**pattern**
79:18,24
**payments**
192:6
**peak**
184:19
**pen**
58:17
**penalized**
209:5,6
**pending**
7:18,19 49:2 150:7 151:17 154:13
**PENN**
262:22
**people**
115:8 150:9 154:8 208:5 213:10 257:22,23 258:13
**percent**
142:24 165:15
**perform**
77:13
**period**
56:21 116:15 155:16 165:23 206:22
**periods**
240:13
**peripheral**
68:12
**person**
125:8 213:4 256:14 257:5,10
**personnel**
38:16
**personnels**
50:23
**persons**
61:19
**pertaining**
1:13
**phase**
228:11 229:7,10
**PHILADELPHIA**
262:23
**phone**
30:23 31:6 50:20 69:24 178:2 181:11 182:24,24 194:8,11 194:12,14 196:20 196:21 259:14
**phonetic**
64:23 97:20 259:15
**physical**
8:14 252:20 253:16 254:2,3

**physicians**
251:12
**picked**
260:10
**pinpoint**
12:14
**place**
24:19 50:6 51:23
103:16 262:14
**Plaintiff**
1:5 2:6 4:16 114:2,6
**Plaintiff's**
68:4,6 114:2
**played**
174:16
**playing**
247:21
**please**
5:10 7:6 31:5 56:10
57:12 58:16 61:7,8
83:16 91:13 93:19
101:6 104:3 114:18
126:9 129:6 131:15
131:24 149:12
150:14 164:6
167:23 254:9
**plus**
186:15
**point**
7:1 12:5 34:13 47:12
48:10 49:23 50:1
51:14 54:3 58:4
70:4 75:13 86:2
92:10,13,14,18,20
92:21,23 98:15,20
99:16 100:4 101:4
101:16,17,19 102:9
106:21 110:17
113:6 114:6 126:15
142:22 144:1 152:5
154:7 160:9 175:4
178:23 196:19
206:18 209:19
219:9 244:17,19
**pointing**
149:16
**points**
39:1 90:6 92:7,8,8
93:5,7,10,22 94:8
94:14,16,20,21,23
95:1 96:5,7,20 97:1
97:14 98:2,8,11,22
99:1,2,4,13 102:6
103:10,12 104:10
104:19,21 105:14
105:15,24 108:8,13
109:23 110:2 113:8
143:23 146:2,14,16
152:7,9,16 154:15
155:3,6 158:18,19
158:21 160:7,18,19
160:21 226:20
228:2,4
**policy**
184:15
**Pollack**
164:4,11,12
**pops**
124:15
**portion**
58:18 148:6
**position**
23:24 25:24 29:12
63:21 66:12,21
**positions**
29:10,23 30:4 238:13
**possible**
194:16
**possibly**
9:20 22:19 43:20
46:23 51:3 147:7
168:23 206:23
234:21 253:24
258:1 260:22
**post-Ryder**
229:22
**posted**
11:24
**predict**
73:15
**preparation**
8:24 9:14
**prepare**
6:15 10:4,17
**prescribed**
251:16 252:5
**present**
14:24 16:20 133:13
133:18
**presently**
21:20
**pressure**
251:18
**pretty**
15:3,3,5,12,20 16:14
16:14,15 38:21 39:2
39:8,15 40:3,19
42:3 43:23 64:24
74:8 79:6,23 93:8
94:19 95:13 105:1,4
105:6,11,14 108:14
134:13 136:12
141:15,16 143:2
157:24,24 158:1
165:8 169:13 181:7
182:5 194:19
195:18,22,23 196:2
196:5,16 213:3,6
215:18 223:16
230:20,21 233:1,5
240:22 250:3
254:23 257:20,22
258:6,9,11,13
**primary**
164:3 252:6
**print**
60:6,8
**printed**
131:5
**printout**
98:22,24 99:3,9,15
101:17 102:3,6
107:8,16
**printouts**
102:9
**prior**
14:1 22:9 87:23,24
90:2 115:4 120:23
123:23 125:21
167:6 189:7 244:12
245:20,22
**probably**
25:21 27:9 41:13
65:9 79:6 93:8 94:7
104:15 141:16
142:21 145:9
151:19 180:17
193:18 245:18
254:6
**problem**
13:12 32:13 34:12
41:11 60:14 106:18
145:13,18 152:23
166:15 209:11
218:7 251:1
**problems**
253:9
**Procedure**
1:12
**proceed**
8:18
**proceeding**
12:21
**process**
44:18,21 118:13
154:5 159:11 206:8
207:20 209:20
216:10 235:10
**produce**
132:2 238:18,20
**produced**
109:9
**production**
102:19
**profiles**
239:6
**programs**
22:3
**prompt**
186:20
**prompted**
37:8
**proper**
30:22

**Prophete**
2:7 4:10,18
**Provena**
165:17,18
**provide**
102:8 130:17 131:19 131:23 140:15 173:18 239:10
**provided**
22:22 26:5 108:4 238:22
**provider**
77:7 164:2 253:8,20
**providers**
251:13
**provides**
133:2
**provisions**
1:11
**psychiatrist**
253:17
**psychologist**
253:17
**PTO**
145:3,21 160:4
**Public**
262:4,10,18
**punch**
100:21,21
**punched**
95:3
**punches**
81:10 128:14
**purpose**
1:14 17:22
**pursing**
34:20
**pursuant**
1:11
**pursue**
14:22 15:7 23:20 63:9
**pus**
73:11 76:12,13
**pusky**
73:9
**put**
27:21 45:5,14,23 46:1,1,3,14,18 49:18 50:12,13 52:13 53:15 96:2,16 99:8 105:7 117:16 128:10 130:5 136:8 136:9 138:17 139:2 139:3 155:23 157:5 164:19 168:22 187:18 198:10 202:2
**putting**
33:12 45:16 46:17 48:1 51:24 121:16 161:13

**Q**

**Q-U-A-N-I-S-H-A**
11:7
**Quanisha**
11:7 61:13
**question**
6:10 7:2,9,10,13,14 7:18,19 30:15,17,24 31:1 34:14 35:9 49:3 55:11,23 57:12 101:6 114:18 127:8 131:15,16 142:13 142:16 145:12 146:9 149:11 150:7 156:5 166:14 167:14 173:1,4 174:6,8 201:23 220:1,10,11,14 226:2 256:16 259:1
**questions**
6:7,16,24 7:6,23 8:4 9:8 20:4 167:13 184:18 252:11 255:2,3,5 259:2 261:5 262:9,12
**quick**
83:15 90:23,24 149:9 244:5
**quickly**
142:17 184:21 209:24
**quit**
23:21
**quite**
29:15

**R**

**R**
2:1
**raise**
4:23 82:23 124:21 157:21 161:4,8
**raised**
220:6,18 221:8
**ran**
43:20 167:6
**random**
37:3
**randomly**
190:9
**range**
14:6 39:14 198:8
**rate**
32:23 33:1,14 34:6 36:12,16 37:18 38:6 39:24 42:5 53:20 122:8 186:6,12 196:9 198:20 199:14,22 200:5,20 200:22 218:6
**reach**
98:18
**reached**
180:21 207:8
**reaching**
206:22 208:4,4 215:22
**read**
36:1,7 56:24 58:22 58:23 109:11 110:8 126:12
**readiness**
8:3
**reading**
35:4,22 36:15 68:9 68:16 111:20 122:24 123:2 124:3 124:4 149:5,14 196:10 209:17 212:7 213:1 216:23 217:17
**ready**
60:23 79:20 91:15 110:10 162:17 222:4 223:22
**real**
39:18 68:11 73:9 83:15 142:16 149:8 149:8 167:2 216:8 244:5
**realize**
155:22 157:1,3
**realized**
15:4 53:19 157:13,13 157:14
**really**
12:14,24 16:2 24:7,8 24:8,11 25:1 29:14 29:15 35:8,9,10,12 41:23 42:1,24 60:3 63:13 69:14 81:21 86:3 94:24 95:8,9 97:2,2 98:21 112:16 112:17 123:20,21 125:14 128:9 133:14 135:20 142:23,24,24 144:5 147:4,4 165:6 167:7 167:10,12,14 174:14,15 175:6 181:9,10 182:4,6 184:21 186:19 192:11 194:7,10 195:24 196:12,15 198:18 199:23 200:11,11,16 209:23 212:9 216:4 216:6,15,16 218:3 224:7,10 225:6,8 226:16,19,21 243:15,18 249:11

258:11
**reason**
8:18 54:16 81:6 105:2 117:4 143:4 144:8 151:13 179:24 206:10 207:18 208:17 219:13 220:1 225:12 257:18
**reasons**
32:22
**recall**
30:3 36:7 91:16 102:10,11 104:24 105:9 124:14 129:9 129:14 147:4 150:24 167:16,17 173:21 174:14,15 181:9 182:4 194:7 194:10 197:4 251:4
**receive**
21:17 67:13 98:14 118:8 130:14 138:10 160:8
**received**
72:18 90:5 102:12 103:10 108:7 109:17 112:20 116:13 130:24 131:19,20 134:23 134:24 150:22 153:15 155:9 157:20 158:18 159:13 177:6 183:16 198:24 218:10 240:1
**receiving**
91:16 146:14 150:24 154:14 184:7 227:9 227:10 248:7
**recess**
60:16 91:3 162:13 254:8
**rechanged**
127:19
**recognize**
58:20 60:24
**record**
4:1,14 5:11 12:9 30:12,21 38:10 55:14 60:15,17 91:2 91:6 106:5 141:23 142:2 145:14 149:18 162:10,11 162:15 164:14 221:22 222:2 254:7 254:10 261:13 262:12
**records**
112:20 113:1
**recruiters**
235:4
**redo**
114:21
**reduced**
46:10 201:12 203:6,7 204:9,11,12
**refer**
170:13
**referred**
57:5 192:14,21 194:3 207:9 262:14
**referring**
13:3 33:16 41:5 48:20,23 56:13 61:14 100:7 150:8 161:24 174:1 175:9 176:20 179:6 186:13
**refuse**
94:6 104:14 142:9,11
**refused**
94:6 101:2 104:13 141:22 142:2,10
**regarding**
7:4 11:19 72:19 115:8 124:17 253:9
**regional**
125:7
**regular**
41:12 98:21 147:7 160:16,17 189:16 190:10
**regularly**
253:2
**related**
9:5 11:24 80:19 111:24 163:23 204:7 205:1 254:21
**relax**
77:11
**relevance**
18:8
**relevant**
61:20
**remaining**
38:24 57:24 64:24 65:22 202:13,16
**remember**
14:5 15:20 16:3 18:13 24:7,8,13 25:3,16 39:9 40:4 48:11 59:5 64:13,21 82:18,19 90:9 104:17 112:6 130:4 141:16 172:13 194:16 195:19 196:6 198:14 251:7
**removed**
105:19,20
**repeat**
7:7 32:9 36:4 44:17 106:16
**rephrase**
7:7 34:8,15 199:8 250:24
**report**
64:11 184:16 214:5
**reported**
1:20 2:13 65:17
**reporter**
1:15 4:12,20,22 5:21 6:6,15 24:2 36:4 56:5 58:12 59:20 66:23 103:22 126:4 129:2 132:15 150:15 251:23 252:1
**REPORTER'S**
262:1
**reporting**
65:5,14
**reports**
66:8
**representation**
14:22 15:7,14 16:16 35:6 63:9 213:14
**request**
4:9 88:13 89:5,12 102:4,17,18,19 103:1 107:6,8,10,13 107:15 145:21,22 152:17,20,24 153:22 155:18 156:11,16 159:15 201:21 231:5
**requested**
89:16 146:3 154:24 155:13,16 156:9 159:21 184:19 206:6
**requesting**
103:9 158:6 201:4,19
**requests**
147:18
**require**
22:24 26:7 27:14 30:6
**required**
23:2,13 45:5,7 87:17
**requirement**
87:6
**reread**
43:2
**reschedule**
10:5
**research**
37:24 40:24 119:13 119:20,23 120:14 122:24 123:18 124:12,21 125:11 125:24 140:21 192:20 229:4
**researched**

119:7 124:10 192:19
**researching** 47:6 115:9 118:18 119:14 195:20
**reserve** 261:11
**reset** 179:13,23,24 180:3,3
**resign** 27:11
**resigned** 23:21
**resource** 37:10 38:12,13 81:1 99:23 207:9
**Resources** 114:5
**respond** 15:2 215:13
**responded** 15:3
**response** 16:13 61:6 192:2 193:19 215:14,15
**responses** 102:17
**responsibilities** 66:10,14
**rest** 87:2 204:4
**result** 5:22 165:3 180:8 186:17 250:13,15 251:2
**results** 182:11,18 183:16,16
**resume** 238:9,12
**resumes** 239:4
**retaliated** 19:6
**retina** 164:15
**retinal** 67:15 68:7 164:4,8
**return** 88:16,22,23 145:8 158:11
**returned** 88:15
**review** 6:17 8:24 56:10 58:16 60:22 61:5 72:15 91:13 93:19 110:8 129:6 150:16 216:21 219:10
**reviewed** 257:3
**reviewing** 60:22 72:16 129:7 147:14
**reword** 156:5
**right** 4:23 20:16 24:7,8 25:2 29:9 30:15 32:4 33:8,9 34:5 35:4,5,7,7,24 36:17 36:23 41:17 45:2 49:7 50:6 52:15,20 52:21 53:13 55:5 62:13 63:11,11 67:16,16,17 68:13 70:10 73:15 103:23 107:24 116:19 118:4 119:1 121:23 124:16 125:8 133:13 139:11,12 141:9,23 155:6,8 156:23 158:8 159:22 162:8 165:12 178:23 183:8 185:11 196:11 198:16 202:22 203:23 210:15 211:1,3,20 219:17,20 220:2 230:3,12 231:7 235:11,22 244:4 245:8,8 255:23 256:1,3,6,9,16,21 257:16
**rights** 19:16,19 31:24 32:2 32:3,16,17,19 33:9 185:16,20 191:17 192:1,8 205:12,14 206:11 214:10,18 214:20 215:4,13
**ring** 259:15
**role** 63:3
**roles** 66:10
**rolling** 56:20,21 116:15
**room** 132:24
**row** 149:20,22 160:21
**rules** 1:12 5:18 18:9
**run** 18:17 166:18,18 168:2 214:12
**runniness** 75:10
**running** 74:2 119:15 121:5
**runny** 73:23,23 74:1 76:12
**Ryder** 1:7 4:3,18 11:5,22 12:5,17 14:10,23 15:6,10,16,19 17:2 17:7,7,8 22:6,9,15 22:16,16 23:18 29:13 31:8,23 33:21 38:16 42:21 44:11 44:19 50:22 59:17 62:20,22 64:19 66:21 69:8,18 70:6 72:18 88:6 92:8 95:15 97:14 103:10 105:10 106:22 107:1 115:3 117:12 124:19 130:2,14 131:3,20 134:20 135:11 138:7,9 146:12 156:10 167:5 169:19,23 170:8,10,11,16 172:6,8,11,12,13,18 172:20 174:16 175:1 176:2,10 177:14 180:24 181:15 182:11,16 182:17,23 183:1,15 183:19 184:7,24 201:3,5,6 205:23 207:8 213:21,22 214:2,5 215:9 216:1 216:24 217:3 220:6 220:18 221:4,7,11 222:7,12,16,22 223:3 228:8,18 229:23 238:10,24 239:14 240:2 241:8 251:5 252:20 254:14,22 256:12 256:17 257:2,10 258:1,20 260:1
**Ryder's** 187:20 242:4 250:13 250:16,23 251:2

## S

**s** 2:1 3:7 233:24
**S-I-M-M-S** 12:10
**S-T-E-P-N-E-Y** 11:8
**salary** 251:4
**sat** 45:16,22 46:15,17 47:2 49:21 52:11,16 53:15 115:12 116:1 117:10,16 130:5 135:16 138:16,22

23:6,6 85:21 158:14
**saw**
164:17
**saying**
16:14 35:5 38:21 41:17 55:2 76:6 98:8 100:10 108:7 117:1 123:3 128:16 131:11 134:6,20 135:21 136:15 144:2 151:13 160:13,23 167:17 167:19 168:14 169:24 173:9 178:9 179:3,18 186:1,2,13 186:16,24 191:22 192:6 195:12,23 196:15 197:23 209:12 213:7,11 217:19 223:13 243:4,24
**says**
68:4 72:21 91:22 94:5 99:22 104:6 114:1 147:19,23,24 148:20 149:2,22 151:2 156:2 216:21 258:19
**scared**
44:3 122:1 136:14 246:11,13
**scenario**
96:7
**schedule**
46:10 80:14,17,18 81:7,13 82:2 83:4 83:21,22,24 84:9 85:6,15 89:13 123:5 123:19 126:21,24 127:12,13,14,15,19 144:12 187:4,14,24 189:21 201:12 202:12 203:6,7,7 206:19 223:19
**scheduled**
36:19 71:17,20 72:2 84:6 126:16 127:5 160:20 187:6,6,8,10 191:5,6,8 201:14 203:19 209:24 210:4
**schedules**
83:20
**school**
21:13 22:2 240:4
**Schubert**
61:13 164:3 252:6
**seal**
262:17
**search**
238:19
**searches**
37:3,5,6
**searching**
37:8
**second**
50:7 72:21 99:12 106:6 110:11 112:8 126:14 174:20 184:12 197:4 200:14 227:20
**seconds**
9:24
**see**
14:22 24:12 34:2 35:7 37:17 41:17 47:15 67:16 68:2,10 68:11 70:11 74:4 81:12,12 100:10 101:17 102:22 109:17 111:20 117:23 119:11 122:4,5 129:19 130:9 136:7 147:19 148:1,2,6,11,11,12 154:2 157:8 158:11 158:12 159:21 164:23 172:12 184:16 186:7 193:17 200:16 207:11,21 208:7 212:1,6 215:11,18 218:23 219:4,17 224:13 228:11 229:11 233:16 239:2 244:6,9,16 245:8 250:8 253:18 253:24 258:19
**seeing**
41:14 68:10,19 77:6 129:9 164:19 207:10 249:9
**seek**
14:21 15:14 213:14 216:11
**seeking**
12:17 15:7 35:6 212:10,12,14 213:22 222:16 223:4
**seen**
55:20 59:9,12 63:13 80:22 81:7 105:21 132:9 136:16 144:23 165:10,11 218:6 223:18 244:8 248:10 249:7 251:12 253:8
**send**
54:24 179:10
**sense**
28:22 29:7 125:10 196:11
**sent**
55:1 56:15 146:5 156:2 184:3,4 197:2 197:20 207:2 217:6 260:20
**sentence**
114:19
**separate**
181:12 211:18,19,20 211:21
**September**
232:12,24 233:3,5 234:2,3,11,13,16 235:19,20,20 236:2 236:9,15 237:7,24 238:6
**serious**
208:14
**served**
21:11
**Services**
1:21 4:11,12 262:21
**set**
180:1 233:9
**settlement**
30:11,19,20
**seven**
86:3 262:22
**severe**
75:10
**share**
182:11
**shared**
182:15,17,22 183:5,7
**sheet**
128:13 202:6
**sheets**
94:9
**shift**
23:3 26:12,14,22 27:4 58:1 85:17 92:12,16 95:10,14 95:17,18 190:10 202:14,17
**shifts**
188:5
**Shore**
91:3
**short**
150:5,5 221:24 243:21
**short-term**
148:10,24 149:7 150:9,10 152:3 154:6,10 156:19,21 159:9,23 160:1
**shortest**
76:17
**shorthand**
1:15 262:9
**shortly**

119:19 198:5
**show**
56:5 58:11 59:20 72:10 81:9 90:21 91:9 93:14 100:9 101:15,19,21 103:19 107:17,19 109:3 110:3 126:3 147:9 150:3 210:22
**showed**
128:13 210:21
**showing**
103:12 238:23
**shows**
238:19
**shut**
131:11 179:22
**sic**
27:22 37:16 43:2 58:3 70:10 73:9 75:3 103:20 105:15 224:13 257:19
**sick**
83:8 146:12,23 147:2 160:5,12,22
**sidetracked**
51:8
**sign**
94:6,6 101:2 104:13 104:14 108:12 136:12 139:14,14 141:2,10,12,13,17 141:19 142:2,9,10 142:11,20 143:1
**signature**
261:11 262:17
**signed**
46:13 93:11 108:10 108:14 109:21 110:14 111:17 129:16 132:6 136:10,11 143:3,4 152:2 168:9 170:6
**signing**
136:11 141:8 142:22
**signs**
68:19
**similar**
130:6,24 131:20 239:22 252:11
**Simms**
12:8,11 13:14,16 14:19 15:2,22 16:13 16:21 17:11 33:24 42:19,21
**simple**
34:18 167:3 216:8
**simplify**
233:14
**sinking**
75:4
**sit**
46:22 49:15,15,17,18 61:18 75:17,21 76:4 77:10,11
**sites**
124:14
**sitting**
51:23
**situation**
15:6,10 32:7 33:23 34:20 42:24 46:7 186:3 206:13 208:19 211:11,13 211:24 226:22,24 244:7
**situations**
98:4 213:5
**six**
97:24 227:6
**Skokie**
2:3
**Slawomir**
2:15 4:11
**sleep**
242:12 243:6 245:13 245:14,16,21 246:4 246:7 248:12,20,24 249:7
**sleeping**
242:14 249:5
**slow**
134:15
**Smith**
2:7 4:10,17 38:7,11 38:12 39:4
**smooth**
5:19
**smoothly**
56:2
**social**
12:1
**somebody**
34:22 35:11 82:4 95:16 184:3 213:15
**soon**
105:6 132:19
**sorry**
10:6 12:18 13:11 16:24 23:23 24:2 36:4 38:10 39:11,13 55:7 58:17 60:2,4 66:23 67:23 71:6 76:19 78:14,24 101:1 102:19 103:22 119:13 130:13 131:7 132:15,17 133:7 134:23 135:2 137:9 142:18 145:15,17 147:22 149:16,20 149:22 153:23 163:2 167:24 177:3 177:19 179:16 182:1 184:1,13,13 186:9 194:2 195:9 199:8 202:2 211:3 211:20 212:18,18 217:9 219:19 223:12,12,21 224:16 235:2,18 238:15 240:7 242:2 242:2,22,22 243:3 248:20 249:16 251:23,24 252:1 255:2 256:9 260:4 260:12
**sought**
222:11
**sound**
252:11
**sounded**
196:13 221:9,11
**soup**
82:18
**sources**
241:9
**South**
1:16 2:9 4:9 262:4
**span**
48:13 247:4
**spark**
209:20 233:1,5,7 234:7 236:5
**sparks**
230:8 232:7,11 233:21 234:13 236:3,13,15,17 237:22 241:3,12
**speak**
10:22 11:9,15 12:11 13:13,16,19 14:1 15:18 16:23 17:1,6 39:6 49:11 51:2 89:18 99:18,21,23 104:21,23,24 105:3 105:5,22 124:17 158:3 164:6 170:10 170:16 179:2,4 192:16 206:23 207:6,21 222:21 223:17 256:7 257:23 259:21,23
**speaking**
31:2,5 38:7,18 40:16 40:17 117:5 125:8 138:3 206:23 207:23 211:22,23
**Spears**
64:23 82:12 97:6
**specific**
12:19 75:12 92:11 100:14 124:14 174:17 194:15

259:10
**specifically**
104:23 105:1 110:23 156:18 168:18 194:15 213:21,22 214:8,15 215:6 218:22 230:24 250:13
**spell**
5:10 12:9 22:11 64:1
**Spielberg**
259:9,9
**split**
27:4
**spoke**
9:13,19 10:8,10 14:6 14:9 15:22,24 16:7 33:24 39:3,7 40:8 42:19 48:6,8,14,16 49:10 50:11 52:10 53:8,24 54:3,5,8 55:20 57:2 89:20 105:8 112:15 115:8 116:1 119:11,21 120:15,15,16 125:22 158:5,23 159:14 170:17,18 170:21,22 171:4,11 171:12,20 172:15 178:2 183:8 197:1,3 197:16 211:14,15 211:17,17,18,21 218:14 254:13 255:21 256:3 259:6 259:22 260:4,6
**spoken**
11:19 39:9 170:8 178:22 223:3
**sporadic**
246:24 247:1 248:15 248:16 249:3,15,19 250:4,5
**spreadsheet**
100:12,12 101:21 129:13
**St**
165:17,20
**stack**
258:17
**staff**
114:5
**staffing**
235:4
**start**
13:13 37:8,10 41:16 41:21 46:17 62:22 64:17 71:21 73:10 73:11,12 75:7 78:18 119:5,24 143:15 144:10 157:7,11 187:8 190:8 205:22 210:13 217:3 222:19 228:24 230:9 231:17,18,19 231:19,20 232:10 233:1 235:15 244:3 245:14 247:17 249:17
**started**
22:15,15,16 37:13 40:23 41:15 42:7 45:19 50:13 65:5,13 71:22 76:23,23 82:3 82:19 83:13 84:10 85:3 115:9 119:22 120:7,13,13,19 144:23 157:10,15 161:11,17 188:10 189:4,17 190:17 194:18,20 209:22 233:3 234:7 236:3 236:15 242:16 243:4,6 244:14 247:6 248:13,20 249:12,13
**starting**
151:10 163:18 189:17 190:15 251:24 252:3
**starts**
73:22 74:2,3
**state**
1:13,16 5:10 19:18 73:5 185:19
**stated**
81:2
**statement**
262:2
**States**
1:1 4:4
**stating**
181:10 184:11
**stay**
51:18 82:3 86:10 87:1 223:19
**stayed**
86:11
**steady**
37:15
**stenographer**
262:10
**step**
78:2 99:13,14
**Stepney**
11:7 20:16
**stick**
236:6 243:22
**stipulations**
72:7
**stop**
31:5 76:13 212:14 219:20 232:2 244:11
**stopped**
210:18
**stops**
156:21
**storage**
23:18,19
**story**
214:13
**straighten**
98:6
**straightened**
99:23 105:11,12
**STREET**
262:22
**strictly**
192:22
**stroke**
68:7 69:1,9,17,21 71:3,8 87:22 88:12 89:6,15 144:16 163:23 164:18 165:3 204:6 205:1 216:3 242:16,23 244:13 245:11 246:12 247:7 251:8 251:14 252:10,15 256:13,18
**stuff**
18:17 32:22 36:2,3 38:2 46:9 62:12 73:11 83:9 86:23 90:18 93:9 97:15 98:9 100:3 107:11 123:1 172:3 179:13 181:11 192:7,22 195:5,18,24 196:3 206:16 207:24 239:11 246:21,22 247:21,22 250:22 257:20
**submit**
44:10
**submitted**
238:12 256:20
**substance**
9:10 10:2
**substances**
8:8
**substantially**
68:5
**sue**
19:22
**sued**
17:18,20 19:21
**suffer**
8:14 240:21
**suffered**
242:3
**Suite**
1:16 2:3,9 262:4
**Sunday**

80:16 85:21 86:8,15 86:16,16,17 126:16 127:11 128:19 158:14 187:14 227:20
**sup**
82:7
**supervisor**
45:8,11,17 46:5,11 57:22 58:2,4,6 64:12,13,14,17,24 65:21 82:4,9,17,18 94:10,11 95:7,10,14 95:20,22 96:1,9,23 97:5,9,11,19 98:16 98:24 99:19,21,22 100:5 101:3 106:2 184:10 207:3
**supervisors**
64:18
**supplement**
102:17 234:19
**supports**
254:13
**suppose**
89:1 117:14 123:22 214:22
**supposed**
36:14 96:21 117:6,8 117:12,13,17 135:14 137:13 140:15 196:11 217:20 219:12
**supposedly**
37:21 81:19 136:2 167:3 171:15 199:17
**Supreme**
1:12
**sure**
15:20 16:4 55:19 57:8,9 62:12 63:14 69:14 85:1 86:24 93:8 94:15 99:6,7 102:16 105:1,4,6,11 105:14 107:11 108:14 112:17 114:22,23 118:7 121:5 122:5 124:4 128:9 131:23 132:1 132:2 134:13 141:15 142:24 145:13 157:24,24 158:1 164:22 165:15 169:13 181:7,7 182:5 186:1 194:19 196:17 198:16 209:2 213:3 213:6 215:18 219:21,24 230:20 230:22 231:12 234:15 256:15 257:20,22 258:6,9 258:11,13 259:17
**swear**
4:21
**switch**
85:15 86:19 236:12
**switched**
65:22 127:15
**switching**
58:5 165:7
**sworn**
5:1,4 262:7
**sympathetic**
206:13 208:19,21,23 210:17,19,21 211:10 212:8
**symptoms**
79:13,14
**system**
45:13,21 47:17 50:5 53:5,6,15 95:23,24 100:3,6,6,8 116:2,3 121:16 138:18,20 138:21 161:13

**T**

**T**
3:7
**T-O-M-M-Y**
5:12 180:6
**take**
7:17,19 22:20 26:3 33:6 37:12,18 40:6 42:2,4 44:7,10 50:7 54:23 60:6,12,13 61:7 62:19 72:4,15 75:18 87:22 90:23 90:24 91:13 93:19 104:3 107:11 108:1 122:6 123:4 126:9 133:17 143:14 145:3 152:14 161:12 162:9,9 173:17 185:6 186:4 186:21 187:1 201:9 202:14 203:12 211:7,8 213:14 221:17,21 251:18 251:20 254:5 256:22 260:7
**taken**
1:11,14 4:8 5:15 33:3 35:2 46:20,20,21 47:4 49:13,19,23 52:2 101:16,17 107:9 116:23 117:3 200:23 212:2 239:13 240:5 253:1 262:3,9
**takes**
235:10
**talk**
6:6,6 14:19 95:24 115:15 137:18,19 137:19 178:7,8 196:19,24 204:23 222:7 254:21
**talked**
9:10,11 115:16 120:9 138:14 162:20 169:9 179:7 183:1 227:9,10 253:7
**talking**
13:1,2 16:15 40:22 54:20 111:13 120:22 137:12 145:13 158:19 180:16 196:13,15 217:7,19 219:3 226:3 247:3
**talks**
167:12 223:18
**tardy**
92:2 106:7
**task**
80:10
**taxes**
241:15,18,19
**Taylor**
258:19,20
**team**
196:2,16 257:24 258:1
**Tear**
77:21
**tell**
9:9,13 10:2 24:11 50:21 53:1 70:8 83:3 90:15 96:6 98:24 107:9 111:23 127:3 136:24 141:4 151:12 163:9 167:5 170:7,20 172:6,11 172:18 178:20 184:9,10 185:10 194:14 200:11 204:21 209:1 214:8 215:9 216:4,8 218:17 226:14 252:21
**telling**
42:21 43:5 48:19 51:13 118:13 123:18 125:10 151:6 167:10 171:19,22,23 172:1 172:1 173:11 176:2 176:3,10,10,14,15 176:15,16 177:7 194:22 195:5,19 197:23 198:18 208:24 210:24

219:2
**tells**
157:21 191:16
**ten**
201:15
**Tension**
253:11
**term**
150:5,5
**terminated**
33:7 42:17 43:7,10 118:3 136:3,5,21 138:24 140:1 141:9 141:17 168:14,24 169:3 184:11,13 207:14 212:15,18 212:20 215:16 226:13,15,15,19 227:1,2 260:9
**termination**
14:16 39:8 65:23 66:4 74:21 163:19 181:9 188:24 213:20 225:13,17 226:4 228:5,7,14,18 229:15 234:1 235:12 239:14 242:13 243:7 244:4 245:15 260:1,5,6
**terms**
41:1 207:23
**testified**
5:4 47:8 82:10 115:12,16 122:19 187:13 211:17
**testify**
8:3,8,16 194:3
**testimony**
7:4 8:5 113:3 115:7 118:16 140:8
**thank**
5:8,14 25:14 29:7 35:20 52:3,5 103:18 132:4 170:16 240:11 255:1 261:6
**therapist**
253:16,16
**therapy**
253:23 254:2,3
**there-ish**
25:7
**thick**
164:23
**thin**
164:23
**thing**
6:23 13:2 15:4,5,13 15:13,15 34:1 41:21 42:23 43:14 52:15 89:15 101:1 134:8 172:1,2 189:8 198:22 206:8,9 211:23 216:8 247:20
**things**
10:5 35:4,22 36:1,15 68:11 96:21 142:10 162:20,23 169:13 192:6,20 206:2 209:16 215:19,24 217:17 239:2 244:2 247:19,23
**think**
9:20 22:15 24:8 25:1 25:2,4 29:11,19,20 30:17 34:5 38:4,8,8 38:9,15 47:21 48:7 48:9 53:3 55:5,18 58:3 62:23 63:9 64:12 82:8 88:13 89:19 96:15 102:10 102:10 105:14 130:18 144:22 145:24,24 146:1,2 151:16 154:3,7 158:22 162:8 164:4 164:4 165:13,14 168:8 169:8,9 172:14,16,16,17 173:6,14,14,23 174:4,7,11,18 175:20,24 179:3,7 192:3 193:11 197:3 197:3 208:6 211:16 214:9 217:22 218:2 221:14 226:18,20 226:23 229:9 233:17 237:13 238:11 239:22 247:14,16,18 254:23 256:11 259:2,12 260:23
**thinking**
63:12 118:2 137:13 157:15 158:15,20 175:2 213:2 214:13 214:22 217:20,22 246:18 247:13 258:3,5
**thinners**
164:20 165:2 251:19
**third**
104:6 106:5
**thoroughly**
213:5
**thought**
25:17 81:16 85:6 121:22 122:19 139:6,9 154:13 171:9 173:16 214:1 214:15 215:3,6,12
**threatened**
19:9,21
**three**
28:24 48:12 52:14 72:24 76:10,11,14 76:14,20,24 82:10 92:12,15,16,17,18 139:8 165:11 199:21 211:18 247:8 249:1
**throw**
188:2
**Thursday**
9:21,22 10:7,10 84:14 85:20 95:19 95:20 99:18 188:12 188:19 189:24 190:9,12,21
**ticket**
17:23
**TikTok**
12:2
**time**
4:6 6:6 11:12 13:21 14:6 15:24 22:15 34:4,21 40:17,20 42:19,24 43:13 44:17 45:7,8,15 46:3,14 48:10 50:15 50:18 51:17 53:8,14 57:10,24 58:2,4 59:8 63:1,8 66:12 68:21 72:4 73:6 74:20 75:12 79:16 79:24 80:23 81:1,10 82:5,17 83:17,19 85:14 88:7,10 91:5 92:11,15 97:24 98:6 99:16 100:15,21,23 111:11,14 116:2 117:7,10,15,21,24 119:3 120:19 121:20 124:7 125:22 127:17 128:6,13 134:4 137:20 138:8,18,19 144:19,20,21 145:6 146:11 150:1 153:22 156:16 160:12,22 162:9,15 163:10,10,12 164:17,24 165:10 168:8 170:22,23 171:15,19 172:9 173:11,17,22,23 175:4,6,19 176:5,12 176:20 178:1 179:7 180:11 183:22 184:1,15,19 192:23 193:2 195:13 196:10 200:10,22 201:5 205:19 206:5 206:21 211:13

221:14 222:2 225:7 227:11,23 230:21 231:11 233:2,24 234:8 235:12 240:13 241:5 242:13,24 244:6 245:3,7,9 247:4 249:18 255:17 259:8 260:7 261:6 261:13 262:14
**timeline**
173:20
**times**
9:16 28:24 39:7,9,10 40:8 48:16 59:1,2 72:23,24 97:12 98:1 100:10,13 107:12 156:20 191:13 199:22,22 211:17 231:20,22 242:7 243:20 249:1 255:9 255:13
**tip**
24:19
**tire**
76:6
**Tisch**
97:20 98:7
**today**
4:6 5:8,18,22 6:2,16 8:5,9 9:1 10:23 11:2 61:18 80:4 164:21 179:18 216:7 222:6 254:13 261:6
**today's**
8:19
**Todd**
2:2 4:15
**told**
45:9 46:12 52:20 57:18 70:12,15,20 81:22 82:8 114:2 119:1,4,21,23 120:1 120:4,5,5 125:15 136:1,4,12 137:2,24 138:23 141:1 145:7 145:19 152:1,4 153:12 154:20 163:3 167:18 168:13 170:17,18 171:14 172:7,8,12 172:13,14,20,22 173:9 174:16 175:5 175:17,20,21,22 176:2 177:13 181:15,18 184:3 185:6,8,11,11 196:22 198:23 200:9 204:14 205:15 207:1,3 208:9 214:7,9,18 215:3,12 218:23 241:13 252:24 254:14 258:4
**Tommy**
1:4,11 3:3 4:2,3,16 5:2,12 20:11 21:2 40:4 91:5 96:3,4 146:5 157:18 162:15 180:6 208:7 209:10 211:3 214:12 218:3 222:2 260:16,20 262:3,13
**Tommy's**
146:7
**Tommy6044**
181:12
**tongue**
24:20
**tooken**
105:15
**top**
211:1 260:16
**Torres**
98:4
**total**
13:3 92:7 138:23 139:22 187:11 190:13
**totaled**
168:23
**touch**
171:6 172:4 178:20
**touched**
254:23
**track**
32:11 49:5 100:15,16 100:17 101:10
**tracking**
120:23
**traffic**
17:23
**train**
171:9 173:16
**training**
21:18 22:2 240:2
**trans**
174:15
**transcript**
6:15,18
**transferred**
125:6 194:6
**treat**
33:21 34:24
**treated**
32:5,6,7 33:19 34:13 34:16 35:17 205:16
**treating**
35:13
**treatment**
72:23 248:8
**trial**
6:20 81:3 83:11
**tried**
142:11,11
**triggers**
247:12
**trouble**
68:9
**truck**
96:14
**trucks**
66:15,18
**true**
262:11
**truth**
216:4 226:14
**truthful**
8:5 121:10
**truthfully**
8:9,16
**try**
6:2 14:21 15:7,14 16:16 40:19 41:17 43:8 109:8 194:15 229:10,11
**trying**
24:7,24 31:1 32:11 34:23 37:22 48:7,13 50:10 51:17,18,22 52:24 57:2,9 60:9 63:9 64:12 82:8 84:22 86:23 111:4 111:18,20 124:4 136:6 145:24 151:24 152:1 154:3 159:21 172:14,16 172:17 173:14,14 173:15,23 174:9,18 174:21 175:4,24 176:12,13,14 178:6 178:19 189:24 195:6 199:15 200:11 202:1,6,24 208:8 209:15 212:6 212:9,9 214:23 215:18 216:11 219:4,16 233:14 244:6,9,11,16 245:8 258:23
**Tuesday**
1:17 84:13 85:20 86:17 127:16 156:3
**Tufano**
1:15,24 2:13 4:12,22 262:3,20
**turn**
67:21 233:8
**twice**
9:17 23:15 28:19,20 39:15 78:7,7 197:3 199:21 231:14,14 247:11 248:4
**Twitter**

12:2
**two**
25:22 28:24 40:8 48:2,16 59:2,3,24 60:2 72:23,23 91:4 105:17 112:13 139:8 143:16 148:9 154:15 175:23 176:10,19 188:2,12 188:19,19 190:20 199:21 201:6,7,10 201:11 204:1,3 211:17,19,20,20 230:13 231:22 232:20 233:15 240:20 241:2 255:11
**type**
33:13 34:6,19 37:15 39:18,24 42:5 43:14 53:20 96:11 122:8 130:2 154:8 207:21 208:13 209:19 223:8,9,18 239:6 242:24
**types**
209:15 246:10

**U**

**U**
21:7
**uh-huh**
5:24 47:10 135:1 138:13 151:8 185:4 223:6 225:15 234:12 236:16 245:1
**unable**
8:18 255:9,14,18
**unavailable**
240:14
**undersigned**
262:10,15
**understand**
6:3,12,21 7:6,8,10,13 7:21 8:4 9:11 41:2 43:21 44:12,15,16 52:9 54:21 73:18 74:23 94:24 103:2 106:14 109:10 110:22 111:4,18 166:6,17 172:3 173:4 195:22 202:7 203:1 208:15 210:5 233:17 259:1
**understanding**
7:5 37:22 133:6 146:23 153:21 166:9 171:5,6 184:24
**understands**
174:11
**understood**
7:10,14 39:20 43:10 166:8
**undue**
229:12
**unfortunate**
186:3 219:7
**unfortunately**
54:23 55:21
**United**
1:1 4:4
**University**
21:9
**unlawful**
228:8,10,18,24 229:5 229:8,9,14
**unload**
66:15,18
**Unrelated**
204:6
**update**
238:9
**USA**
149:22
**usage**
119:8
**use**
6:2 32:21 33:10,12 36:13 41:1 52:23,24 54:19 55:3,22 72:8 78:3,23 120:11 122:8 124:8 137:6,7 137:22 143:20 144:18,20,21 145:6 151:15,15 152:1,11 152:12,24 153:3,5,9 153:18,22 154:2,5 154:12,24 155:10 155:21 156:9,24 157:3,17,17 158:6 158:24 159:7 161:18 163:4,12 165:21,24 166:11 166:12,13,24 167:1 168:11 172:10 180:24 181:15 183:3 185:12 186:17 191:13 195:4 200:8 201:1 205:12 206:17 207:24 208:9 209:11 211:5,6 214:19 218:4 219:14 235:4
**usually**
73:16 75:12,23 77:22
**Utilized**
210:15

**V**

**vacation**
239:16,18,19,21
**vacations**
239:13,24
**validated**
99:19
**varies**
23:11 76:3
**vary**
123:19
**verbal**
5:23 91:19 96:17,18 97:9 101:3 109:18 169:11
**verbally**
96:23 97:16 98:9 159:11 161:12 169:16 257:23 258:4,5,11
**verse**
71:11
**verses**
4:3
**versus**
123:6 172:22 188:15 201:13 212:6
**video**
4:2 91:1,4 162:11,14 221:22 222:1
**videographer**
2:15 4:1,10,20 60:15 60:17 91:1,4 162:11 162:14 221:22 222:1 254:7,9 261:12
**videotaped**
1:10
**violated**
32:1,2,16,18 33:9 185:17,21 191:18 191:22,23 205:13 205:14 206:11 214:10,18,20 215:4 215:13
**violating**
191:24
**vision**
67:16 68:6,12 70:9 77:4,16 79:21 211:2
**visits**
38:24 211:5,7 250:21
**vocaled**
257:19
**voluntarily**
28:2,8
**volunteer**
27:18,24 28:14,18,19 28:20 29:5 98:3
**volunteering**
28:13 97:23
**vs-**
1:6

**W**

**W-2**
239:2,4
**W-2s**
239:11
**Wacker**
1:16 2:9 4:9 262:4
**wage**
40:15 61:24 62:11 213:17
**wages**
185:23 192:7
**wait**
55:23 57:12 131:15 143:8 153:6,12 154:14,20 157:18
**waited**
224:12
**waiting**
172:4 179:2,3 222:21
**wake**
79:20,22 208:13 242:10,10 246:8
**waking**
246:6
**walk**
44:21 148:16
**walkthrough**
90:19
**Walmart**
230:8 232:6,7,10 233:1,5,7,21 234:7 234:13 235:7 236:3 236:5,12,15,17 237:22 241:3,12,12
**want**
5:17 6:23 7:4 9:9,19 11:18 14:8 24:9 30:10,19,24 31:2,4 33:18 34:2 44:4 48:15 51:7 53:23 57:8 60:6 63:14 67:10 82:16 85:1 89:5 103:5,7 104:23 109:7 114:10 116:10 128:24 133:8,14,14,17,17 134:19 140:24 141:21 142:20,23 145:13 154:16 156:5 158:22 162:19 171:8,9 173:17 174:20 184:21 187:17,19 191:7,16 193:9 196:15 209:23 212:13 216:14,15 219:21,24 221:17 224:19 243:8 253:15 254:20 258:9
**wanted**
45:14 56:23 81:9 91:18 102:22 104:24 176:4 199:13 223:24
**wants**
30:11 193:13
**warehouse**
25:10,20 26:1 29:15 29:23
**warehouses**
24:11,22 29:24
**Warfarin**
251:19
**warning**
91:20 99:12 104:7 106:6,7 108:4 109:18 110:11 183:24 207:7 227:10
**wasn't**
16:2 24:9 32:24 33:12 35:3,4,24 40:5 41:14 42:1 43:16 45:14,16 46:8 46:13 47:15 48:1 52:20 54:13,17 55:4 57:20 69:12,13 75:9 80:23 82:16 83:23 88:2 95:2 100:2 104:18 112:11,15 117:9,9,14,15,19 118:7 119:19 120:19 121:15 123:20 124:5,8 125:14 128:10 129:10 130:1,10 136:1,9,10,15 137:10,12 138:17 139:16,20 140:18 144:7 146:14,20,21 151:13 153:6 155:20 157:11 158:20 161:9,9,19 167:8 172:2 176:8 177:20 198:17,18 200:16 204:10 207:2 210:21 215:14,15,16,17,17 217:6,7,13,15 218:3 218:24 220:20 221:9 242:14 244:8 255:23 258:22 260:6
**water**
50:9
**way**
7:8 27:21 34:15 36:15,15 39:8 56:2 62:13,19 66:3 68:17 69:5 86:10,11,11 87:2 101:10 117:5 123:20 127:18 138:19 141:7 158:9 163:18 166:12 173:12 176:17 179:20 185:17,18 185:20 190:7 199:2 199:5 203:15 210:22 211:9 213:5 213:19 214:1 215:18 216:6,7 233:17 234:2 237:1 242:13 257:18
**ways**
214:3
**we'll**
15:9 30:20 31:6 60:6 60:12 152:14 158:21 202:3 228:24 261:11
**we're**
8:2 51:10 54:23 58:8 78:13 85:14 90:19 103:4 132:19 145:13 172:18 174:10 219:22 236:12 247:3 254:5
**Wednesday**
80:16 84:14 85:20 86:8,15,16,17,17 95:19 126:16 127:11,16 128:19 187:14
**week**
23:7,9 26:10,17,23 28:17,18,18 36:19 36:21 39:16 40:8 41:12 59:7 70:24,24 71:8 72:24 78:7,7 78:22 79:6,9,12 86:19,20,21,22 87:8 87:11 95:16 99:5 102:5 110:18 123:11 126:19 128:21,22 136:4,5 136:21 144:3 145:8 145:20,21,23 146:4 158:10 168:14 175:23 176:19 186:15,22,23 187:2 187:5,12,22 188:16 188:22 189:1,11,23 190:15 191:9 198:9 198:10,11 201:16 203:10 204:14 210:1,2,8 211:17 218:15 227:19,20 227:21 230:13,14 230:15,17 231:3,10 231:14,22,24 232:16 233:20

234:17 235:15,16 235:19,24 236:4,11 236:17,19,20,24 237:7,14,17,20 238:4 247:11 248:4 249:1 260:4,5,6,9

**weekend**
158:15 239:16

**weekly**
48:17

**weeks**
28:19 86:19 120:12 123:9,13 139:8 175:18 178:5 193:17 230:13 240:20 241:2 249:4 255:11 260:3

**went**
7:24 13:22 21:7,9 33:22 40:14,15,15 45:23,24 50:15 53:16 84:1,17,19 86:8 90:2 93:9 112:22 118:11 120:16,18,19,20 121:14 123:17 124:3 132:12 135:7 145:6 157:9 161:1 172:17 176:1 182:5 187:17,19 190:19 190:20 196:7 205:17 207:1,13 214:24 219:12 252:19

**weren't**
34:13 80:9 96:21 113:11 120:23 121:5 143:11 195:13 198:23 203:2 205:16 219:8

**white**
130:12

**wife**
11:2,3

**wife's**
11:6

**witness**
3:2 4:21 5:1,3 12:23 16:5 24:3 31:9 36:5 36:11 45:1 49:4 55:10,13,24 56:3 60:14 66:24 67:9 73:20 78:15 79:1 89:9 102:21 103:7 106:15 113:4,23 114:21 125:4 128:8 130:21 131:11,14 131:17 132:16 150:8 162:2 164:7 167:24 172:22 174:8,13 221:20 225:5 229:3,18 252:2 254:17 257:8 257:13 261:8,10 262:3,7,13,17

**witnesses**
60:11

**word**
40:20 41:19 43:10 54:19 97:10 107:12 107:12 124:8 159:11 192:9 195:19 200:10,17 205:12 209:18

**wording**
54:17 111:3 215:24 219:2

**words**
6:2 71:10 125:12 207:23 215:23

**work**
22:8,13 23:7,11,13 24:6 25:19 26:16 28:2 36:19,19,21 37:12 39:20 41:12 44:11,21 46:10 70:2 77:12,23 80:14,17 80:17,19,20 81:4,7 81:13,14,16,22 82:5 82:21 83:4,24 84:1 84:20 85:16,18 86:14,18 87:6,8,10 87:17 92:8 95:18,19 97:21,23,24 100:20 100:20 110:17,18 110:23 112:11,15 119:6 123:5,19 127:1,12 143:17,24 144:11,12 145:4,8 147:7 154:3,11 156:20 158:11 160:16,17 165:21 166:1 187:4,5,6,7 188:4,16,17 189:11 189:23 190:9,14,15 191:3,11,14 193:2 201:8,9,11,12,13,14 201:15 202:3,9,13 202:15,16,23 203:3 203:16,19 204:2,3 204:10,12 206:18 206:19 210:5 227:11 230:17,19 231:4,4,15 232:4,13 232:16,22 233:2,14 234:16 235:10,13 240:14,19 241:6 255:9,11,14,18

**work--**
28:8

**worked**
22:14 24:22 25:4 29:24 33:17 84:5 85:19 86:19,20 110:17,19,20 112:10,12 126:19 126:23 127:4,5,7,9 127:13,14,22,24 128:5,9,16,21 143:7 187:16,21 188:8 189:1 191:5 192:24 203:5,6,7,10,22 204:9,9 210:1 213:19 223:15 230:22,22 231:3,9 231:23 233:19 234:1 247:17

**working**
22:17,18 23:3,5,17 23:18 24:11 37:14 54:21 62:20,22 80:21,24 82:4 83:18 84:13 85:3,20 95:11 95:11,15 96:13 97:22 123:17 126:22 127:18 128:12 186:19,23 188:1,11,20 190:16 195:13,17 200:1,7 201:2,8 202:18,19 203:12,15 206:8 230:6,10 231:16 232:2,10 233:4,11 234:7,8

**works**
37:24 40:21 43:12 46:10 81:21 118:13 216:17 233:9

**worried**
37:20 206:24 208:3,3 218:3 219:1

**worry**
40:6 132:19 136:21 196:3 209:10

**worse**
75:4

**wouldn't**
41:12 135:19 142:4,4 160:19 179:12,23 210:20 216:7 222:13,17 224:19 229:12 230:20 234:23 239:19,20 239:21 257:21

**wow**
45:21 246:8

**write**
96:24 101:11

**write-up**
98:17,18,19

**write-ups**
90:11

**writing**
58:17 96:16 101:24

107:13,15 139:2,3 169:20,23 170:2 179:10 181:6
**writings**
9:5
**written**
6:15 91:19 99:12 109:18 110:11 179:8 183:24 238:18
**wrong**
34:3 113:6 117:13 128:12 138:1,4 181:2 183:4
**wrote**
104:20 110:16 111:13,15,17,21 112:17
**www.magnals.com**
1:23

**X**

**X**
3:1,7

**Y**

**Yahoo**
179:22 180:1
**yeah**
10:3 12:15,22,24 13:5 14:15,15 16:19 18:15 19:2 25:6,7 25:14,16,18 26:13 27:3,7,17,17,17 28:6,11 29:15,21 32:10 34:10,12 35:23 37:4 38:9 39:5,13,16 41:6 44:8 48:18 49:4,7,9 49:14,14,14,14,14 50:15 51:9 52:10 53:14 54:2 55:6 57:1,4,4,7,9 58:3,19 59:4,12 60:2,8,13 61:11,12,15 62:7 64:16,20,20 65:12 65:19,20 66:19 68:16,22 69:4 74:3 74:14,15 75:3,8,9 75:22 76:16,22 77:5 77:11,19 78:14 79:7 79:7,17 80:6,8,18 81:4,5,6,24,24 82:11 84:21 85:2 86:1,4,6,17,22,22 87:20 88:4,17,21 89:3 90:14,17,18 92:22 93:1 97:10 99:16 100:24 103:3 103:14,23 105:4,18 105:20 106:4,9,15 106:18 108:18 109:12 112:1,6,9 113:5,5 114:12 115:24 116:21,21 117:23 118:3,24,24 119:3,18 120:4,4,16 121:1 123:8 126:2 126:13 127:7 128:18,20,20,20,23 129:13,14,14,15,22 129:22 130:3,8,20 131:2,7,7,14 134:13 134:13,13,14,16 135:4,6,10,10,13,14 136:13 138:14 139:6,6,6,10,13 141:3,15,19,24 142:8,15 143:7,10 143:20,20 144:5,7,8 144:17,17 145:6,15 145:17,24 146:3,13 146:16,17,19,24 147:16 148:2,4,16 150:19,21 151:22 152:23 153:5 154:19 155:5 156:4 156:6,8 159:7,24 160:16 164:8,12,12 165:19 166:1,13,15 166:20,21 167:22 168:5,5,11 169:13 169:19 172:13 173:19,22 174:14 174:23 175:15 177:2,12,15 180:11 180:16,20 182:4,17 187:18 191:23 196:24 197:10 198:9 202:20 203:14,14,17 204:8 204:8 208:22 212:13 215:14 216:17,20 218:16 218:23 219:7 220:12,13 221:16 221:20 222:19,20 222:20 224:18 226:3 227:1,8 228:17 230:2,23,23 231:1,3,8 232:5 234:5 235:12 236:10 237:3,12 238:21 239:4,8,10 239:17 240:11,15 240:23 242:18,20 243:4,10,19 244:14 244:14,14 245:5,7,7 245:7,9 246:5 249:14,19 250:3 251:1 253:20 254:4 254:20 256:9,19 257:14 259:18,20 260:2,5 261:1,8,10
**year**
18:15,16 22:16,17 25:21 38:24 63:11 65:7,9,10 75:8 78:19,23 88:14,14 189:3,7 224:8 239:12
**year-and-a-half**
22:19
**years**
12:15,16 14:4 18:13 18:18 19:1 20:10 24:12,23 29:11 30:2 103:17 180:1 208:13 240:4 244:22,24 246:1 251:10,13,17 252:17 253:3
**yep**
156:4 180:14,14,14 230:16 235:23
**yesterday**
9:19,20 10:8,14 11:10
**Young**
2:8 3:4,5 4:17,17 5:7 12:22 13:4 16:6 18:6,11 24:4 31:13 35:15,20,21 36:6,24 44:14 49:6 55:16 56:4,9 57:13 58:15 60:2,8,13,18 67:1 67:12,24 68:1 72:14 73:24 78:14,16,24 79:4 80:13 89:11 90:24 91:7,12 93:18 101:7 102:16,19 103:6,8,23 104:2 106:17 107:23 109:7,12,13 110:7 111:2 113:9,24 114:24 126:8 127:6 128:15 129:5 130:20,22 131:13 131:18 132:2,4,5,18 140:9 147:13 149:13,17,20,21 150:13 162:1,5,8,16 164:10 168:1 172:20,23 174:19 220:16 221:17,19 221:21 222:3 225:9 225:21 229:20 240:9,11,12 244:21 251:24 252:4 254:5 254:11,19 255:8,20 256:11,24 257:6,12 259:3,5 261:9

**Z**

**Zach**
64:23,23 65:6,18 82:11,12,15,17 94:12 97:6 99:10

**0**

**084-003819**
2:13 262:21

**1**

**1**
61:15,16 62:17 91:23 160:18
**1,958**
127:24 128:6
**1.7**
203:1
**1:22-cv-7020**
1:6 4:6
**1:52**
162:15
**10**
18:22,23 19:1 24:23 26:14,14 29:10 126:19 159:18 188:19 203:22 244:22,24
**10-hour**
190:21
**10/13/1976**
21:4
**10:15**
60:15
**10:31**
60:17
**100**
142:24 165:15 236:11 238:4
**103**
3:11
**1050**
1:16 2:9 262:5
**107**
3:11
**109**
3:12
**10th**
158:12,16 160:9
**11**
94:2
**11:00**
231:21
**11:12**
91:2
**11:19**
91:5
**110**
3:12
**11th**
106:11,19 158:12,13
**12**
72:24 109:18 110:18 110:23 116:15 123:9,13,23 188:5 203:19
**12's**
190:16
**12-hour**
86:18,20 190:20
**12-month**
56:21
**12:00**
231:21
**12:55**
162:12
**126**
3:13
**129**
3:13
**12th**
158:12,13
**13**
110:12 112:19 113:12
**13th**
158:13
**14**
91:23 104:11 202:8
**147**
3:14
**14th**
56:18 105:16 147:19 148:6,21 149:6,23 158:16 160:9
**15**
148:11
**150**
3:14
**15th**
149:2 262:18
**16**
229:24
**1635**
262:22
**16th**
183:13
**17**
21:2
**17th**
144:15 145:4 147:3,8 152:19,20 153:2,10 154:18 155:15 156:10 158:8,24 159:15 160:1,10,14 161:5
**18**
116:14,17,22 133:4,4 196:20
**18th**
56:15 133:11 134:20 134:23 177:6,10,13 197:2,20
**19**
251:6
**19103**
262:23
**1st**
71:23 143:21 144:24 153:7 159:22 161:13,16,17 210:14,15

**2**

**2**
128:21 151:3,3 155:11 160:18 162:11 201:9 255:10
**2/2**
148:3
**20**
30:2 62:23 67:22,24 91:24 109:21 112:19 113:11 186:15 210:2,5,8 224:13
**2000**
241:22
**2015**
25:6,7,9,19
**2016**
25:7,9,19
**2017**
22:14
**2018**
62:23,24 63:2,16,17 65:11 84:12,13 85:3 86:5 91:23,23,23,23 91:24 92:2,3,5 94:2 94:2 104:7,10,11 106:12 112:19 113:11 168:10 189:17
**2019**
108:5 109:1,18,21 110:12 112:20 113:12
**2020**
65:3,3,11,13,20,20 66:3 127:20 189:7 241:15
**2021**
14:17,20 16:11 37:7 42:8 46:24 47:2,7,9 53:21 65:1,19,20,24 66:3 67:20 71:5,24 78:13 80:15,15 86:11,13 87:2,3,5,5 87:9,9,14,22 88:1,6 88:13 89:24 90:2 114:2,9,16 115:4,13 115:15 116:14 119:8,14 120:3 121:2 122:9,12

125:21 127:19,20 129:16 132:6,9,21 133:4 134:10 138:9 139:5 148:3,6,12,12 149:3 151:3,3 155:11 156:3 159:16,18 161:4 163:18,20 170:5 178:15 180:10 188:24 189:7,10,11 189:12,12 190:2,5,7 193:23,24 196:20 196:20 202:8 204:24 224:9 230:12 232:12 233:1,24 234:4,5,11 234:11,13,16 235:2 235:18,18,22,23 236:2,15 237:7,9,24 238:6,16 239:14 240:13 241:10,19 245:6,17 247:7,9,9 247:24 248:1,3,3,13 248:19,23 249:13 249:16 252:3 255:9 255:13,17 259:24
**2022**
72:3,3 75:8 78:17,19 78:24 79:8 88:18,21 88:22 166:3,17,19 167:6 224:3,6,9,20 224:23 225:10 229:24,24 234:24 235:20 248:5 249:2 250:2
**2023**
1:18 4:6 79:10 240:17 253:24 255:10 262:6,19
**21**
180:20 189:21 196:21 235:21 244:20 245:18,20
**218-0882**
2:4
**224**
2:4
**24**
72:24 94:2 95:16
**25**
20:24 128:1 187:9,10 187:11,24
**255**
3:4
**259**
3:5
**25th**
224:13
**26**
91:23 113:15,21 129:16 132:6,9,21 134:10 138:9 139:5 161:4 170:5 178:15 180:13
**26th**
133:12 135:8
**27**
114:4
**27th**
183:11
**29**
1:17 4:6 91:23
**29th**
99:17 262:6
**2nd**
71:4 143:18,24 144:1 144:15 145:4,7 147:2,8,19 148:5,21 149:6,23 151:7,10 152:18 153:1,10,19 153:19 154:17 155:15 156:10,13 157:21 158:9 159:2 159:23,24 161:5,11 161:15,15,15,17 240:17 253:21

**3**

**3**
52:18 104:7,10 106:11 160:18 162:14 171:16 172:10 175:21 178:3 221:22
**3.17**
202:8,9,10,22,23
**3.7**
203:1
**3:12**
221:23
**3:26**
222:2
**3:30**
84:8
**30**
87:12 128:17
**300**
1:16 2:9 4:8 173:10 175:18 262:4
**35**
202:21 203:10
**36**
87:12 191:12 210:1 241:24
**3600**
242:1,2
**3rd**
105:16 106:24 144:2 159:3

**4**

**4**
60:3 92:2 113:22 126:19 160:18 175:21 220:20 222:1
**4:10**
254:7
**4:15**
254:10
**4:26**
261:13
**4:30**
80:24 81:4,17,18,21 81:23 82:2 83:12,18 84:2,4,5,6,16,17,18 84:20,21 85:7,12,13 85:17,23,24 86:16 96:13 126:16 128:12 187:15 188:6,15 189:16 190:10
**40**
26:16 123:7,9,10,11 200:3 201:8,9 230:18,19,23 231:2 232:17 233:4,11,12 233:19 234:1,9,10 234:16,17,23 247:15
**400**
50:14 53:12 121:22 167:21 171:16 172:10 173:11 178:3
**400-hundred-some**
52:19
**400-something**
46:2
**42**
128:22 187:22 188:1 189:1,4,7 201:9
**470**
133:15,19
**480**
56:20 72:6 116:14,17 117:6,9,10,13,19 121:22 122:19,23 123:15 133:9,22 134:21 135:12,14 136:2,3 137:10,13 138:7,11,24 139:13 139:24 169:24 177:7,16 200:16 216:23 217:12 218:4,8,24 219:3,5 219:6,8 220:4,7,19 221:2,5

**5**

**5**
3:4 83:13,22 137:12 160:18 231:4
**5:00**

80:17,19,20,21,22 81:12 84:8,14,17,18 84:18,20,20,21 85:22,23,23,24 127:2,9,22 128:13 128:17

**5:00-ish**
83:7

**5:30**
84:18

**500**
134:6 135:21 136:24 137:1,2,3,10,10,11 137:18,18,19,20,22 168:16,17,20,21 169:1 235:16,19,24 236:18,24 237:13 237:16

**540**
117:13 134:9,17 140:2 169:21 181:5 181:18 182:6

**56**
3:8

**58**
3:8

**59**
3:9

**5th**
158:9 253:24

**6**

**6**
81:13 84:2 92:5 108:5 109:1 112:20 112:24

**6-hour**
86:18,20

**6.5**
92:7 93:5 110:2

**6:00**
80:16,16,17,18,18,19 80:20,21,22,24 81:4 81:10,13,13,16,18 81:20,20,22,24 82:2 82:3,6,6 83:4,4,18 84:2,3,3,4,6,6,6,14 84:16,16,17 85:7,12 85:13,22,23 86:9,9 86:15 95:3 96:13 126:16 127:1,1,1,9 127:22 128:12,16 187:14,14,15 188:6 188:9,9,15,15,15 189:15,15,15,16,16 189:18,18,22,22 190:9,9,10,10,10 231:19

**60**
190:15

**60-some**
200:2

**600**
2:3

**60062**
2:4

**60435**
20:8

**6044**
181:14

**6044@yahoo.com**
180:6

**60606**
2:9

**624-6221**
1:22 262:23

**65**
187:11,11 191:4,9 210:1

**661-4710**
2:10

**7**

**7**
61:15,16 62:17 95:16 148:12 149:3 231:3 231:4,9,23 233:20

**7.5**
93:22

**707**
2:3

**72**
3:9

**773**
2:10

**7th**
159:3 227:22

**8**

**8**
26:15 114:1,9,16 115:4 159:18 231:3 231:4,9,23 233:20

**8-hour**
26:12

**8:50**
156:3

**866**
1:22 262:23

**8th**
145:8 158:7,11,24 159:15,23,24 160:1 160:9,13 227:22 262:22

**9**

**9**
92:2 156:3

**9:06**
1:18 4:7 262:5

**90**
83:17 85:11,16

**90-day**
81:3 83:11

**900**
237:5,6,13,14

**906**
20:7

**91**
3:10

**93**
3:10

**9th**
151:21 153:16 156:11,12 158:12 160:9